IN THE

UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

NO. 13-31201

---

PATRICK KENNEDY,

Petitioner-Appellee Cross-Appellant

VERSUS

BURL CAIN, WARDEN,

Respondent-Appellant Cross-Appellee

---

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF LOUISIANA, NO. 2:11-CV-922,
THE HONORABLE HELEN G. BERRIGAN, JUDGE.

---

RECORD EXCERPTS FILED ON BEHALF OF RESPONDENT- APPELLANT

---

PAUL D. CONNICK, JR.
DISTRICT ATTORNEY
24TH JUDICIAL DISTRICT
PARISH OF JEFFERSON
STATE OF LOUISIANA

JULIET L. CLARK
TERRY M. BOUDREAUX
ASSISTANT DISTRICT ATTORNEYS
DISTRICT ATTORNEY'S OFFICE
200 DERBIGNY STREET
GRETNA, LOUISIANA  70053
(504) 368-1020

# TABLE OF CONTENTS

**Tab**                                                                                                                          **Record Citation**

1.    Docket Sheet . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ROA.625

2.    Notice of Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ROA.584

3.    Bill of Indictment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . St.Ct.Rec. Vol. 1, p. 83

4.    Minute Entry of Jury Verdict . . . . . . . . . . . . . . . . . . . . . . . . St.Ct.Rec. Vol. 1, pp. 79-80

5.    Judgment of the United States District Court (10/16/13) . . . . . . . . . . . . . . . . . ROA.583

6.    Order and Reasons of the United States District Court (10/15/13) . . . . . . . . . . . ROA.575

7.    Report and Recommendation of the United States Magistrate (9/19/12) . . . . . . ROA.289

8.    Notice of Cross Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ROA.643

9.    Denial of Certificate of Appealability (as to Cross Appeal) . . . . . . . . . . . . . . . ROA.658

10.   Opinion of the Louisiana Fifth Circuit Court of Appeal (6/26/02) . . . . St.Ct.Rec. Vol. 41

Certificate of Service

APPEAL,CLOSED,FR/R,STAYED

# U. S. District Court
# Eastern District of Louisiana (New Orleans)
# CIVIL DOCKET FOR CASE #: 2:11-cv-00922-HGB
# Internal Use Only

Kennedy v. Cain
Assigned to: Judge Helen G. Berrigan
Case in other court:  24th JDC Jefferson Parish, 00-00000
                 USCA, 5th Circuit, 13-31201
Cause: 28:2254 Petition for Writ of Habeas Corpus (State)

Date Filed: 04/19/2011
Date Terminated: 10/16/2013
Jury Demand: None
Nature of Suit: 530 Habeas Corpus (General)
Jurisdiction: Federal Question

**Plaintiff**

**Patrick Kennedy**

represented by **G. Benjamin Cohen**
Capital Appeals Project
636 Baronne St.
New Orleans, LA 70113
504-322-4690
Email: benc@thejusticecenter.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cecelia M. Trenticosta**
Capital Appeals Project
636 Baronne St.
New Orleans, LA 70113
504-529-5955
Email: ceceliat@thejusticecenter.org
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**N. Burl Cain**

represented by **Juliet L. Clark**
District Attorney's Office
Parish of Jefferson
200 Derbigny
Gretna, LA 70053
504-368-1020
Email: jclark@jpda.us
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Respondent**

**Attorney General State of Louisiana**

Email to Active Attorneys' Primary Addresses
Email to All Attorneys' Primary Addresses



Email to Casewide NEF Recipients

| Date Filed | # | Docket Text |
|---|---|---|
| 04/19/2011 | 1 | PETITION for Writ of Habeas Corpus (28:2254) (Filing fee $ 5 receipt number 053L-2967391) filed by Patrick Kennedy. (Attachments: # 1 Civil Cover Sheet)(Trenticosta, Cecelia) (Entered: 04/19/2011) |
| 04/21/2011 | 2 | Initial Case Assignment to Judge Helen G. Berrigan and Magistrate Judge Louis Moore, Jr. (cl, ) (Entered: 04/21/2011) |
| 04/22/2011 | 3 | Habeas Corpus Response Order that Attorney General for the State of Louisiana and the District Attorney for Jefferson Parish respond to the petition of Habeas Corpus within 90 days. Signed by Magistrate Judge Louis Moore, Jr on 4/21/2011.(jdh, ) (Entered: 04/22/2011) |
| 04/22/2011 | 4 | Certified Mail Receipts of habeas response order to Attorney General, District Attorney & Clerk of Jefferson Parish. (gbw, ) (Entered: 04/25/2011) |
| 04/28/2011 | 5 | Return of Service of H/C Response order served on Jefferson Parish District Attorney on 4/25/11.(plh, ) (Entered: 04/29/2011) |
| 04/28/2011 | 6 | Return of Service of H/C Response order served on Clerk 24th JDC Jefferson Parish on 4/25/11.(plh, ) (Entered: 04/29/2011) |
| 04/28/2011 | 7 | Return of Service of H/C Response order served on La Attorney General on 4/25/11.(plh, ) (Entered: 04/29/2011) |
| 07/19/2011 | 8 | EXPARTE/CONSENT MOTION for Extension of Time to Answer re 1 Petition for Writ of Habeas Corpus (28:2254) by Burl Cain. Motion(s) referred to Louis Moore, Jr. (Attachments: # 1 Proposed Order)(Clark, Juliet) (Entered: 07/19/2011) |
| 07/25/2011 | 9 | ORDER granting 8 Motion for Extension of Time to Respond re 1 Petition for Writ of Habeas Corpus (28:2254) as to Burl Cain; Response due 8/10/2011. Signed by Magistrate Judge Louis Moore, Jr on 7/25/2011. (gbw, ) (Entered: 07/25/2011) |
| 08/09/2011 | 10 | EXPARTE/CONSENT Second MOTION for Extension of Time to Answer re 1 Petition for Writ of Habeas Corpus (28:2254) by Burl Cain. Motion(s) referred to Louis Moore, Jr. (Attachments: # 1 Proposed Order)(Clark, Juliet) (Entered: 08/09/2011) |
| 08/10/2011 | 11 | ORDER granting 10 Motion for Extension of Time to Answer re 1 Petition for Writ of Habeas Corpus (28:2254) as to Burl Cain; Response due 8/25/2011.. Signed by Magistrate Judge Louis Moore, Jr on 8/10/2011. (gbw, ) (Entered: 08/10/2011) |
| 08/25/2011 | 12 | EXPARTE/CONSENT Third MOTION for Extension of Time to Answer re 1 Petition for Writ of Habeas Corpus (28:2254) by Burl Cain. Motion(s) referred to Louis Moore, Jr. (Attachments: # 1 Proposed Order)(Clark, Juliet) (Entered: 08/25/2011) |
| 08/29/2011 | 13 | ORDER granting 12 Motion for Extension of Time to Answer re 1 Petition for Writ of Habeas Corpus (28:2254) as to Burl Cain; Response due 9/2/2011.. Signed by Magistrate Judge Louis Moore, Jr on 8/29/2011. (gbw, ) (Entered: 08/29/2011) |
| 09/02/2011 | 14 | EXPARTE/CONSENT Fourth MOTION for Extension of Time to Answer re 1 Petition for Writ of Habeas Corpus (28:2254) by Burl Cain. Motion(s) referred to Louis Moore, Jr. (Attachments: # 1 Proposed Order)(Clark, Juliet) (Entered: 09/02/2011) |
| 09/02/2011 | 15 | ORDER granting 14 Fourth MOTION for Extension of Time to Answer re 1 Petition for Writ of Habeas Corpus (28:2254) as to Burl Cain; Response due 9/6/2011.. Signed |

| | | by Magistrate Judge Louis Moore, Jr on 9/2/2011. (gbw, ) (Entered: 09/02/2011) |
|---|---|---|
| 09/06/2011 | 16 | RESPONSE to 1 Petition for Writ of Habeas Corpus (28:2254) by Burl Cain.(Clark, Juliet) Modified text/filer on 9/8/2011 (mm, ). (Entered: 09/06/2011) |
| 09/20/2011 | 17 | EXPARTE/CONSENT MOTION for Leave to File *Reply* by Patrick Kennedy. Motion(s) referred to Louis Moore, Jr. (Attachments: # 1 Proposed Order)(Trenticosta, Cecelia) (Entered: 09/20/2011) |
| 09/21/2011 | 18 | ORDER granting 17 Motion for Extension of Time to File a Reply; Reply due 10/1/2011. Signed by Magistrate Judge Louis Moore, Jr on 9/20/2011. (gbw, ) (Entered: 09/21/2011) |
| 09/29/2011 | 19 | Response/Reply by Patrick Kennedy to 16 Response to Habeas Petition (Trenticosta, Cecelia) (Entered: 09/29/2011) |
| 09/29/2011 | 20 | MOTION for Hearing by Patrick Kennedy. Motion(s) referred to Louis Moore, Jr. Motion set for 11/16/2011 11:00 AM before Magistrate Judge Louis Moore Jr.. (Attachments: # 1 Memorandum in Support, # 2 Notice of Submission)(Trenticosta, Cecelia) (Entered: 09/29/2011) |
| 10/06/2011 | 21 | ORDER denying 20 Motion for an Evidentiary Hearing. Signed by Magistrate Judge Louis Moore, Jr on 10/6/2011. (gbw, ) (Entered: 10/06/2011) |
| 10/20/2011 | 22 | OBJECTIONS by Patrick Kennedy re 21 Order on Motion for Hearing (Trenticosta, Cecelia) (NEF: Mag Moore) Modified on 10/21/2011 (plh, ). (Entered: 10/20/2011) |
| 12/23/2011 | 23 | ORDERED that the 22 Objections filed by Patrick Kennedy, is DISMISSED without prejudice as premature. This matter has been referred to the Magistrate Judge motion for Report and Recommendation. Any objections to his rulings can be raised when his Report and Recommendation is issued, if appropriate. Signed by Judge Helen G. Berrigan on 12/23/2011.(blg) (Entered: 12/27/2011) |
| 06/06/2012 | 24 | ORDER REASSIGNING CASE. Case reassigned to Magistrate Judge Joseph C. Wilkinson, Jr for all further proceedings. Magistrate Judge Louis Moore, Jr no longer assigned to case. Signed by Chief Judge Sarah S. Vance. (car, ) (Entered: 06/06/2012) |
| 09/19/2012 | 25 | REPORT AND RECOMMENDATIONS: It is RECOMMENDED that the petition of Patrick Kennedy for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be DENIED and DISMISSED WITH PREJUDICE. Objections to R&R due by 10/3/2012. Signed by Magistrate Judge Joseph C. Wilkinson, Jr on 9/19/12.(tbl) (Entered: 09/19/2012) |
| 10/03/2012 | 26 | OBJECTION to 25 Report and Recommendations by Patrick Kennedy (Attachments: # 1 Request for Oral Argument)(Trenticosta, Cecelia) Request For Oral Argument Docketed Separately. Modified on 10/4/2012 (caa, ). (Entered: 10/03/2012) |
| 10/03/2012 | 28 | Request/Statement of Oral Argument by Patrick Kennedy regarding 26 Objection to Report and Recommendations (caa, ) (Entered: 10/04/2012) |
| 10/04/2012 | 27 | Correction of Docket Entry by Clerk re 26 Objection to Report and Recommendations. Filing attorney attached a Request/Statement for Oral Argument to this objection instead of filing it as a separate entry. Clerk took corrective action by separating the request and docketing it as a separate entry. All future requests for oral argument must be filed separately.(caa, ) (Entered: 10/04/2012) |
| 10/16/2012 | 29 | Correction of Docket Entry by Clerk re 26 Objection to Report and Recommendations; **Filing attorney should have attached a Notice of Submission to the Objection if a |

| | | |
|---|---|---|
| | | hearing is requested. Since a Notice was not attached, if the attorney wants a Hearing to held on the Objection, a Motion for Hearing must be filed.** (plh, ) (Entered: 10/16/2012) |
| 10/16/2012 | 30 | EXPARTE/CONSENT MOTION for Hearing re 26 Objection to Report and Recommendations, 28 Response/Reply by Patrick Kennedy. (Attachments: # 1 Memorandum in Support, # 2 Proposed Order)(Trenticosta, Cecelia) (Attachment 2 replaced on 10/16/2012) (plh, ). (Entered: 10/16/2012) |
| 10/18/2012 | 31 | ORDER denying 30 Motion for Hearing. Signed by Judge Helen G. Berrigan on 10/18/12. (plh, ) (Entered: 10/18/2012) |
| 02/28/2013 | 32 | EXPARTE/CONSENT MOTION for Leave to File *Supplement to Objections to Report and Recommendations* by Patrick Kennedy. (Attachments: # 1 Proposed Order, # 2 Supplement Supplemental Memorandum in Support of Objections to Report and Recommendations, # 3 Supplement Woodfox v. Cain (Feb. 26, 2013))(Trenticosta, Cecelia) (Entered: 02/28/2013) |
| 03/01/2013 | 33 | ORDER granting 32 Motion for Leave to File supplement to Objections to the Report and Recommendations. Signed by Judge Helen G. Berrigan on 03/01/2013. (kac, ) (Entered: 03/01/2013) |
| 03/01/2013 | 34 | Supplemental Memorandum filed by Patrick Kennedy in Support of 26 Objections to Report and Recommendations. (Attachments: # 1 Exhibit)(kac, ) (Entered: 03/01/2013) |
| 03/04/2013 | 35 | ORDER that by March 18, 2013, the respondent shall file a response to the petitioners objections to the magistrate judges report and recommendation and the petitioners supplemental memorandum. Signed by Judge Helen G. Berrigan on 3/4/13.(plh, ) (Entered: 03/04/2013) |
| 03/19/2013 | 36 | RESPONSE filed by Burl Cain re 26 OBJECTION to 25 Report and Recommendations, 34 Supplemental Memorandum in Support of 26 Objections to Report and Recommendations *pursuant to Order of March 4, 2013*. (Clark, Juliet) Modified text and link on 3/20/2013 (plh, ). (Entered: 03/19/2013) |
| 03/20/2013 | 37 | Correction of Docket Entry by Clerk re 36 Memorandum; **Clerk modified text to link to documents 26 and 34.** (plh, ) (Entered: 03/20/2013) |
| 03/20/2013 | 38 | EXPARTE/CONSENT MOTION for Leave to File *Reply to Response to Objections and Supplemental Memorandum* by Patrick Kennedy. (Attachments: # 1 Proposed Order, # 2 Proposed Pleading)(Trenticosta, Cecelia) (Entered: 03/20/2013) |
| 03/20/2013 | 39 | ORDER granting 38 Motion for Leave to File Reply to the State's Response in Opposition to Petitioner's Objections to the Magistrate Judge's Report and Recommendation and the Petitioner's Supplemental Memorandum. Signed by Judge Helen G. Berrigan on 03/20/2013. (kac, ) (Entered: 03/20/2013) |
| 03/20/2013 | 40 | Reply to State's Response in Opposition to Petitioner's Objections and Supplemental Memorandum re 25 Report and Recommendations by Patrick Kennedy (kac, ) (Entered: 03/20/2013) |
| 10/15/2013 | 41 | ORDER ADOPTING REPORT AND RECOMMENDATIONS 25 . ORDERED that the Report and Recommendation of the United States Magistrate Judge is APPROVED as to the petitioners first claim regarding race and regarding gender on all but one ground and APPROVED as to the second, third, fourth, fifth, sixth, seventh, eighth, ninth, tenth and eleventh claims; the Court ADOPTS the Report and Recommendation regarding those claims as it opinion and those claims are DISMISSED. FURTHER |

| | | |
|---|---|---|
| | | ORDERED that the petitioners objections to the Report andRecommendation as it pertains to the defenses establishment of a prima facie showing and an equal protection violation with regard to gender discrimination in the selection of grand jury forepersons is SUSTAINED and the petition is GRANTED. FURTHER ORDERED that the state either reindict the defendant within 180days or release the defendant. The state shall notify the defense and the Court of its intention within 60 days. Signed by Judge Helen G. Berrigan on 10/15/13.(plh, ) (Entered: 10/15/2013) |
| 10/16/2013 | 42 | JUDGMENT - ORDERED that the state either reindict the petitioner within 180 days of this judgment or release the petitioner. The state shall notify the petitioner and this Court of its intention within 60 days. Signed by Judge Helen G. Berrigan on 10/16/2013.(kac, ) (Entered: 10/16/2013) |
| 11/13/2013 | 43 | NOTICE OF APPEAL by N. Burl Cain as to 41 Order Adopting Report and Recommendations,,,, 42 Judgment,. (Credit Card not accepted or unavailable - payment of filing fee due within 2 business days) (Clark, Juliet) (Entered: 11/13/2013) |
| 11/14/2013 | | Filing fee received from N. Burl Cain: $ 455 (cl, ) (Entered: 11/15/2013) |
| 11/15/2013 | 44 | APPEAL TRANSCRIPT REQUEST by N. Burl Cain re 43 Notice of Appeal. Transcript already on file in Clerk's office. (Clark, Juliet) Modified on 11/18/2013 (plh, ). (Entered: 11/15/2013) |
| 11/18/2013 | 45 | **DEFICIENT** MOTION to Stay re 41 Order Adopting Report and Recommendations,,,, 42 Judgment, by N. Burl Cain. Motion set for 12/4/2013 09:30 AM before Judge Helen G. Berrigan. (Attachments: # 1 Memorandum in Support, # 2 Proposed Order)(Clark, Juliet) Modified on 11/19/2013 (plh, ). (Entered: 11/18/2013) |
| 11/19/2013 | | NOTICE OF DEFICIENT DOCUMENT: re 45 Motion to Stay. **Reason(s) of deficiency: Notice of Submission not provided.** For corrective information, see section(s) D12 on http://www.laed.uscourts.gov/cmecf/Deficiency/deficiency.htm **Attention: Document must be refiled in its entirety within seven(7) calendar days; otherwise, it may be stricken by the court without further notice. Deficiency remedy due by 11/26/2013.** (plh, ) (Entered: 11/19/2013) |
| 11/20/2013 | 47 | MOTION to Stay re 41 Order Adopting Report and Recommendations,,,, 42 Judgment, by N. Burl Cain. Motion set for 12/4/2013 09:30 AM before Judge Helen G. Berrigan. (Attachments: # 1 Memorandum in Support, # 2 Proposed Order, # 3 Notice of Submission)(Clark, Juliet) (Entered: 11/20/2013) |
| 11/21/2013 | 48 | ORDERED that the motion noticed for submission/hearing on 12/04/2013 will be considered on the briefs re 47 MOTION to Stay re 41 Order Adopting Report and Recommendations, 42 Judgment. Any oppositions shall be filed by 11/26/2013. Signed by Judge Helen G. Berrigan on 11/21/2013.(kac, ) (Entered: 11/21/2013) |
| 11/25/2013 | 49 (p.631) | RESPONSE/MEMORANDUM in Opposition filed by Patrick Kennedy re 47 MOTION to Stay re 41 Order Adopting Report and Recommendations,,,, 42 Judgment, . (Trenticosta, Cecelia) (Entered: 11/25/2013) |
| 11/25/2013 | 50 (p.643) | NOTICE OF CROSS APPEAL by Patrick Kennedy as to 42 Judgment. (Credit Card not accepted or unavailable - payment of filing fee due within 2 business days) (Trenticosta, Cecelia) Modified link/text on 11/26/2013 (plh, ). (Entered: 11/25/2013) |
| 11/26/2013 | 51 | USCA Appeal Fee paid as to Patrick Kennedy (Filing fee $ 455 receipt number 053L-4244533) re 50 (p.643) Notice of Cross Appeal filed by Patrick Kennedy (Trenticosta, Cecelia) (Entered: 11/26/2013) |

| 11/26/2013 | 52 | Correction of Docket Entry by Clerk re 50 (p.643) Notice of Cross Appeal; **Filing attorney incorrectly linked document to document 41. Clerk properly linked document to document 42.** (plh, ) (Entered: 11/26/2013) |
|---|---|---|
| 12/11/2013 | 53 (p.645) | EXPARTE/CONSENT MOTION for Leave to Appeal in forma pauperis by Patrick Kennedy. (Attachments: # 1 Exhibit, # 2 Exhibit)(Trenticosta, Cecelia) (Additional attachment(s) added on 12/12/2013: # 3 Proposed Order) (plh, ). Modified event on 12/12/2013 (plh, ). (Entered: 12/11/2013) |
| 12/12/2013 | 54 | Correction of Docket Entry by Clerk re 53 (p.645) MOTION for Leave to Proceed in forma pauperis; **Filing attorney selected incorrect event. Correct event is MOTION for Leave to Appeal in forma pauperis. Clerk took corrective action.; Filing attorney did not include a proposed order. Proposed Order subsequently provided to Clerk and has now been attached to the motion.** (plh, ) (Entered: 12/12/2013) |
| 12/19/2013 | 55 (p.650) | Response/Reply by N. Burl Cain to 42 Order (plh, ) (Entered: 12/19/2013) |
| 12/20/2013 | 56 (p.651) | ORDER AND REASONS granting 47 Motion for Stay of order granting habeas corpus relief. Signed by Judge Helen G. Berrigan on 12/19/2013. (kac, ) (Entered: 12/20/2013) |
| 01/03/2014 | 57 (p.657) | ORDER granting 53 (p.645) Motion for Leave to Appeal in forma pauperis. Signed by Judge Helen G. Berrigan on 1/2/2014. (my, ) (Entered: 01/03/2014) |
| 02/18/2014 | 58 (p.658) | Certificate of Appealability Denied by USDC. Signed by Judge Helen G. Berrigan on 02/18/2014.(kac, ) (Entered: 02/18/2014) |

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

PATRICK KENNEDY                **CIVIL ACTION**

VERSUS                        **NO. 11-922**

BURL CAIN, WARDEN          **SECTION "C" (2)**

## NOTICE OF APPEAL

Notice is hereby given that Burl Cain, Warden, the respondent in the above-named case, hereby appeals to the United States Court of Appeals for the Fifth Circuit from the *Judgment* entered in this action on October 16, 2013, which granted the writ of habeas corpus in accordance with the *Order and Reasons* entered on October 15, 2013.

Respectfully submitted,

/s/ Juliet L. Clark
JULIET L. CLARK # 23451
TERRY M. BOUDREAUX # 3306
ASSISTANT DISTRICT ATTORNEYS
200 DERBIGNY STREET
GRETNA, LOUISIANA 70053
(504) 368-1020



EXHIBIT
2

13-31201.584

## CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2013, I electronically filed the foregoing with the Clerk

of Court by using the CM/ECF system, which will send a notice of electronic filing to the following:

> G. Benjamin Cohen
> Cecilia Trenticosta
> 636 Baronne Street
> New Orleans, Louisiana 70113
> *Attorneys for Patrick Kennedy*


/s/ Juliet Clark_____
JULIET L. CLARK # 23451

2

# Twenty-Fourth Judicial District Court of Louisiana

| THE STATE OF LOUISIANA | | |
| --- | --- | --- |
| | SS. | Parish of Jefferson |
| Twenty-Fourth Judicial District | | Twenty-Fourth Judicial District Court |

The Grand Jurors of the State of Louisiana, duly empaneled and sworn, in and for the body of the Parish of JEFFERSON, in the name and by the authority of the said State, upon their Oath, present:  That one

PATRICK KENNEDY, b/m 12/13/64

late of the Parish of JEFFERSON, on or about the ___2nd___ day of ___March___ in the year of our Lord, One Thousand Nine Hundred and ___Ninety-Eight (1998)___ with force and arms, in the Parish of JEFFERSON aforesaid, and within the jurisdiction of the Twenty-Fourth Judicial District Court of Louisiana, in and for the Parish of JEFFERSON aforesaid, then and there being violated  R. S. 14:42 in that he did commit aggravated rape upon a female juvenile under the age of 12 years,

contrary to the form of the Statute of the State of Louisiana, in such case made and provided, and against the peace and dignity of the State.

Asst.    District Attorney of the Twenty-Fourth Judicial District

ITEM #  C-1086-98
     Class I



EXHIBIT

3

**Witnesses for the State:**    No. _____ 9?:14a?

## The State of Louisiana
### VS.

PATRICK KENNEDY (JPCC)

---

### INDICTMENT FOR

AGGRAVATED RAPE

R. S. 14:42

---

A T RUE BILL
May 7, 1998

_____
Foreperson of the Grand Jury,

Parish of Jefferson

Day 14

# 24th Judicial District Court
# Parish of Jefferson - State of Louisiana

State of Louisiana
Versus
**PATRICK KENNEDY**
Judge:   Ross P. LaDart
ADA:    Vincent Paciera, Jr., Donald A. Rowan, Jr.

Case Number:     98-1425
Division:            O
Complaint:        C108698
Date:               08/25/2003
Court Reporter:   Don Theriot

The Defendant, PATRICK O'NEAL KENNEDY, appeared before the bar of the Court this day,  at 09:05 AM August 25, 2003, for the Court to take up the open jury trial of matter  9801425, entitled State of Louisiana (vs) PATRICK KENNEDY, for the charge:
    RAPE/AGGRAVATED - VICTIM UNDER 12 (14:42)

Present were:
    PATRICK  O'NEAL KENNEDY - Defendant
    MARK J. ARMATO - Counsel for the defendant
    GRAHAM DAPONTE - Co-counsel for the defendant
    Vincent Paciera, Jr. - Assistant District Attorney for the State of Louisiana
    Donald A. Rowan, Jr. - Assistant District Attorney for the State of Louisiana

The Defendant is in Jefferson Parish Prison.

Polling waived, jurors present:
    Amber Hezeau
    Sallie Uhl
    Angelo Vo
    Gilda Wise
    Kim Doucet
    Brenda Dufrene
    Bernice Augustus
    Kevin Servat
    Deonne Hanley
    Samantha Harris
    Jamie Dubois
    Amy Cavallo
    Wayne Murry - Alternate juror
    Leo Broders - Alternate juror

Defense witnesses:
    Col. Walter Gorman
    Milton Dureau
    Richard Rodrigue
    Sgt. Kelly Jones
    Kim Parnell
    Ronald Montgomery
    Chatherine Holmes
    Robert Tucker

State evidence:
    J 5 - Connecticut Lab Report of 6/23/98

Defense evidence:
    J 5 - Connecticut Lab Report of 6/23/98
    D 9 - Connecticut Lab Report of 7/22/98
    D 10 - Connecticut Lab Report of 6/23/98
    D 11 - Memo from Col. Gorman of 4/24/98
    D 12 - Letter from Milton Dureau to Dr. Lee of 5/14/98
    D 13 - Photo  bicycle
    D 14 - Photo  bicycle
    D 15 - Photo  bicycle
    D 16 - Photo  grip on bicycle

Both sides stipulated that Juvenile Court of Jeff_____ _____ _____ 22, 1998 return L▇
H▇▇▇▇ to the lawful custody of her mothe▇

Entry:

EXHIBIT
4

Trial

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

PATRICK KENNEDY                          CIVIL ACTION

VERSUS                                   NO. 11-0922

BURL CAIN, WARDEN                        SECTION: "C" 2


### J U D G M E N T

In accordance with the Court's order and reasons filed October 15, 2013,

**IT IS ORDERED, ADJUDGED AND DECREED** that the petitioner's first claim

regarding race and regarding gender on all but one ground and the second, third, fourth, fifth,

sixth, seventh, eighth, ninth, tenth and eleventh claims are **DISMISSED**.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the petitioner's

objections to the Report and Recommendation as it pertains to the defense's establishment of

prima facie showing and an equal protection violation with regard to gender discrimination in

the selection of grand jury forepersons is SUSTAINED and the petition for writ of habeas

corpus pursuant to Title 28 U.S.C. § 2254 is hereby **GRANTED**.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the conviction

and sentence of Patrick Kennedy are hereby SET ASIDE.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that the state either

reindict the petitioner within 180 days of this judgment or release the petitioner.  The state

shall notify the petitioner and this Court of its intention within 60 days.

New Orleans, Louisiana, this 16th day of October 2013.


HELEN G. BERRIGAN
UNITED STATES DISTRICT JUDGE



EXHIBIT
5
PENGAD 800-631-6989

13-31201.583

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

PATRICK KENNEDY                          CIVIL ACTION

VERSUS                                   NO. 11-922

BURL CAIN                                SECTION "C" (2)

ORDER AND REASONS

This matter comes before the Court on Report and Recommendation issued by

the Magistrate Judge and the objections of the petitioner, Patrick Kennedy ("Kennedy"),

who is challenging his conviction for aggravated rape of a person under the age of

twelve, La. Rev. Stat. § 14:42, and attendant life sentence imposed on January 7, 2009.

Kennedy presents eleven grounds for relief: (1) race and gender discrimination in the

selection of grand jury forepersons; (2) trial by a death-qualified jury in a case in which

the death penalty was unconstitutional; (3) denial of due process based on the States'

alleged failure to timely provide certain evidence; (4) ineffective assistance of counsel;

(5) trial by elected, rather than appointed, judges;  (6) trial court error in denial of a

motion and providing of jury instructions; (7) trial court error in admitting gruesome

photographs into evidence; (8) prosecutorial misconduct; (9) trial court error in

admitting certain expert testimony; (10) exclusion of citizens from jury service based

upon prior pardoned convictions; and (11) cumulative error.  The Magistrate Judge

recommended denial of relief on all grounds, and the petitioner, who is represented by

counsel, timely filed objections, to which the State replied.



EXHIBIT

6

The Court has independently reviewed the petition, the record, the Report and Recommendation of the United States Magistrate Judge, the petitioner's objections thereto, and the law.  The Court approves the Report and Recommendation of the United States Magistrate Judge as to the petitioner's first claim regarding race and regarding gender on all but one ground, as well as the second, third, fourth, fifth, sixth, seventh, eighth, ninth, tenth and eleventh claims and adopts the Report and Recommendation as to those claims as it opinion.  Those claims are dismissed for the reasons set forth in the Report and Recommendation.   For the following reasons, the Court does find that relief is warranted on the petitioner's first claim pertaining to the petitioner's equal protection challenge regarding gender discrimination in the selection of the grand jury forepersons.

Kennedy was indicted in May 1998 and filed a motion to quash the indictment based on the allegedly discriminatory selection of grand jury forepersons in Jefferson Parish.  As stated by the Magistrate Judge and reflected in the record, the claim challenging the constitutionality of the denial presents a mixed question of law and fact.  The state trial court held a hearing in 2002 and determined that during a ten-year period from May 24, 1988, to September 10, 1998, nineteen grand juries were empaneled.  The nineteen grand jury forepersons selected consisted of ten white males, six white females, one black female and two black males, indicating that 36.8% of the forepersons

2

chosen were women.   The state trial court found that a *prima facie* case of purposeful

discrimination had been established by the defense, but that the State successfully

rebutted that showing with testimony of a judge and former assistant district attorney

who testified that he was involved in the grand jury foreperson selection process for 19

years and solicited volunteers for the position to be interviewed by the judge and, in so

doing, made positive efforts to include women.  The state trial court found no gender

discrimination in the process that selected grand jury forepersons.  "The Court is

persuaded after hearing all of the evidence, that the State of Louisiana has shown that

there, to the extent of the statistics in the methodology for selecting Grand Jury

Forepersons, that these criteria are permissible, racially and gender neutral."  *State v.*

*Kennedy*, 823 So.2d 411, 415 (La. App. 5th Cir. 2002).

On appeal, the Louisiana Fifth Circuit Court of Appeal found absolute disparity,

resulting from the comparison of the percentage of women in the general population

and the percentage of women chosen as grand jury forepersons, between 13.4% to

17.41% and comparative disparity, a number resulting from the division of  absolute

disparities by the population figure, between 26.7% and 32.12% for women.   The

Louisiana Fifth Circuit summarized the data as follows:

> Regarding women, it is noted that 36.8 % of the forepersons were women for
> the 10 year period.  The 1990 census figures show 51.95% women, for an absolute
> disparity of 15.15%, and a comparative disparity of 29.16%.  The 2000 census
> figures show 52% female, for an absolute disparity of 15.2%, and a comparative

13-31201.577

disparity of 28.23%. Considering the voter registration from 1990 to 2000, females represent 54.21%, an absolute disparity of 17.41% and a comparative disparity of 32.12%. Considering the number of women called randomly to serve in grand juries from 1988 until 1998, 50.2%, the absolute disparity is 13.4% and the comparative disparity is 26.7%.

*Kennedy*, 823 So.2d at 418-419.   Based on this data, the Louisiana Fifth Circuit concluded:

> When the degree of under representation of women is considered along with all the other factors such as the improvement in the selection process in the preceding 10 years rather than 19 years, the large size of the population segment and correlative small comparative disparity, and the fact that only 19 grand juries are considered, we cannot conclude that the defendant made a *prima facie* showing of purposeful discrimination in the selection of grand jury forepersons.

*Id.* at 420.   This opinion was affirmed by the Louisiana Supreme Court.   *State v. Kennedy*, 836 So.2d 43 (La. 2003).

In *Rose v. Mitchell*, 443 U.S. 545, 556 (1979), the Supreme Court "recognized that a criminal defendant's right to equal protection of the laws has been denied when he is indicted by a grand jury from which members of a ... group purposefully have been excluded." In order to establish an equal protection violation in the grand jury foreperson selection process sufficient for habeas relief, a *prima facie* case of discrimination is established if the defendant shows: (1) the group is a recognizable, distinct class, singled out for different treatment; (2) the degree of underrepresentation is calculable by comparing the proportion of the group in the total population to those chosen as grand jury forepersons over a significant period of time; and (3) the selection

4

procedure is susceptible of abuse. *Rose v. Mitchell*, 443 U.S. 545, 565 (1979). There is no issue here that the first and third requirements were met. If a *prima facie* case is established, the burden shifts to the defendant to "dispel the inference of intentional discrimination." *Castaneda v. Partida*, 430 U.S. 482, 497–98 (1977).

Habeas relief under 28 U.S.C. § 2254 (d) is available only if the state court adjudication of a claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." The Court finds that the facts as articulated by the Louisiana Fifth Circuit mandates finding an equal protection violation by virtue of the United States Court of Appeals for the Fifth Circuit's own pronouncement of what it considers clearly established Federal law as determined by the Supreme Court.

Specifically, this Court is bound by its Fifth Circuit's announcement in *Mosley v. Dretke*, 370 F.3d 467, 479 (5th Cir. 2004) as to the defense showing on the second *Rose* prong pertaining to the degree of underrepresentation.

> It is true that the Supreme Court "has never announced mathematical standards for the demonstration of systematic exclusions of blacks." .... This Court has, however, recognized that absolute disparities of 19.7%, 14.7% and 13.5% are sufficient to satisfy this prong of the *Rose* test.

(citations omitted). This recognition by the Fifth Circuit that the Supreme Court finds

5

the cited percentages to be sufficient clearly establishes that an absolute disparity range

between 13.4% to 17.41% is prohibitive.[1]   The *Mosley* opinion was issued in 2004 prior

to the petitioner's resentencing, thereby providing a relevant measurement of the body

of Supreme Court precedent at the time Kennedy's conviction became final. *Wallace v.*

*Prince*, 2013 WL 5486862 at *17 (M.D.La.).   *Mosley* mandates a finding of discrimination

in the selection of grand jury forepersons here.

   This conclusion is also consistent with the Louisiana Supreme Court's own

decision in the only other equal protection gender challenge to the grand jury

forepersons in Jefferson Parish over the same time period.   *State v. Jacobs,* 823 So.2d 942

(La. 2002).  In *Jacobs*, the Louisiana Supreme Court remanded to the trial court to

conduct a full evidentiary hearing on the issue of discrimination in the selection of

grand jury forepersons in Jefferson Parish in the event the state elected not to reindict

the defendant.

   Because the state court adjudication on this issue is contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States according to the Fifth Circuit, that adjudication is

not subject to AEDPA deference.  This Court also finds that the rebuttal evidence

---

[1]The *Mosley*  court also noted that absolute disparity "is the only disparity used
by this Court to determine underrepresentation" when the target group is a sufficiently
large portion of the overall population.  *Mosley*, 370 F.3d at 479 n. 5.  The statistics for
Jefferson Parish indicate that women have a slim majority.

13-31201.580

presented to the state trial court is insufficient to rebut the *prima facie* case as a matter of law. Testimony was presented from someone whose role in the grand jury foreperson selection process consisted of "soliciting volunteers for the foreperson position" to be interviewed and chosen by the judge. *Kennedy*, 823 So.2d at 415. On this point, the Court agrees with the Louisiana Fifth Circuit's explicit finding that this testimony was insufficient to rebut a *prima facie* case as a matter of law. "Jurisprudence has shown that the State should present the testimony of the actual person(s) who made the selection of the grand jury foreperson." *Id.*, 823 So.2d at 415 n. 4. Therefore, the *prima facie* case of discrimination is unrebutted here, and the Court finds as a matter of law and fact that the defense has established that there was gender discrimination in the selection of grand jury forepersons at the time Kennedy was indicted resulting in an equal protection violation.

*Mosley* also provides this Court with clear guidance on the remedy that is appropriate here. "The Court noted that even if the original indictment were quashed, the defendant could be re-indicted, and re-convicted, with the same proof used at the first trial, so long as the procedure used "conforms to constitutional requirements." *Mosley*, 370 F.3d at 475, quoting *Rose*, 443 U.S. at 552. "While recognizing this as a cost, the Court nonetheless insisted this was the remedy necessary if discrimination were found in the selection of the grand jury or the grand jury foreperson." *Id.*, citing *Rose*,

13-31201.581

443 U.S. at 551.

Accordingly,

IT IS ORDERED that the Report and Recommendation of the United States

Magistrate Judge is APPROVED as to the petitioner's first claim regarding race and

regarding gender on all but one ground and APPROVED as to the second, third, fourth,

fifth, sixth, seventh, eighth, ninth, tenth and eleventh claims; the Court ADOPTS the

Report and Recommendation regarding those claims as it opinion and those claims are

DISMISSED.

IT IS FURTHER ORDERED that the petitioner's objections to the Report and

Recommendation as it pertains to the defense's establishment of a *prima facie* showing

and an equal protection violation with regard to gender discrimination in the selection

of grand jury forepersons is SUSTAINED and the petition is GRANTED.

IT IS FURTHER ORDERED that the state either reindict the defendant within 180

days or release the defendant.  The state shall notify the defense and the Court of its

intention within 60 days.

New Orleans, Louisiana, this 15th day of October, 2013.

HELEN G. BERRIGAN
UNITED STATES DISTRICT JUDGE

8

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

PATRICK KENNEDY                                    CIVIL ACTION

VERSUS                                             NO. 11-0922

BURL CAIN                                          SECTION "C"(2)

## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing if necessary, and to submit proposed findings and recommendations for disposition pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases. The case was recently reassigned to me. Record Doc. No. 24. Upon review of the voluminous record, including 42 volumes reflecting the state court proceedings, I have determined that a federal evidentiary hearing is unnecessary. See 28 U.S.C. § 2254(e)(2).[1] For the following reasons, I recommend that the instant petition for habeas corpus relief be **DENIED** and **DISMISSED WITH PREJUDICE.**

---

[1]Under 28 U.S.C. § 2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination. Section 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. § 2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence, 28 U.S.C. § 2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner. 28 U.S.C. § 2254(e)(2)(B).



EXHIBIT

7

PENGAD 800-631-6989

I.    FACTUAL AND PROCEDURAL BACKGROUND

On May 7, 1998, petitioner, Patrick Kennedy, a convicted inmate, was indicted in

Jefferson Parish for the rape of his eight-year old stepdaughter, L. H., in violation of La.

Rev. Stat. § 14:42 (aggravated rape; victim under the age of 12).[2] The Louisiana Supreme

Court summarized the facts of the case as follows:

> It was not disputed that the victim was brutally raped. On the morning of March 2, 1998, the victim was transported by ambulance to Children's Hospital where she was examined in the emergency room. The victim's predominate injury was vaginal with profuse bleeding. Her entire perineum was torn and her rectum protruded into her vagina. Dr. Scott Benton of Children's Hospital testified as an expert in pediatric forensic medicine that the victim's injuries were the most serious he had seen, within his four years of practice, that resulted from a sexual assault. A pediatric surgeon was called in to repair the damage, which was repaired successfully.
>
> The evidence presented at trial centered around the identity of the defendant as the rapist. Alvin Arguello, chief dispatcher for A. Arpet Moving Co., the defendant's employer, testified that when he arrived for work on the morning of March 2, 1998, which was generally around 6:15 a.m., there was a message from the defendant indicating he would not be available to work that day. The defendant called Arguello again between 6:30 and 7:30 a.m., sounding nervous, to ask him how to get blood out of a white carpet because his stepdaughter had "just become a young lady." Rodney Madere, owner of B & B Carpet Cleaning, testified at trial that the defendant, whom he identified by caller ID, called him at 7:37 a.m. on March 2 to schedule an urgent carpet cleaning job to remove bloodstains. The State introduced a photo of the caller ID box from B & B Carpet Cleaning showing a call from "Kennedy P" at 7:37 on March 2. Lester Theriot, an employee of B & B, testified that Madere called him before 8:00 on the morning of March 2, 1998, and told him to report immediately to the defendant's home, but he did not get there until after he dropped his son off at school, which he routinely did between 8:15 and 8:45. When he arrived, he could not get into the home because the police and an ambulance were present.FN6
>
> > FN6 These phone calls made to Arguello and Madere were not known to police until several days after the rape, and later served to shift the focus of the investigation to the defendant.

---

[2]State Record ("St. Rec.") Vol. 1 of 42, pp. 83-84, Indictment, 5/7/98; Grand Jury Return, 5/7/98.

2

13-31201.290

At 9:18 in the morning on March 2, 1998, the defendant called 911 to report that his stepdaughter had just been raped. The 911 call was played for the jury. The defendant advised the operator that his daughter was in the garage while he was getting his son ready for school and that he exited the residence after hearing loud screaming. He told the operator that he discovered the victim lying in the side yard between their house and the empty lot next door, and that she told him that two boys grabbed her, pushed her down, pulled her over there, and raped her. When the operator asked if they were white males or black males, the defendant responded, "Ms. __ [the victim], was they black or white?  She said they was black boys." He further told that operator that he had seen one of the boys "walking through this neighborhood all the time," and described him as 18 years old, wearing a black shirt and blue jeans, and riding a ten-speed bike.

Jefferson Parish Sheriff Office (JPSO) Deputy Michael Burgess responded first to the reported rape from only a block away, arriving between 9:20 and 9:30. Deputy Burgess testified that he was so close to the crime scene when he got the call that he thought he would actually catch the rape in progress. In fact, the transcript of the 911 call indicates Burgess arrived at the scene while the defendant was still talking to 911. Burgess testified that he was confused when he arrived because the crime scene in the yard was inconsistent with a rape occurring there: there was a dog sleeping undisturbed nearby and a small patch of coagulated blood was found in otherwise undisturbed long grass. He did not see anyone fleeing on a bike.

Burgess testified that he heard voices from inside the house, approached the house through an open garage door, and proceeded through the garage to the back door. Inside the garage, he observed a straight thin line of blood drops on the concrete. The defendant came to the back door talking on the telephone, but ignored the officer as he tried to get information on the crime, continuing to talk on the phone. This prompted the officer to order the defendant to get off the phone and give him a description of the suspects so he could pursue them. Inside the house, Deputy Burgess did not see any more blood until they reached the stairs, which had a blood trail leading up them. Deputy Burgess testified that the defendant took him upstairs to the victim, who was lying sideways on the bed in her room, wearing a t-shirt, and wrapped in a bloody cargo blanket. The defendant was wiping his hands with a towel that had blood on it. When the officer asked where it came from, the defendant then told him he got the towel from the bathroom after he put the victim in the bathtub to clean her. The defendant told him further there was blood on the steps because he carried her up the stairs from the backyard like an infant. However, there was no blood on his own clothes and no blood trail from the circle of coagulated blood in the backyard.

Deputy Burgess testified he attempted to question the victim but she was only partially able to respond verbally to his questions at first. When Burgess questioned her, the defendant "kept trying to answer for her and [he] got a little upset with that." The victim told Burgess that she was selling Girl Scout cookies

3

in the garage with her brother when two boys dragged her from the garage and one raped her.

Stephen Brown, EMS field supervisor for West Jefferson Medical Center, testified that he was in the ambulance that responded to the 911 call minutes later. He found the victim upstairs in the home, wearing a Pocahontas shirt, with her shorts pushed down around her ankles, and wrapped in a bloody cargo blanket. The defendant had a basin filled with water which he was using to wipe off the victim's genital area. The defendant told him he was wiping down the blood to see where the blood was coming from, at which point Brown directed him to stop. Brown then examined the victim and found she had blood oozing from her vaginal area, which he then covered with a pad. Brown testified he attempted to interview the victim, but that the defendant interrupted the victim and tried to answer the questions for her.

Both Burgess and Brown testified that they considered the defendant's behavior to be atypical and ultimately suspicious.

Detective Brian O'Cull, formerly of JPSO, testified that he interviewed the defendant at 10:18 a.m. on March 2, 1998, about an hour after the rape was reported and before the defendant was a suspect, and that the interview was recorded. Detective O'Cull identified an audiotape and transcripts of this interview, in which the defendant claims that he found the victim lying in the yard behind the house with her shorts half-way off in a puddle of blood, and that he then grabbed a work blanket, picked her up on it and brought her into the house, where he sat her in the tub with the water running while he called 911. The defendant claimed that the victim told him two boys were involved, and he saw a 19-year-old boy he recognized from the neighborhood ride off on a blue ten-speed bicycle "with the handle bars turned up," which he had seen on previous occasions behind the empty house next door. The defendant also told O'Cull that he had called the school earlier to report that the victim was staying home because she was sick.

Detective Mike Hullihan testified that the defendant was Mirandized and interviewed by police later that day at the police station, although he was not a suspect at that time. The defendant told him that his wife left for work at 5:30 in the morning, and that after he fixed the victim breakfast, she vomited in the bathroom. After she vomited a second time, he gave her orange juice mixed with Tylenol and called school to report that she would be absent. The defendant stated that he was upstairs cleaning when the victim's younger brother came and told him that the victim was sick and lying in the yard. When the defendant went to investigate, he saw a black male fleeing on a bicycle and found the victim crying and lying in the yard with her panties and shorts next to her. The defendant told the officers he wrapped the victim in a cargo blanket, carried her upstairs, put her in the bathtub and called 911. The defendant described the attacker as a black male, about 250-270 pounds, wearing blue jeans and a black t-shirt, with a fade haircut and wearing a gold earring in his left ear, and fleeing on a light blue 10-speed bicycle with "upwards handle bars" on it. After taking the defendant to several locations

4

in an effort to locate a bicycle similar to the one he described, the defendant identified one on display at K-Mart and pointed to the light blue cap on a laundry detergent bottle as being the same color as the bike. Det. Hullihan testified that he was surprised that the defendant picked out this bike as a similar bike. A picture of this bike, which was not a ten-speed with handle bars turned up as earlier described by the defendant, but was instead a regular bike with straight handlebars, was introduced into evidence.

Sergeant Kelly Jones of the JPSO Personal Violence Division was lead investigator on the case. When she arrived at the defendant's home on March 2, she instructed the other officers to begin canvassing the neighborhood to look for the suspect and bike as described by the defendant. In the side yard, she noticed a location in the grass which appeared to contain coagulated blood but the grass was not disturbed and she could not locate any blood leading away from this location. She observed four or five very small drops of blood on the concrete floor just inside the garage and several random small drops of blood leading up the stairs. She collected several items from the victim's bedroom, including the utility blanket she had been lying upon, the t-shirt she was wearing, a pair of black shorts and underpants, and a blood-stained towel.

Sergeant Jones then interviewed the victim at the hospital. The victim was in pain and described her attacker as a black male, age 18-19, medium build, with muscular arms. Sergeant Jones testified that the defendant was present during the interview and prompted the victim to include that the attacker had an earring and noted that they had seen the attacker cutting grass in the neighborhood previously. Sergeant Jones also testified that the defendant described the attacker as over 6' tall, large but not fat, with muscular arms, and described the bicycle as a blue 10-speed with curled racing-style handlebars.

On March 3, Detective Florida Bradstreet interviewed defendant in connection with her discovery of a bike belonging to Devon Oatis behind a nearby apartment on Longleaf Lane in Harvey. The blue, gearless, bicycle was found in tall grass and was described by Det. Bradstreet as covered with spider webs, rusted, with flat tires, and inoperable. It appeared to have been there for some time as the grass underneath it was indented and dead. The defendant positively identified the bicycle as the one on which he saw the subject ride away and stated that he saw this bike behind the house on Sunday evening. Contrary to the defendant's earlier description of the bike, before he identified a similar bicycle at K-Mart, this bicycle was not a ten-speed with handle bars turned up, but was a regular bicycle with straight handlebars. The defendant described the bicycle's rider to Det. Bradstreet as a husky individual of 260 to 280 pounds, but that he did not have "fat hanging." Later, the defendant described the suspect to Det. Bradstreet as 18-19 with a muscular build, a low fade haircut and a gold earring in his left ear.

After the defendant identified the bike that belonged to Devon Oatis, Sergeant Jones interviewed Oatis, a 16-year-old male, who was 6'11" tall and 270-280 pounds and appeared as being very heavy set. Sergeant Jones testified that she

5

13-31201.293

interviewed Oatis, a juvenile, in the presence of his mother. They both gave statements, which Sergeant Jones determined to be false . . . . However, Sergeant Jones testified that Oatis was ruled out as a suspect because his physical description did not match those given by the victim and the defendant and because his bicycle was inoperable.

In the meantime, the victim continued to claim that two boys on a bicycle pulled her from the garage and one of them raped her in the yard. Dr. Benton testified that when he first examined the victim at Children's Hospital, she reported to him that two boys took her from the garage and one raped her while the other watched. Dr. Benton testified that medical records showed that the victim told all hospital personnel this same version of the rape while she was at the hospital, but that she told one family member that the defendant raped her. In addition, several days after the rape, the victim was interviewed by psychologist Barbara McDermott, and the videotaped interview was introduced by the defense at trial. In this interview, lasting for three hours over two days, the victim said that she woke up, watched television, and ate breakfast, which was prepared by the defendant, whom she called "Daddy." The victim said she was playing in the garage with her brother when she was approached by a boy who asked her about Girl Scout cookies. After a long delay, she said she fell off a ledge at the end of the garage and the boy pulled her by the legs across the concrete into the neighbor's yard with the other boy following them. She was trying to grab the grass while he was dragging her. The boy then pulled down his pants and her shorts, placed his hand over her mouth, and "stuck his thing in [her]." She could not go anywhere because he was on top of her and the other boy was behind her. When another boy saw the defendant through the window, they both fled on a bicycle. She forgot what both boys looked like and did not remember what either boy had on, though she thought one had on a black shirt and blue jeans. She did not remember anything after that until the ambulance arrived. Dr. McDermott questions the victim thoroughly and argumentatively on each element of the victim's story, telling the victim that her story does not make sense. For example, Dr. McDermott asks the victim why she did not suffer abrasions from being dragged across concrete by her legs, and asks her why she did not scream if the attacker's hand was not placed over her mouth until they reached the neighboring yard.

In spite of the victim's version of events as stated above, the focus of the investigation began to shift toward the defendant. On March 4, 1998, the police found out for the first time about the defendant's phone calls to his employer, A. Arpet Moving Co., hours before he made the 911 call, telling Arguello that he would not be into work and asking him how to get blood out of a white carpet because his step-daughter "had just become a young lady." Sergeant Darryl Monie testified that on March 4, the defendant evidently knew the police had this information, and explained that he called his employer at about 5:15 a.m. to report that he was available for work that day. However, the defendant told him he called his employer back after the police had arrived at his house, first to inform him that

6

he could not come to work because "his little girl had become a young lady," and then later because she had been raped. The defendant also told Sergeant Monie that he sought advice in the first phone call on removing bloodstains from carpet.

On March 9, 1998, the police also found out about the defendant's call to B & B Carpet Cleaning, after Mr. Madere contacted them after seeing blood-stained carpets being removed from the defendant's home on the televised news. As stated earlier, the defendant made this call at 7:27 a.m., almost two hours before the defendant claimed the victim had just been raped, to request an urgent carpet cleaning job to remove blood stains. The defendant was arrested and charged with aggravated rape on March 10, 1998.

The State relied heavily on the testimony of Mr. Madere and Mr. Arguello because it created a time line indicating that the rape did not occur as reported by the defendant, i.e., that the rape occurred much earlier in the morning than reported by the defendant, that the defendant waited several hours before calling 911, and that the defendant was apparently attempting to clean up evidence of the crime in the meantime. The police also became aware of physical evidence that the crime scene had actually been cleaned.

Sergeant Jones testified that pursuant to search warrants issued on March 4, 5, 7, and 8, 1998, luminol testing of areas in the victim's home presumptively established the presence of blood in a large area of the carpet at the foot of the victim's bed, on the carpet pad and on the subfloor beneath. Sergeant Jones testified that a stain was observed on the subfloor following the removal of the carpet and padding. The police also found a one gallon jug container labeled "SEC Steam Low Foam Extraction Cleaner" found in the garage, and a pail and two towels from the bathroom sink. The police also discovered a stain on the underside of the victim's mattress and mattress pad, which they initially believed indicated defendant had altered the crime scene by turning over the mattress. Sergeant Charles Durel of the JPSO Crime Lab identified his sketches and photographs of the home, which showed the presumptive locations of blood visualized with luminol. Samples of several of these items from these locations were subsequently tested by Drs. Henry Lee and Michael Adamowicz of the Connecticut State Police Forensic Science Lab in 1998. Dr. Lee testified that liquid dilution demonstrated that someone had attempted to clean some bloodstains from some of the carpet samples. Dr. Adamowicz tested samples of a mattress pad and carpet and a vaginal swab of the victim. Dr. Adamowicz found no DNA on the mattress. He found otherwise unidentifiable human DNA on the carpet. He found the victim's DNA on some carpet samples, the cargo blanket, a towel, and a sanitary napkin. However, the defense had the mattress pad tested by Dr. Carolyn Van Winkle, senior forensic biologist at the Tarrant County Medical Examiner's Lab, who testified that she re-tested the same mattress pad in 2001 using a more sensitive test that came into common usage after 1998, and absolutely could rule out the victim as the source of blood on the mattress pad.

7

Dr. Lee also testified as an expert in serology, DNA, crime scene analysis and reconstruction, and general criminalistics. Dr. Lee found no semen in the victim's shorts. No seminal fluid or spermatozoa was found in any of the swabs taken from the victim at the hospital. Because of the lack of positive evidence related to the defendant, the bulk of Dr. Lee's testimony was devoted to discussing the absence of evidence that might confirm the defense's theory that the victim was raped in the yard as she initially stated. He stated that he examined the shirt and shorts the victim was wearing for any grass or soil stains but could not find any, indicating that the victim was not dragged through the grass as she initially claimed. He also did not find any abrasion marks consistent with being dragged. He opined that blood staining on the back of the victim's shorts was consistent with the shorts being placed on the victim after she was raped. He also examined the victim's underwear and found a blood transfer stain on the back of them and did not find any grass or soil stains on them. He examined photographs of the crime scene outside and found nothing to indicate that a struggle had taken place, as there were no depressions in the grass and only a small blood stain sitting on top of the grass, indicating a low-velocity dripping, suggesting that the blood had been planted there.

Finally, and most important for the State was the testimony of the victim, supported by the testimony of her mother, C.H. C.H. testified at trial that she married the defendant in 1998. After the rape, the victim was removed from her custody for approximately one month because she had permitted the defendant, who was in jail, to maintain phone contact with the victim. C.H. testified that soon after the victim was returned to her custody, the victim for the first time reported to her that defendant had raped her. She testified that the victim was in the room she shared with her younger brother, crying as her mother had never seen her cry before. After she allowed the victim to come sleep in her room, the victim told her that she could not hold it in anymore and that the defendant was the one who raped her.

The victim, who was eight when raped and nearly fourteen years old at the time of trial, took the stand during the fifth day of testimony. Upon taking the stand, one of the prosecuting attorneys stepped out of the courtroom for a few minutes. Defense counsel objected that the victim was permitted to sit on the stand during this delay and cry while the jury watched. The defense approached the bench to move for a mistrial, which motion was denied. After some brief questions about her age, the State asked "Do you remember what happened to you in 1998," to which the victim answered "yes." When asked to tell what happened, the victim stated "I woke up one morning and Patrick was on top of me and." She evidently then lost her composure, which required the court to recess, at which time the defense again moved for, and was denied, a mistrial.

During that recess, out of the presence of the jury and in a discussion at the bench, pursuant to a joint stipulation, the state offered a videotaped interview performed on December 16, 1999, at the Child Advocacy Center (CAC) by Amalee Gordon. After the recess ended, the victim testified that she was interviewed by

8

Amalee Gordon on December 16, 1999. The state then formally offered the videotaped interview into evidence and offered to stipulate that the tape was edited to satisfy the rules of evidence and that the tape in fact satisfied all of the statutory requirements that were previously discussed with defense counsel at the bench. Defense counsel formally accepted the stipulation, stating "We would agree with that stipulation, Your Honor, and we have no objection to the tape." Although the videotape was offered into evidence after the victim lost her composure on the stand upon accusing the defendant, it is apparent that both parties knew from the outset of trial that the videotape would be introduced into evidence, as defense counsel asked the jury during opening statements to watch this tape closely and compare it with the first videotape made in March of 1998, in which the victim accuses two boys of dragging her out of her garage and one of them raping her.

The videotape was played at that time for the jury while the victim remained seated on the stand. After the tape was played for the jury, the defense approached the bench and again moved for a mistrial on the basis that, while the tape was played (for approximately 23 or 24 minutes), the jury could observe the victim crying as she watched the tape. This motion was denied.FN15

> FN15  In denying this motion, the district court noted that, although the victim had tears in her eyes at one point during the viewing of the tape, there was no outburst or excessive display of emotion by the victim and the jurors did not appear to react in a way that would indicate they were upset by the victim's response to the tape.

This videotape has been reviewed and is briefly summarized as follows. The victim and the interviewer sit in chairs against the backdrop of a quilt. The interviewer notes that Sergeant Kelly Jones is also present working the equipment and on one occasion points to the quilt, implying that Sergeant Jones is behind it. The interviewer informs the victim that she is present because something happened to her and asks whether she knows what that is, to which the victim responds that she was raped by Patrick Kennedy. The victim states that she woke up one morning and the defendant was on top of her. He raped her, saw that she was bleeding, and called the police after informing her that she had better tell them the story he made up. The victim could not recall what that story was. The interviewer probes for additional details and the victim can state only (over the course of about fifteen minutes) that it happened in her room, on the bed, with the defendant's hand covering her eyes, while her shorts were off and the defendant was naked. The victim draws her bed showing the location the rape occurred and identifies her and the defendant's "private parts" on male and female outline drawings as the only place (with the exception of his hand over her eyes) that the defendant touched her. The defendant did not make her do anything else or say anything else to her. After she was raped, the victim said she fainted and did not remember anything until the ambulance arrived to take her to the hospital. At the hospital, other people asked her questions. She could not remember what they asked her other than for her birth date. The victim knew that she had bled and recalled seeing blood on her bed but

13-31201.297

nowhere else.  This video was crudely edited to excerpt only admissible portions of the victim's statements.

　　　　After this videotape was played, the victim remained on the stand and testified on direct and cross-examination.  Her testimony in full is as follows:

By Mr. Paciera [prosecutor]:

Q. You're alright?

A. Yes.

Q. Okay, when we looked at that tape, that was I think from December of 1999. You were a lot younger then?

A. Yes.

Q. And that was almost a year and a half after this happened to you, is that right?

A. Yes.

Q. So when this happened to you, you were even smaller and younger?

A. Yes.

Q. When this first happened to you, you said somebody else did this, do you remember?

A. Yes.

Q. Do you remember what you said?

A. Yes.

[Defense object to leading questions and judge admonishes]

Q. When this first happened, what did you say happened?

A. I said two black boys raped me.

. . . [ellipsis by the Supreme Court]

Q. Did two black boys do this to you?

A. No.

Q. Were you outside at all when this happened to you?

A. No.

Q. Were you ever in the garage when this happened to you?

A. No.

Q. Were you ever downstairs in the house when this happened to you?

A. No.

Q. After this happened to you, did you ever go downstairs?

A. No.

Q. Who told you about saying two boys did it?

A. Patrick.

. . . [ellipsis by the Supreme Court]

Q. Who was home the day this happened?

A. Me, my brother and Patrick.

Q. And where had your Mom gone?

A. To work.

Q. Was it still early morning or midday or do you remember what time this happened?

A. Morning.

Q. After this happened to you, what did Patrick do?

10

13-31201.298

A. He got up, I'm not sure where he went, but he left my room and he came back.

Q. Did he have anything when he came back?

A. No.

Q. Was he carrying anything?

A. No.

Q. Okay, was there some point when he came in and he was carrying anything?

A. Yes.

Q. What was he carrying?

A. A cup of orange juice and pills chopped up in it.

Q. And what did he do with the orange juice with the chopped up pills?

A. He gave it to me.

Q. Now, after this happened to you, did it injure you, did you bleed?  Not the orange juice, when you were raped.

A. Yes.

Q. Did you bleed?

A. Yes.

Q. Did anyone ever clean you?

A. No.

Q. When you said Patrick, he left your room, is that what you said?

A. Yes.

Q. And could you tell where he was or could you hear him?

A. Not when he left the first time.

Q. Okay, well, could you hear some other time?

A. Yes.

Q. What could you hear?

A. I heard when he was on the phone with his boss.

Q. What'd he tell his boss?

A. He told his boss that his daughter had became a young lady and he couldn't come in today.

Q. Did you stay in the bedroom the whole time after this happened until the police got there or—

A. No.

Q. What happened?

A. I was throwing up and he carried me to the bathroom.

Q. Were you throwing up after he did this?

A. Yes.

Q. And when he brought you into the bathroom, what bathroom did he bring you into?

A. In the hall bathroom.

Q. Did you throw up anymore?

A. I threw up in the tub.

Q. How did you get back to your bedroom after that?

A. I don't remember.

11

13-31201.299

Q. You don't remember?  Do you remember either the police getting to your house or somebody else like a doctor kind of person getting to your house?

A. I remember the police coming.

Q. How did you feel when the police came?  Okay, I'll ask another question.  Did you talk to the police?

A. While I was in the room?

Q. What's that?

A. While I was in the room?

Q. While you were in the room, if you remember.

A. I don't remember.

Q. Do you remember going to the hospital?

A. Yes.

Q. Do you remember how you got to the hospital?

A. Yes.

Q. How did you get to the hospital?

A. In the ambulance.

Q. Do you remember being at the hospital?  You, okay, do you remember being at the hospital?

A. Yes.

Q. Do you remember talking to any doctors at the hospital?

A. Yes.

Q. Did anybody tell you what they were going to have to do to help you?

A. Yes.

Q. And what did they tell you or what did they do to help you?

A. While I was in the hospital?

Q. Yes.

A. When I first got there?

Q. We don't have to be real specific but did the doctors do some kind of surgery on you?

A. I don't know.

Q. Did they give you medicine?

A. Yes.

Q. Did it put you to sleep?

A. Yes.

Q. The person, Patrick that you said did this to you, I want you to point to him right now.

Mr. Paciera:   Please let the record reflect that the witness is pointing to the defendant, Patrick Kennedy.

Q. Is everything that you're saying in this courtroom today the truth?

A. Yes.

Q. Did you hear yourself when you were on that tape from December of 1999?

A. Yes.

Q. Is everything you heard on there the truth?

13-31201.300

A. Yes.

Q. That this person raped you?

A. Yes.

Q. Nobody else?

A. Nobody else.

Q. In your room?

A. In my room.

Q. Thank you, [L. H.]. I want you to answer this lady's questions.

On cross-examination, the victim testified that she remembered telling the police and people at the hospital that someone else did this to her, that after the rape the defendant did not live with them anymore, that she had to leave her mother and brother and go live with another family for a while and this was upsetting to her, and that she first told her mother that the defendant was the one that raped her right before she had the interview with Amalee Gordon. She could not remember certain other details, such as talking to one of the defense attorneys a year-and-a-half after the rape, talking to certain police officers after the rape, or making the first videotaped statement.

After the State rested its case, the defense presented evidence attempting to show that Oatis was the likely rapist, pointing out that he lied about being in school that day and that the defendant had identified his bike as the one the suspect used. To counter the state's witnesses' characterization of the bike as inoperable, the defense presented the testimony of Kimberly Parnell, a nearby resident who was interviewed by police when they canvassed the neighborhood. She testified that she often saw several young men, including Oatis, in the neighborhood riding this same bike, some of whom used it to sell drugs, and that she saw Oatis refill the tires with air before riding it because of its poor condition. Ronnie Montgomery, a private investigator hired by the defense, testified that he was unable to locate Oatis.

A cornerstone of the defendant's case was that the victim was coerced into changing her story, and that a comparison of the first and second videotapes showed that the first tape was much more detailed than the second, suggesting that the first was more truthful. The defense also presented evidence attempting to show that the victim's mother, C.H., changed her story in order to be reunited with her daughter. Catherine Holmes, a family friend, testified that C.H. expressed great fear that she would lose custody of her daughter. According to Holmes, C.H. described visiting her daughter after she was removed from her home and telling the victim that it was okay to tell people that defendant raped her because C.H. was instructed to do so by "them." After the victim was returned to C.H., Holmes said C.H. cut off all contact with her. Robert Tucker, a private investigator hired by the defense, testified that he interviewed the victim in 1999 and that she told him that she was raped by a young man who fled on a bicycle and that defendant did not rape her. Tucker said that C.H. told him that she was afraid, based on harassment and threats from police and social workers, that she would lose custody of her daughter. The

13

13-31201.301

defense also stressed the lack of any physical evidence directly linking the defendant to the crime.

State v. Kennedy, 957 So. 2d 757, 760-772 (La. 2007), rev'd, 554 U.S. 407 (2008) (some footnotes omitted).

Several pre-trial writ applications were filed with the state appellate and supreme courts. First, Kennedy filed a writ application, challenging the state trial court's ruling allowing the victim and Shawanda Logan to testify concerning Kennedy's other sexual acts.[3] On May 24, 2000, the Louisiana Fifth Circuit granted the writ in part and denied it in part, finding that the victim's testimony in this regard was admissible but that Shawanda Logan's testimony was not. State v. Kennedy, No. 2000-K-960 (La. App. 5th Cir. 5/24/00) (unpublished opinion).[4] On April 3, 2001, the Louisiana Supreme Court affirmed the state appellate court's decision. State v. Kennedy, 803 So. 2d 916, 2000-KK-1554 (La. 2001).

The State filed a pre-trial writ application challenging the trial court's ruling limiting the number of victim impact witnesses and disallowing testimony of mental health practitioners as part of victim impact evidence. On July 14, 2000, the Louisiana Fifth Circuit denied the writ application. State v. Kennedy, No. 2000-K-1226 (La. App.

---

[3]St. Rec. Vol. 39 of 42, Application for Supervisory Writ, 2000-K-960, 4/24/00.

[4]St. Rec. Vol. 39 of 42.

14

5th Cir. 07/14/00) (unpublished opinion).[5]  On March 16, 2001, the Louisiana Supreme

Court likewise denied the State's writ application.  State v. Kennedy, 787 So. 2d 310, No.

2000-KK-2428 (La. 2001).

Thereafter, Kennedy filed a pre-trial writ application in connection with the district

court's denial of his motion to quash the indictment due to race and gender

discrimination in the selection of grand jury forepersons.  On June 26, 2002, the

Louisiana Fifth Circuit granted the writ but denied relief, finding that Kennedy had failed

to present a prima facie case of purposeful discrimination against African-Americans and

women in the selection of grand jury forepersons.  State v. Kennedy, 823 So. 2d 411, No.

2002-K-00214 (La. App. 5th Cir. 2002).[6]  On January 24, 2003, the Louisiana Supreme

Court denied Kennedy's writ application.  State v. Kennedy, 836 So. 2d 43, No. 2002-

KK-2088 (La. 2003).

Kennedy next filed a pre-trial writ application, along with a request for a stay of

the proceedings, alleging that the trial court had violated the Ex Post Facto Clause of the

Constitution.  On August 7, 2003, the Louisiana Fifth Circuit denied Kennedy's writ and

his request for a stay.  State v. Kennedy, No. 2003-K-881 (La. App. 5th Cir. 08/07/03)

---

[5]St. Rec. Vol. 40 of 42.

[6]The state appellate court granted the writ application because the basis of its denial of Kennedy's
motion to quash differed from the basis of the trial court's ruling.  The trial court determined that
Kennedy had made out a prima facie case of purposeful discrimination, but that the State rebutted the
showing via its showing of racial and gender neutral selection criteria.

15

(unpublished opinion).[7] On August 12, 2003, the Louisiana Supreme Court denied relief. State v. Kennedy, 851 So. 2d 313, No. 2003-KK-2269 (La. 2003).  On August 14, 2003, the state supreme court denied Kennedy's motion for reconsideration. State v. Kennedy, 854 So. 2d 296, No. 2003-KK-2269 (La. 2003).

On August 11, 2003, trial commenced in the Twenty-Fourth Judicial District Court for the Parish of Jefferson, continuing until August 26, 2003.  During that time, Kennedy filed an emergency writ application, arguing that he was entitled to a mistrial based upon the State's failure to disclose exculpatory evidence. On August 22, 2003, the Louisiana Fifth Circuit denied Kennedy's writ application. State v. Kennedy, No. 2003-993 (La. App. 5th Cir. 8/22/03) (unpublished opinion).[8]  The Louisiana Supreme Court denied relief on that same date.  State v. Kennedy, 852 So. 2d 993, No. 2003-KD-2393 (La. 2003).

On August 25, 2003, the jury found Kennedy guilty of aggravated rape.[9]  On August 26, 2003, the jury unanimously determined that Kennedy should be sentenced to

---

[7]St. Rec. Vol. 41 of 42.

[8]St. Rec. Vol. 41 of 42.

[9]St. Rec. Vol. 24 of 42, pp. 5908-5909; St. Rec. Vol. 42 of 42, Guilty Verdict, 8/25/03, 6:25 p.m.

13-31201.304

death.[10] In accordance with the jury's verdict, on October 2, 2003, the state trial court sentenced Kennedy to death.[11]

On direct appeal to the Louisiana Supreme Court,[12] Kennedy raised the following assignments of error:

(1) The execution of a defendant for a non-homicide offense violates the Eighth Amendment to the United States Constitution and Article I, Section 20 of the Louisiana Constitution.

(2) The capital punishment scheme used in this case failed to narrow the class of defendants eligible for the death penalty.

(3) Imposition of the death penalty where the defendant did not "kill, attempt to kill, or intend that killing take place" violates the Eighth Amendment;

(4) Delayed disclosure of exculpatory evidence denied Mr. Kennedy a fair trial and secured the State sufficient time to procure a conviction and death sentence.

(5) The State improperly delayed in turning over exculpatory evidence – including lab reports, a videotape, and exculpatory phone records – in violation of its statutory and constitutional obligations.

(6) Mr. Kennedy was prejudiced by the State's delay in turning over discoverable material.

(7) The trial court erroneously denied defendant's request for a mistrial, a recess, and his subsequent request for alternate remedies.

---

[10]St. Rec. Vol. 25 of 42, p. 6029.

[11]St. Rec. Vol. 25 of 42, p. 6068.

[12]Under the provisions of La. Const. Art. 5, § 5(D)(2), a case is appealable to the Louisiana Supreme Court if "the defendant has been convicted of a capital offense and a penalty of death actually has been imposed."

13-31201.305

(8) The trial court's refusal to assess [the victim's] competency violated Mr. Kennedy's right to due process of law and a fair trial.

(9) The trial court erroneously denied the defense request to assess [the victim's] competency.

(10) The district court should have considered whether the taint of leading questions and manipulation undermined [the victim's] competence.

(11) The district court should have considered the taint that may have impacted the competency of [the victim's] testimony.

(12) The conviction in this case was secured with the use of rampant hearsay and violated Mr. Kennedy's Sixth Amendment right to be present, his right to counsel, and his right to confront and cross-examine witnesses.

(13) The admission of the videotape of [the victim] constituted a statutory violation of La. Rev. Stat. § 15:440 et seq. because she was not available for cross-examination.

(14) The application of La. Rev. Stat. § 15:440.4 in this case unconstitutionally deprived Mr. Kennedy of the right to confront [the victim] and the right to counsel and to be present.

(15) The United States Supreme Court jurisprudence in Crawford v. Washington, 541 U.S. 36 (2004), makes clear that the videotaped testimonial evidence is inadmissible, and a number of other state courts have held analogous statutes unconstitutional.

(16) Testimony of [the victim's mother] concerning [the victim's] accusations was blatant hearsay.

(17) The trial court improperly precluded Mr. Kennedy from litigating a mental retardation defense to the jury.

(18) The district court erroneously applied a statutory sanction for "non-compliance" based upon Mr. Kennedy's alleged conduct at interviews that were held prior to the enactment of the statute.

18

13-31201.306

(19) The trial court's ruling that Mr. Kennedy was non-cooperative was incorrect.

(20) The exclusion of a mental retardation defense based upon Mr. Kennedy's assertions that he was not mentally retarded violates the Fifth, Sixth and Eighth Amendments.

(21) Preclusion of litigation and consideration of mental retardation violates the Sixth Amendment.

(22) Compelling a defendant's "full" cooperation in a mental retardation examination violates the Fifth Amendment.

(23) The trial court erroneously prohibited the defense from introducing evidence concerning Mr. Kennedy's low IQ and mental disability at the culpability phase.

(24) Evidence concerning Mr. Kennedy's mental deficiencies was relevant to the reliability of his statement.

(25) Evidence of Mr. Kennedy's mental state was relevant to the State's claim concerning the "time-frame" and other conduct.

(26) Passion and prejudice inflamed the jury when it was forced to endure watching [the victim] cry for long periods of time, and the trial court erred in sustaining the prosecutor's objection to the court's proposed instructions to the jury to confine its attention to the evidence.

(27) Prosecutorial misconduct vitiates the validity of the guilt and penalty phase determinations.

(28) Culpability phase argument was rife with prosecutorial misconduct.

(29) The State improperly elicited evidence regarding the comparison of this offense to other offenses.

(30) At the penalty phase, the State committed egregious misconduct by arguing to the jury that [the victim] and Schwanda Logan wanted Patrick Kennedy dead.

19

(31) The prosecution introduced arbitrary factors into the penalty phase when it asked the jury to consider victim impact evidence about other unrelated offenses.

(32) The trial court improperly introduced evidence of an un-adjudicated offense, undermining Mr. Kennedy's right to a fair sentencing hearing and a reliable determination of sentence.

(33) Allegations of prior rape and molestation were too remote to admit into evidence.

(34) There was not clear and convincing evidence that the other offense, involving someone named "Jackson" had occurred.

(35) The destruction of relevant evidence rendered Mr. Kennedy unable to rebut or challenge the "Jackson," evidence.

(36) The introduction of gruesome photographs violated Mr. Kennedy's presumption of innocence and right to a fair trial.

(37) The trial court erroneously allowed the State to elicit "expert" testimony on grass discoloration and stains over defense objection, with no Daubert hearing in violation of Mr. Kennedy's right to a fair trial.

(38) Discrimination in selection of grand jury foreperson violated the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and requires reversal of the conviction and death sentence.

(39) The evidence presented by the State to rebut a claim of discrimination was  constitutionally insufficient.

(40) Once the State presented evidence, the question of whether the defense made out a prima facie case of discrimination was moot.

20

13-31201.308

(41) The trial court correctly found a prima facie case of discrimination because women and African-Americans were significantly under-represented, the under-representation occurred over a significant period, and even under a shorter period of time, there is evidence of under-representation.

(42) The trial court erroneously denied appellant's motion to quash the indictment based upon the exclusion of prospective jurors whose rights of citizenship had been restored, and the exemption of jurors where an exemption no longer existed.

(43) The State conceded that the right to serve on a jury is a critical right of citizenship.

(44) The defense presented ample evidence that individuals who had previously completed their sentence were excluded from jury service.

(45) The trial court made a series of rulings on challenges for cause to jurors that undermined Mr. Kennedy's right to a fair and impartial jury.

(46) The trial court erroneously granted the State's challenge to a number of jurors who exhibited non-disqualifying opposition to the death penalty. (47) Juror Dwayne Lange was improperly removed for cause on the State's challenge where he simply explained that the death penalty was "warranted" in "certain instances" and "not warranted" in others.

(48) Juror Venkata Subramanian was removed for cause because he disagreed with the benefits of the death penalty, even though he made clear that he could impose it.

(49) The trial court erroneously granted the State's challenge for cause to jurors who would impose a death sentence for murder, but who had substantial doubts about imposing the death penalty for aggravated rape.

(50) The removal of juror Henry Butler, who favored the death penalty for murder, was improper.

(51) Juror Darlene Howell was excused because she thought the death penalty should be reserved for cases involving a murder.

21

(52) The trial court erred in granting the challenge for cause to Juror Scheid.

(53) The trial court granted the State's challenge for "hardship" to a significant number of minority veniremen.

(54) The trial court granted the State's challenges to jurors for cause based upon age.

(55) The trial court erroneously denied defense challenges for cause, forcing the defense prematurely to exhaust its peremptory strikes and seat an odious and obnoxious juror.

(56) The trial court erroneously denied the defense (and State) their cause challenge to Bernice Augusta.

(57) The trial court erroneously denied the defense cause challenge to Juror Asfour.

(58) The trial court frustrated Mr. Kennedy's right to full and fair voir dire.

(59) The trial court erred in denying Kennedy's motion for a new trial, given that the weight of the evidence was against a conviction and death sentence.

(60) The trial court improperly denied Kennedy's motion to suppress statements and evidence.

(61) The trial court erroneously denied Kennedy's motion to suppress statements in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.

(62) The trial court erred in denying the defense motion to suppress evidence.

(63) The trial court erroneously overruled defense objections to a number of improper instructions.

(64) The trial court erroneously instructed the jury not to go beyond the evidence to acquit, in violation of State v. McDaniel, 515 So. 2d 572 (La.

22

13-31201.310

App. 1st Cir. 1987), infringing upon Kennedy's presumption of innocence, and diminishing the State's burden of proof.

(65) The trial court's reasonable doubt definition improperly contained an articulation requirement in violation of State v. Smith, 637 So. 2d 398 (La. 1994), and Cage v. Louisiana, 498 U.S. 39 (1990).

(66) The trial court's instruction on counting witnesses assumed the sufficiency of the State's proof in violation of Kennedy's right to a fair trial and due process of law.

(67) The trial court improperly denied the defense request for specific instructions on mitigating circumstances in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

(68) The jury never determined beyond a reasonable doubt that death was the appropriate punishment.

(69) Cumulative error warrants reversal of appellant's conviction and sentence.[13]

On May 22, 2007, the Louisiana Supreme Court affirmed both Kennedy's conviction and death sentence, determining that the state statute, La. Rev. Stat. § 14:42, allowing capital punishment for the rape of a person under the age of twelve, did not violate the Eighth Amendment.[14]  On June 25, 2008, the United States Supreme Court reversed and remanded the matter, finding that imposition of the death penalty for the rape of a child where the crime did not result, and was not intended to result, in the death of the victim constituted a violation of the Eighth Amendment.  Kennedy v. Louisiana,

---

[13]St. Rec. Vol. 27 of 42, Original Brief on Appeal, 5/22/06.

[14]State v. Kennedy, 957 So. 2d 757, 2005-KA-1981 (La. 2007).

23

554 U.S. 407, 413 (2008).[15]  On November 21, 2008, the Louisiana Supreme Court, acknowledging that the "Supreme Court's holding . . . effectively sets aside defendant's death sentence," remanded the matter to the trial court "for the resentencing of defendant to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence." State v. Kennedy, 994 So. 2d 1287, 1287-88, 2005-KA-1981 (La. 2008).  On January 7, 2009, the state trial court resentenced Kennedy to life imprisonment without benefit of parole, probation, or suspension of sentence.[16]

On or about December 17, 2009, Kennedy's counsel filed with the state trial court an application for post-conviction relief, asserting the following claims:

(1) denial of due process due to the State's failure timely to provide (a) Connecticut crime laboratory reports; (b) exculpatory videotape of the victim; (c) evidence concerning charges facing the victim's mother prior to and during trial, which the State continues to withhold;

(2) denial of effective assistance of counsel due to counsel's failure to:  (a) introduce exculpatory phone records; (b) introduce a videotape taken 18 months after the offense that exonerated Kennedy and that impeached the victim and her mother; (c) impeach the victim's mother with documentary and testimonial evidence; (d) object to introduction of the photograph of the caller I.D. box and to identify its inaccuracy; (e) effectively cross-examine Mr. Madere; f) object to introduction of an inadmissible videotaped accusation, rather than stipulating to its admission; (g) impeach Dr. Lee and subpoena Dr. Messina; (h) request a taint hearing; and (i) call several witnesses who would have testified favorably for the defense;

---

[15]On October 1, 2008, the Supreme Court modified its June 25, 2008 opinion, stating that the authorization of the death penalty "in the military sphere" for the crime of rape "does not draw into question our conclusions that there is a consensus against the death penalty for the crime [of rape] in the civilian context and that the penalty here is unconstitutional." Kennedy v. Louisiana, 129 S.Ct. 1, 2 (2008).

[16]St. Rec. Vol. 42 of 42, Sentencing minutes, 1/7/09.

24

13-31201.312

(3) denial of due process based upon race and gender discrimination in the
selection of the grand jury foreperson;

(4) denial of due process based upon exclusion of citizens from jury service
based upon prior pardoned felony convictions;

(5) denial of right to a fair trial and impartial jury because he was tried
before a death qualified jury in a case in which the death penalty was
unconstitutional; and

(6) denial of due process because the election of judges transformed his
proceedings from a trial and appeal into a plebiscite.[17]

In its response,[18] the State addressed the merits of Kennedy's claims of untimely

disclosure of charges against the victim's mother (claim (1)), ineffective assistance of

counsel (claim (2)), and denial of due process because he was tried before a death

qualified jury (claim (5)). With regard to Kennedy's claims of untimely disclosure of lab

reports and videotape (claim (1)) and discrimination in the selection of grand jury

forepersons (claim (3)), the State cited Louisiana Code of Criminal Procedure article

930.4(A), asserting that these claims had already been raised and addressed on direct

appeal. As to Kennedy's claim regarding exclusion from the jury of citizens with

pardoned felony convictions (claim (4)), the State argued that this claim should be barred

pursuant to Louisiana Code of Criminal Procedure article 930.4(C), due to Kennedy's

failure to raise this claim on direct appeal. Finally, with regard to Kennedy's complaint

concerning the fairness of his state court proceedings because the judges were elected

rather than appointed (claim (6)), the State argued that this claim should be barred

---

[17]St. Rec. Vol. 42 of 42, Uniform Application for Post-Conviction Relief, 12/17/09.

[18]St. Rec. Vol. 42 of 42, State's Response to Post-Conviction Application, 3/15/10.

25

pursuant to Louisiana Code of Criminal Procedure article 930.4(B), due to Kennedy's failure to raise the claim in the proceedings leading to his conviction.

On April 28, 2010, the state trial court issued an order denying relief.[19] As to Claims (1)(a), (1)(b) and (3), the court deemed the issues procedurally barred under Louisiana Code of Criminal Procedure article 930.4(A) because the issues had been addressed on direct appeal.[20] As to Claims (1)(c), (2)(a-c) and (5), the court denied relief on the merits. With respect to claims (4) and (6), the state trial court found the claims procedurally barred pursuant to Louisiana Code of Criminal Procedure article 930.4(B) and (C).[21]

On May 21, 2010, Kennedy filed a writ application with the Louisiana Fifth Circuit Court of Appeal.[22] On July 6, 2010, the Louisiana Fifth Circuit issued an opinion denying Kennedy's writ application.  State ex rel. Kennedy v. Burl Cain, Warden, No.

---

[19]St. Rec. Vol. 42 of 42, District Court's Order, 4/28/10.

[20]Louisiana Code of Criminal Procedure article 930.4(A) provides, in pertinent part: "Any claim for relief which was fully litigated in an appeal from the proceedings leading to the judgment of conviction and sentence shall not be considered."  Article 930.4(A) is "not a procedural bar in the traditional sense" and does not bar this court from addressing the merits.  Bennett V. Whitley, 41 F.3d 1581, 1583 (5th Cir. 1994).

[21]Louisiana Code of Criminal Procedure article 930.4(B) provides: "If the application alleges a claim of which the petitioner had knowledge and inexcusably failed to raise in the proceedings leading to conviction, the court may deny relief."  Article 930.4(C) provides: "If the application alleges a claim which the petitioner raised in the trial court and inexcusably failed to pursue on appeal, the court may deny relief."

[22]St. Rec. Vol. 42 of 42, Original Application for Writ of Review, 5/21/10.

26

13-31201.314

2010-KH-418 (La. App. 5th Cir. 2010) (unpublished opinion).[23] The state appellate court

determined that the district court did not err in its dismissal of claims (1), (3), (5), and

(6). With respect to claim (2), ineffective assistance of counsel, the Louisiana Fifth

Circuit determined that the trial court did not err with respect to its dismissal on the

merits of subclaims (a)-(c). As for the remainder of Kennedy's sub-claims, the appellate

court noted that Kennedy "does not state how the district court erred in denying" these

claims and thus Kennedy had failed to satisfy his burden of proof. With regard to

claim (4), the Louisiana Fifth Circuit observed that Kennedy had raised the same claim

on direct appeal. On July 27, 2010, Kennedy filed a writ application with the Louisiana

Supreme Court, raising the same claims he had raised before the state district and

appellate courts.[24] On April 1, 2011, the Louisiana Supreme Court denied the application

without stated reasons. State ex rel. Kennedy v. Cain, 60 So.3d 1246, No. 2010-KP-1765

(La. 2011).

## II.    FEDERAL HABEAS PETITION

On April 19, 2011, Kennedy's counsel filed this petition for federal habeas corpus

relief.[25] In his petition, Kennedy raises the following eleven (11) claims: (1) race and

gender discrimination in the selection of grand jury forepersons; (2) trial by a death-

---

[23]St. Rec. Vol. 42 of 42.

[24]St. Rec. Vol. 42 of 42, Original Application for Writ of Review, 7/27/10.

[25]Rec. Doc. No. 1.

27

13-31201.315

qualified jury in a case in which the death penalty was unconstitutional; (3) denial of due

process because of the State's failure timely to provide (a) Connecticut crime laboratory

reports, (b) exculpatory videotape of the victim and (c) evidence concerning charges

facing the victim's mother before and during trial, evidence which the State has yet to

provide;[26] (4) ineffective assistance of counsel due to counsel's failure to (a) introduce

exculpatory phone records, (b) introduce October 1999 video, (c) impeach the victim's

mother, (d) object to introduction of a hearsay photograph of the caller I.D. box,

(e) cross-examine Madere, (f) object to introduction of an inadmissible videotaped

accusation, rather than stipulating to its admission, (g) impeach Dr. Lee and subpoena

Dr. Messina, (h) request a "taint hearing," (i) call favorable witnesses, and (j) the

cumulative effect of the above listed errors; (5) trial by elected, rather than appointed,

judges; (6) trial court error in denying motions for mistrial and refusing to instruct jury

to confine its attention to the evidence; (7) trial court error in admitting gruesome

photographs into evidence; (8) prosecutorial misconduct that vitiated the validity of the

verdict; (9) trial court error in admitting expert testimony of Dr. Henry Lee regarding

---

[26]Sub-claim (c) is not listed in Kennedy's "Table of Contents." Rec. Doc. No. 1, p. 2. Instead, the issue is only vaguely referenced in Kennedy's supporting memorandum in which he complains that "[a] third item has still yet to be fully disclosed." Id. at p. 55.

13-31201.316

grass discoloration; (10) exclusion of citizens from jury service based upon prior pardoned felony convictions; and (11) cumulative error.[27]

The State filed a response in opposition to Kennedy's petition conceding timeliness, but asserting that claims (3)(c), (4)(d-i) and (8) have not been exhausted, claim (5) is procedurally barred and the rest are without merit.[28]  Kennedy filed a reply to the State's response.[29]

III.  GENERAL STANDARDS OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") went into effect on April 24, 1996[30] and applies to habeas petitions filed after that date.  Flanagan v. Johnson, 154 F.3d 196, 198 (5th Cir. 1998) (citing Lindh v. Murphy, 521 U.S. 320 (1997)).  The AEDPA therefore applies to Kennedy's petition, which was filed by counsel in this federal court on April 19, 2011.

The threshold questions in habeas review under the amended statute are whether the petition is timely and whether the claims raised by the petitioner were adjudicated on

---

[27]Though not enumerated as a separate claim, Kennedy, at the end of his memorandum, argues that he is entitled to an evidentiary hearing.  Rec. Doc. No. 1, p. 125.  I will address this argument following my discussion of Kennedy's eleven (11) enumerated claims.

[28]Rec. Doc. No. 16.

[29]Rec. Doc. No. 19.

[30]The AEDPA, which was signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments.  Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law.  United States v. Sherrod, 964 F.2d 1501, 1505 (5th Cir. 1992).

13-31201.317

the merits in state court; i.e., the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim. Nobles v. Johnson, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. § 2254(b), (c)).

In this case, the State concedes and I find that Kennedy's federal petition was timely filed.

The State asserts that Kennedy's claim (3)(c) is unexhausted because it "was not pursued in his writ application filed in the Louisiana Supreme Court under Writ No. 10-KP-1765."[31]  As noted below at page 61, Kennedy has failed to brief, support or in any way sustain his burden of proof as to this claim.  Accordingly, I recommend that in the instant case the exhaustion issue with respect to this claim need not be addressed because this claim should be denied on its merits.  28 U.S.C. § 2254(b)(2).  Similarly, with respect to claims (4)(d-i), the State asserts that Kennedy failed to raise any supporting arguments with the state appellate and supreme courts.  The State's assertion in this regard is evidenced by the state appellate court's specific refusal to address these claims due to Kennedy's failure properly to raise them before the court.

To fully exhaust state remedies, the petitioner must have raised each claim at each level of the Louisiana courts. Baldwin v. Reese, 541 U.S. 27, 32 (2004); O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999).  Because Kennedy failed to raise claims (4)(d-i) at

---

[31]Rec. Doc. No. 16, p. 13.

13-31201.318

each level of the Louisiana courts, I agree that these claims were not exhausted.  In addition, Kennedy's state court pleadings reveal that he did not raise claim (4)(j) before any of the state courts.  However, because these claims are clearly without merit, I will address them without requiring full exhaustion.  28 U.S.C. § 2254(b)(2).

With respect to claim (8), prosecutorial misconduct, the State argues that Kennedy did not exhaust his state court remedies because he "never mentioned the Due Process clause or the Sixth Amendment or articulated a constitutional basis for these claims when presenting them to the Louisiana Supreme Court on direct appeal."[32]  In response, Kennedy argues that while his "appellate brief did not cite book and verse of the federal constitution, the claim was clearly grounded upon federal constitutional principles."[33]

"A federal court claim must be the 'substantial equivalent' of one presented to the state courts if it is to satisfy the 'fairly presented' requirement." Whitehead v. Johnson, 157 F.3d 384, 387 (5th Cir. 1998) (citing Picard v. Connor, 404 U.S. 270, 275-78 (1971)). "This requirement is not satisfied if the petitioner presents new legal theories or new factual claims in his federal application." Id. (citing Nobles, 127 F.3d at 420) (emphasis added).

---

[32]Rec. Doc. No. 16, p. 14.

[33]Rec. Doc. No. 19, p. 8.

13-31201.319

Having reviewed the pertinent portion of Kennedy's appellate brief,[34] I find that while Kennedy did not specifically refer to violations of his federal constitutional rights, such alleged violations were inherent in the overall context of his claims.[35]  Further, as discussed below at page 99, while the Louisiana Supreme Court relied upon state law in addressing Kennedy's prosecutorial misconduct claims, the state law in this regard mirrors applicable federal law.

The State asserts, and I find, that Kennedy's claim (5) is procedurally barred. I will address this procedural default issue before proceeding to the merits of Kennedy's remaining claims.

IV.   ELECTED JUDGES (CLAIM NO. 5)

In his fifth claim in this court, Kennedy argues that his constitutional rights were violated because the state judges who handled his case were elected, not appointed. Generally, a federal court will not review a question of federal law decided by a state court if the decision of that state court rests on a state ground that is both independent of the federal claim and adequate to support that judgment.  Coleman v. Thompson, 501 U.S. 722, 731-32 (1991); Glover v. Cain, 128 F.3d 900, 902 (5th Cir. 1997); Amos v. Scott, 61 F.3d 333, 338 (5th Cir. 1995) (citing Harris v. Reed, 489 U.S. 255, 260, 262

_____

[34]St. Rec. Vol 27 of 42.

[35]See, e.g., St. Rec. Vol. 27 of 42, Original Brief on Appeal, p. 51 ("The prosecution's argument also treaded upon Mr. Kennedy's presumption of innocence and his decision not to testify.").

32

13-31201.320

(1989)). This "independent and adequate state law" doctrine applies to both substantive and procedural grounds and affects federal review of claims that are raised on either direct or habeas review. Id.

Procedural default does not bar federal court review of a federal claim raised in a habeas petition unless the last state court to render a judgment in the case has clearly and expressly indicated that its judgment is independent of federal law and rests on a state procedural bar. Harris, 489 U.S. at 263; Glover, 128 F.3d at 902. When the last state court judgment does not indicate whether it is based on procedural default or the merits of a federal claim, it is presumed that the court relied upon the same grounds as the last reasoned state court opinion. Ylst v. Nunnemaker, 501 U.S. 797, 802 (1991).

Kennedy's claim (5), that he was denied due process because his state proceedings were conducted by elected rather than appointed judges, was raised in his post-conviction proceedings. The last reasoned decision on this issue was that of the state trial court, which stated:

> Petitioner claims that the election of judges violates his due process of law. This claim is procedurally barred from review. If the application raises a claim the petitioner knew about, but inexcusably failed to raise prior to conviction, the court may deny relief. LSA-C.Cr.P. art. 930.4(B). Additionally, if the application alleges a claim that was raised at trial, but was inexcusably not pursued on appeal, the court may deny relief. LSA-C.Cr.P. art. 930.4(C). The petitioner's claim is barred because it could

33

have been, but was not, raised at trial or on appeal.  Under La.C.Cr.P. art. 930.4, such claims should be denied.[36]

(A)    Procedural Bar:  Independent and Adequate

For this state-imposed procedural bar to prevent review by this federal habeas court, the bar must be independent and adequate.  A procedural restriction is "independent" if the state court's judgment "clearly and expressly" indicates that it is independent of federal law and rests solely on a state procedural bar.  Amos, 61 F.3d at 338.  To be "adequate," the state procedural rule must be strictly or regularly followed and evenhandedly applied to the majority of similar cases.  Glover, 128 F.3d at 902.  A state procedural bar is presumptively adequate when the state court expressly relies on it in deciding not to review a claim for collateral relief.  Id.

With respect to claim (5), the state trial court issued the last reasoned opinion in which it denied Kennedy's claim that he was denied due process because elected judges presided over his proceedings, relying upon Louisiana Code of Criminal Procedure articles 930.4(B) and (C).  This court has repeatedly held that both articles 930.4(B) and 930.4(C) are independent and adequate state grounds for dismissal, which bar review by

---

[36]St. Rec. Vol. 42 of 42, Order, 4/28/10.  In the state appellate court's opinion, rather than substantively addressing the instant claim, the court simply provided that the district court did not err in "summarily den[ying] the claim on grounds that relator knew about this claim at trial and at the time of appeal, but inexcusably failed to raise it.  La. C.Cr.P. art 930.4B and C."  St. Rec. Vol. 42 of 42, 5th Cir. Order, 2010-KH-0418. The Louisiana Supreme Court thereafter denied Kennedy's writ application, No. 2010-KH-1765, without reasons.  State ex rel. Kennedy v. Cain, 60 So.3d 1246, 2010-KP-1765 (La. 2011).

13-31201.322

the federal courts in a habeas corpus proceeding. See Lewis v. Cain, No. 09-3240, 2010 WL 4363546, *9 (E.D. La. Aug. 19, 2010) (Chasez, MJ.), report & recommendation adopted, 2010 WL 4340795 (E.D. La. Oct. 21, 2010 (Feldman, J.) (La. Code Crim. Proc. 930.4(C)); Hurd v. Cain, No. 09-3112, 2009 WL 3063354, at *7 (E.D. La. Sept. 23, 2009) (Lemmon, J.) (La. Code Crim. Proc. 930.4(C)); Rose v. Prince, No. 08-4783, 2009 WL 2922801, *4 (E.D. La. Sept. 10, 2009) (Vance, J.) (La. Code Crim. Proc. 930.4(C)); Simmons v. Cain, No. 06-2130, 2008 WL 2185422, at *4-6 (E.D. La. May 20, 2008) (Berrigan, J.) (La. Code Crim. Proc. art. 930.4(B)).

Because the state court's decision on claim (5) rested on independent and adequate state rules of procedural default, this court may not review claim (5).

(B)     Cause and Prejudice

A federal habeas petitioner may be excepted from the procedural default rule only if he can show "cause" for his default and "prejudice attributed thereto," or demonstrate that the federal court's failure to review the defaulted claim will result in a "fundamental miscarriage of justice." Glover, 128 F.3d at 902 (citing Coleman, 501 U.S. at 731-32); Amos, 61 F.3d at 338-39 (citing Harris, 489 U.S. at 262; Engle v. Isaac, 456 U.S. 107, 129 (1982)).

To establish cause for a procedural default, a petitioner must demonstrate that some objective factor external to the defense impeded his efforts to comply with the state's procedural rule. Murray v. Carrier, 477 U.S. 478, 488 (1986). The mere fact that

35

petitioner or his counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default. Id. at 486.

Kennedy attributes the above procedural default to ineffective assistance of counsel.[37]  Ineffective assistance of counsel may in some circumstances serve as cause to overcome a procedural bar. See Murray, 477 U.S. at 489 (where ineffective assistance claim has independently been presented to state courts, it may be used to establish cause for a procedural default).  However, the ineffective assistance of counsel claim cannot do so if it is, itself, procedurally defaulted.  In such circumstances, the petitioner must first show "cause and prejudice" for the defaulted claim.  Edwards v. Carpenter, 529 U.S. 446, 452-53 (2000).

Review of Kennedy's claims asserted in his direct appeal and post-conviction proceedings in state court reflects that he never complained that his counsel was ineffective for failing to raise the claim that he was prejudiced because his proceedings were conducted by elected judges.  Thus, Kennedy has failed to exhaust his state court remedies as required under Rose v. Lundy, 455 U.S. 509 (1982), and any attempt to do so in state court at this point would be procedurally barred as untimely under Louisiana

---

[37]Rec. Doc. No. 1, p. 109.

13-31201.324

Code of Criminal Procedure article 930.8.[38]  See Mays v. Cain, No. 08-3983, 2011 WL

2295173, at *4 (E.D. La. June 9, 2011) (Lemelle, J.) (quoting Coleman, 501 U.S. at 735

n.1) (additional citation omitted) ("[A] procedural default occurs when a prisoner fails

to exhaust available state remedies, and 'the court to which the petitioner would be

required to present his claims in order to meet the exhaustion requirement would now

find the claims procedurally barred.'").

Kennedy also contends that he could not have known about the prejudice he would

suffer at the hands of elected judges until the Louisiana Supreme Court affirmed his

conviction and death sentence on direct appeal.[39]  This argument is wholly without merit.

Kennedy knew or must have known long before the commencement of his state court

proceedings that his state court case would be in the hands of elected judges.  Thus, he

knew the basis of his claim long before the Louisiana Supreme Court upheld his

conviction and death sentence.

"The failure to show 'cause' is fatal to the invocation of the 'cause and prejudice'

exception, without regard to whether 'prejudice' is shown." Hogue v. Johnson, 131 F.3d

466, 497 (5th Cir. 1997) (citing Engle, 456 U.S. at 134 n.43).  Kennedy having failed to

show an objective cause for his default, the court need not determine whether prejudice

---

[38]Article 930.8 provides petitioners with two years from the date their convictions and sentences
became final to timely seek post-conviction relief.

[39]Rec. Doc. No. 19, p. 10.

37

13-31201.325

existed, and petitioner has not alleged any actual prejudice. Ratcliff v. Estelle, 597 F.2d

474, 478 (5th Cir. 1979) (citing Lumpkin v. Ricketts, 551 F.2d 680, 681-82 (5th Cir.

1977)).

(C)    Fundamental Miscarriage of Justice

Kennedy may avoid this procedural bar only if a fundamental miscarriage of

justice will occur if the merits of his claim are not reviewed. Hogue, 131 F.3d at 497

(citing Sawyer v. Whitley, 505 U.S. 333, 339 (1992)).    To establish a fundamental

miscarriage of justice, petitioner must provide this court with evidence that would

support a "colorable showing of factual innocence." Kuhlmann v. Wilson, 477 U.S. 436,

454 (1986); accord Murray, 477 U.S. at 496; Glover, 128 F.3d at 902.   To satisfy the

factual innocence standard, petitioner must establish a fair probability that, considering

all of the evidence now available, the trier of fact would have entertained a reasonable

doubt as to the defendant's guilt. Campos v. Johnson, 958 F. Supp. 1180, 1195 (W.D.

Tex. 1997); see also Nobles, 127 F.3d at 423 n.33 (actual innocence factor requires a

showing by clear and convincing evidence that "but for constitutional error, no

reasonable factfinder would have found the applicant guilty of the underlying offense").

When the petitioner has not adequately asserted his actual innocence, his procedural

default cannot be excused under the "fundamental miscarriage of justice" exception.

Glover, 128 F.3d at 903.

38

Kennedy does not present any indication, and the record contains nothing that suggests, his actual innocence on the underlying conviction. He fails to present any evidence or persuasive argument of actual innocence that was not already presented to and resolved by the jury at trial and the state courts on subsequent review. For these reasons, Kennedy has failed to overcome the procedural bar to his claim. This claim is procedurally barred and must be dismissed with prejudice for that reason. As discussed below, the remainder of his claims must be dismissed on their merits

V.    STANDARDS OF MERITS REVIEW

Title 28 U.S.C. §§ 2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law and mixed questions of fact and law in federal habeas corpus proceedings. Nobles, 127 F.3d at 419-20 (citing 28 U.S.C. § 2254(b) and (c)).

Determinations of questions of fact by the state court are "presumed to be correct . . . and we will give deference to the state court's decision unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Hill v. Johnson, 210 F.3d 481, 485 (5th Cir. 2000) (quoting 28 U.S.C. § 2254(d)(2)). The amended statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption. 28 U.S.C. § 2254(e)(1).

13-31201.327

A state court's determination of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. § 2254(d)(1) and receive deference, unless the state court's decision "'was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent.]'" Penry v. Johnson, 215 F.3d 504, 507 (5th Cir. 2000) (quoting Miller v. Johnson, 200 F.3d 274, 280-81 (5th Cir. (2000)), aff'd in part, rev'd in part on other grounds, 532 U.S. 782 (2001); Hill, 210 F.3d at 485.

The United States Supreme Court has clarified the Section 2254(d)(1) standard as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 405-06, 412-13 (2000); accord Penry, 532 U.S. at 792-93; Hill, 210 F.3d at 485.  "'A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state court decision applied [a Supreme Court case] incorrectly.'" Price v. Vincent, 538 U.S. 634, 641 (2003) (quoting Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002)) (brackets in original) (citing Bell v. Cone, 535 U.S. 685, 699 (2002)).  Rather, under the "unreasonable application" standard, "the only question for a federal habeas court is whether the state court's

40

13-31201.328

determination is objectively unreasonable." Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002).

The burden is on the petitioner to show that the state court applied the precedent to the facts of his case in an objectively unreasonable manner. Price, 538 U.S. at 641 (citing Woodford, 537 U.S. at 24-25); Wright v. Quarterman, 470 F.3d 581, 585 (5th Cir. 2006)).

As determined above, Kennedy's claims (4)(d-j) have not been exhausted in the state courts. With respect to claims that are not fully adjudicated on the merits in state court, the deferential AEDPA standards of review do not apply. Cullen v. Pinholster, 131 S. Ct. 1388, 1401 (2011); Henderson v. Cockrell, 333 F.3d 592, 597 (5th Cir. 2003). Instead, the federal courts review those claims under the pre-AEDPA de novo standards of review. See id. at 598 (citing Jones v. Jones, 163 F.3d 285, 299-300 (5th Cir. 1998)) "(applying de novo standard of review to ineffective assistance of counsel claims that were raised in state court, but not adjudicated on the merits)"); Carty v. Thaler, 583 F.3d 244, 253 (5th Cir. 2009).

VI.  RACE AND GENDER DISCRIMINATION IN SELECTION OF GRAND JURY FOREPERSONS (CLAIM NO. 1)

Kennedy contends that, when he was indicted in May 1998, the State of Louisiana unconstitutionally discriminated against women and African-Americans in the selection

41

of grand jury forepersons in Jefferson Parish.[40]   Thus, he argues that the state courts

unconstitutionally denied his motion to quash his indictment.   Allegations of

discrimination in jury pools involve a mixed question of law and fact.   United States v.

Rodriguez, 581 F.3d 775, 789 (8th Cir. 2009); United States v. Brisk, 171 F.3d 514, 523

(7th Cir. 1999); United States ex rel. Barksdale v. Blackburn, 610 F.2d 253, 259 (5th Cir.

1980).

On January 14, 2002, the state trial court held a hearing on Kennedy's motion to

quash the indictment.[41]   During that hearing, the trial court limited its consideration of

grand jury composition data to a ten-year period from May 24, 1988 to September 10,

1998.[42]   During that ten-year period, 19 grand juries were empaneled and 19 grand jury

forepersons were selected.[43]   Of those 19 grand jury forepersons, ten were white males,

six were white females, one was a black female, and two were black males.[44]

---

[40]Rec. Doc. No. 1, p. 27.

[41]St. Rec. Vol. 9 of 42, pp. 2035, 2078.

[42]St. Rec. Vol. 9 of 42, pp. 2107, 2108, 2117.  The defense presented data covering a period of
19 years, going back to 1970.  The court only considered the data covering a ten-year period.

[43]St. Rec. Vol. 9 of 42, p. 2103.  St. Rec. Supp. Vol. 1 of 1.

[44]St. Rec. Vol. 9 of 42, pp. 2103-2104.  St. Rec. Supp. Vol. 1 of 1.

13-31201.330

Accordingly, African-Americans comprised 15.8% of the grand jury forepersons chosen during this time period and women comprised 36.8%.[45]

Thereafter, a comparison was made between the percentage of African-Americans and women chosen to be forepersons and the percentage of African-Americans and women living in Jefferson Parish during the period from 1990-2000. Based upon the comparison, the state trial court, providing no reasons to support its decision, determined that the defense had established a prima facie case of purposeful discrimination. The court, however, denied Kennedy's motion to quash, finding that the State had successfully rebutted Kennedy's prima facie showing.[46]

Kennedy then filed a writ application with the Louisiana Fifth Circuit. In its analysis, the state appellate court first reviewed the information established at the January 14, 2002 hearing.

> During the 10-year time period considered by the trial court, there were 19 grand juries empaneled and 19 grand jury forepersons selected by the judges of the 24th Judicial District Court of Jefferson Parish. Ten forepersons were white males; six were white females; one was a black female; and two were black males. Thus, African-Americans made up 15.78% of the grand jury forepersons during this time period; and women were grand jury forepersons 36.8% of the time.
> This data was compared to several statistical population samples, the 1990 and 2000 census figures from Jefferson Parish, average voter registration from Jefferson Parish for 1990-2000, and the number of women called randomly to serve on grand juries during the above-mentioned 10-year period. For African-Americans, the 1990 census data shows that

---

[45]St. Rec., Vol. 9 of 42, pp. 2104-2105.

[46]St. Rec. Vol. 9 of 42, pp. 2122 and 2144.

43

13-31201.331

17.63% of the population of Jefferson Parish were African-Americans. Thus, comparing the population percentage of African-Americans to the percentage of African-Americans chosen as grand jury forepersons, there is an absolute disparity of 1.85% (17.63% minus 15.78%). Considering the 2000 census data, 22.9% were African-American. Thus, the disparity in 2000 becomes 7.12% (22.9% minus 15.78%). Considering voter registration lists, 15% were African-American. Thus, the disparity is -.78%, indicating that a slightly higher portion of African-Americans were chosen to serve as forepersons in comparison to the voting population of Jefferson Parish.

Regarding women, it is noted that 36.8% of the forepersons were women for the 10-year period. The 1990 census figures show 51.95% females in the gross population, indicating an absolute disparity of 15.15%. The 2000 census figures show 52% as female. For 2000, the [absolute] disparity is 15.2%. Considering the voter registration for 1990 to 2000, females represent 54.21%, an absolute disparity of 17.41%. The number of women randomly called to serve on grand juries from May 1988 until September 1998 was 50.2%, for an absolute disparity of 13.4%. Therefore, for women, the [absolute] disparities range from 13.4% to 17.41%. We note that women comprised a much larger segment of the overall population segments than did African-Americans.

Kennedy, 823 So. 2d at 414 (footnote omitted).[47]

Thereafter, the Louisiana Fifth Circuit discussed the three-part test enunciated in

Castaneda v. Partida, 430 U.S. 482, 491 (1977), and interpreted by the Louisiana

Supreme Court in State v. Langley, 813 So. 2d 356 (La. 2002), which must be satisfied

to support an equal protection challenge to grand jury selections.

---

[47]As reflected above, the Louisiana Fifth Circuit set forth the statistical information for African-Americans, along with women, even though the defense "conceded that the evidence did not show discrimination against African-Americans as grand jury forepersons during the 10-year time period." Id. at 413-414. The defense also conceded that the grand jury selection process was not discriminatory. Id. at 413.

44

To demonstrate an equal protection violation in the context of grand jury selection, a defendant must establish a prima facie case of purposeful discrimination by showing: (1) that those discriminated against belong to a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied; (2) that the degree of under-representation must be proved "by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time;" and (3) that the selection procedure is "susceptible of abuse or is not racially neutral" so as to support the presumption of discrimination raised by the statistical showing. Castaneda v. Partida, 430 U.S. at 494-95 . . . ; see also State v. Cosey, [779 So.2d 675, 682 (La. 2000)]. This court has previously acknowledged that blacks and women are identifiable groups capable of being singled out for disparate treatment. [Id.] citing J.E.B. v. Alabama ex. rel. T.B., 511 U.S. 127 . . . (1994). This court has also recognized that, at the time the defendant was indicted, Louisiana's procedure for selecting grand jury forepersons was unquestionably subject to abuse according to subjective criteria that may include race and gender. Cosey, . . . 779 So.2d at 682-83, citing Campbell v. Louisiana, [523 U.S. 392 (1998)]; Johnson v. Puckett, [929 F.2d 1067 (5th Cir. 1991)].

Kennedy, 823 So.2d at 415-16 (quoting Langley, 813 So.2d at 371).

Conceding that Kennedy had satisfied his burden of proof with respect to factors (1) and (3), the court determined that the only issue was whether Kennedy had satisfied his burden of proof with regard to factor (2). Specifically, it evaluated whether Kennedy had shown the requisite degree of under-representation via a statistical comparison of the proportion of the group in the total population to the proportion called to serve as grand jury forepersons over a significant time period. Id. at 416.

45

In addressing this issue, the court determined that analysis of the pertinent figures, "looking at 'comparative' disparities together with absolute disparities," would provide "the most accurate picture possible." Id. at 418 (footnote omitted). The court explained that "[c]omparative disparity is calculated by dividing the absolute disparity[48] by the population figure for a population group. It measures the diminished likelihood that members of an under represented group, when compared to the population as a whole, will be called for jury service." Id. at 418 (citing Ramseur v. Beyer, 983 F.2d 1215, 1232 (3d Cir. 1992)). The court found:

> Regarding women, it is noted that 36.8% of the forepersons were women for the 10 year period. The 1990 census figures show 51.95% women, for an absolute disparity of 15.15%, and a comparative disparity of 29.16%. The 2000 census figures show 52% female, for an absolute disparity of 15.2%, and a comparative disparity of 29.23%. Considering the voter registration from 1990 to 2000, females represent 54.21%, an absolute disparity of 17.41% and a comparative disparity of 32.12%. Considering the number of women called randomly to serve in grand juries from 19[8]8 until 1998, 50.2%, the absolute disparity is 13.4% and the comparative disparity is 26.7%.

Id. at 418-19. The court then evaluated other considerations:

> Consistently, throughout the cases in this area, the courts have exhibited a reluctance to emphasize any one factor that controls the court's resolution of the issue. There is no magic, controlling number. Rather, we have been instructed to look at all the factors that bear on the issue, such as the number of years involved, the duration of the disparity, the size of the population segment, and the number of grand juries considered. In other words, it is the totality of the circumstances that must be considered in

---

[48]Absolute disparity is calculated by subtracting the percentage of the population group serving as forepersons from the population figure for the population group. Id. at 414.

46

determining whether the defendant has succeeded in making a <u>prima facie</u> showing of significant under representation.

<u>Id.</u> at 419.

Examining the pertinent statistics in the context of the "totality of the circumstances," the Louisiana Fifth Circuit determined that Kennedy had failed to meet his burden of proof. Specifically, the court held: "[W]e cannot conclude that the defendant made a <u>prima facie</u> showing of purposeful discrimination in the selection of grand jury forepersons." <u>Id.</u> at 420.[49]

"The threshold determination of whether a defendant has made a <u>prima facie</u> showing of discrimination requires the resolution of a mixed question of law and fact." <u>Santiago v. Graham</u>, No. 08-CV-6465(MAT), 2010 WL 4513305, at *13 n.8 (W.D.N.Y. Nov. 10, 2010) (citing <u>United States v. Alvarado</u>, 891 F.2d 439, 443 (2d Cir. 1980), <u>vacated on other grounds</u>, 497 U.S. 543 (1990)).

Kennedy offers the following arguments in support of his claim that the Louisiana Fifth Circuit erred in finding that he failed to make a prima facie showing of purposeful discrimination in the selection of grand jury forepersons: (a) The court applied incorrect statistical analyses. (b) The court failed to consider data gathered by the defense covering a 19-year period. (c) The court improperly considered data covering a period after Kennedy was indicted. (d) Even considering only a 10-year period of grand jury

---

[49]The Louisiana Supreme Court affirmed the Louisiana Fifth Circuit's opinion without issuing reasons. <u>State v. Kennedy</u>, 836 So. 2d 43, No. 2002-KK-2008 (La. 2003).

13-31201.335

selection, the defense proved a prima facie case of discrimination.  (e) The state appellate court erred in limiting its review to 10 years as the district court's judgment does not specify such a limitation.  (f) The state appellate court used an improper standard in reviewing the district court's decision.  (g) The State's failure to rebut Kennedy's prima facie case and discrimination in selection of grand jury forepersons is a structural defect. For the following reasons, none of these arguments is sufficient to support habeas corpus relief.

Kennedy submits that the United States Supreme Court, in determining whether a defendant has made the requisite prima facie case of purposeful discrimination, "has applied four types of statistical analyses:  binomial distribution, standard deviation, absolute disparity, and comparative disparity."[50]  Kennedy further argues that even though it has applied all four tests, the "Supreme Court has . . . recognized, when applied to smaller groups, that binomial distribution analysis . . . is more accurate."[51]  Thus, he implies that the Louisiana Fifth Circuit, by employing absolute disparity and comparative disparity analyses, ran afoul of Supreme Court law.  Kennedy's argument is without merit.

---

[50]Rec. Doc. No. 1, pp. 32-33. Kennedy cites four Supreme Court cases in which the Court applied one of these analytical methods or a combination of them.

[51]Rec. Doc. No. 1, p. 35 (citation omitted).  While African-Americans, as compared with the total population of Jefferson Parish, may constitute a "smaller group," the same is not true for women, who accounted for more than half of the population.

48

13-31201.336

First, review of the Supreme Court decisions cited by Kennedy reflects that the Supreme Court, rather than setting a hard and fast rule, has merely made observations regarding which tests have been applied in different situations and/or which tests other courts have deemed most appropriate in particular instances. See Berghuis v. Smith, 130 S. Ct. 1382, 1393 (2010) (other courts have recognized that absolute disparity and comparative disparity measurements can be misleading when members of a distinctive group compose only a small percentage of those eligible for jury duty); Hazelwood Sch. Dist. v. United States, 433 U.S. 299, 311 n.17 (1977) ("These observations are not intended to suggest that precise calculations of statistical significance are necessary . . . .") (emphasis added); Castaneda, 430 U.S. at 496 n.17 (citation omitted) ("If the jurors were drawn randomly from the general population, then the number of Mexican-Americans in the sample could be modeled by a binomial distribution.") (emphasis added) .

Second, and more importantly, the Court in Berghuis specifically stated that it purposely has not specified "the method or test courts must use to measure the representation of distinctive groups in jury pools." Berghuis, 130 S. Ct. at 1393. Recognizing that "[e]ach test is imperfect," the Court stated: "Even in the absence of AEDPA's constraint we would have no cause to take sides today on the method or methods by which underrepresentation is appropriately measured." Id. at 1393-94 (footnote omitted).

49

13-31201.337

Thus, I find that the analyses employed by the state appellate court did not violate Supreme Court precedent. This argument is without merit.

Kennedy also argues that the state courts erred in limiting their review to 10 years and 19 grand juries when the defense collected data covering 19 years and 36 grand juries. Kennedy presents this argument in different variations: (a) "How the defendant chooses to satisfy his burden is limited only by how much evidence he is able to produce."[52] (b) "If Mr. Kennedy had been able to acquire a lifetime-worth of data, he should have been able to use it to establish his claim."[53] (c) "The Fifth Circuit's refusal to consider <u>half</u> of the evidence Mr. Kennedy presented at the hearing was contrary to established federal law setting forth the procedure for grand jury discrimination challenges."[54] (d) "[N]o federal case in our jurisdiction has ever limited the data considered in a grand jury discrimination claim to such a truncated set of numbers, where the defendant has presented a larger data set."[55]

Kennedy cites no decision in support of his argument setting a bright line rule regarding how many years and grand juries a court must consider in determining whether a prima facie case of discrimination has been shown in the selection of grand jury

--------

[52]Rec. Doc. No. 19, p. 16 (footnote omitted).

[53]<u>Id.</u> at p. 17 (citation omitted).

[54]<u>Id.</u> at p. 18 (emphasis original) (citation omitted).

[55]<u>Id.</u> at p. 18 (citations omitted).

50

13-31201.338

forepersons. Nor does Kennedy cite any law requiring that a court must consider all data supplied by the defendant in making such a determination. Instead, Kennedy cites numerous cases in which courts have considered data covering a longer period of time and more grand juries than the Louisiana Fifth Circuit did. See, e.g., Allen v. Cain, 64 F. App'x 416, 2003 WL 1524576, at *2 (5th Cir. 2003) (considered data presented by defendant which consisted of 16 years and 47 grand juries);[56] Johnson v. Puckett, 929 F.2d 1067, 1068 (5th Cir. 1991) (considered 42 grand juries); Guice v. Fortenberry, 722 F.2d 276, 280 (5th Cir. 1984) (considered a period of 15 years).[57]

As the State argues in its response, Kennedy "has not identified any relevant United States Supreme Court jurisprudence requiring that a period greater than ten years be considered,"[58] and my research has uncovered no such decisions. Therefore, I find that the Louisiana Fifth Circuit's decision to examine data from a 10-year period during which 19 grand juries were selected was not contrary to or an unreasonable application of clearly established Supreme Court law.

As noted above, the Louisiana Fifth Circuit considered data concerning the selection of grand jury forepersons over the period from May 24, 1988 to September 10,

_____

[56]Rec. Doc. No. 1, p. 49.

[57]Id. at p. 50.

[58]Rec. Doc. No. 16, p. 27.

51

1998. Kennedy was indicted on May 7, 1998, and argues that it was improper for the court to consider data beyond that date.

The data considered by the Louisiana appeal court reflects that only one grand jury was chosen over the approximately four-month period from May 8, 1998 to September 10, 1998, following Kennedy's indictment.[59]  While Kennedy suggests that the Fifth Circuit considered that extra grand jury because an African-American was chosen as foreperson, there is no evidence to support this suggestion.  Further, in support of his position, Kennedy merely cites cases in which courts have only considered data regarding the grand jury which indicted the defendant, along with preceding juries.[60]  However, there is no Supreme Court case dictating that a court may not consider data regarding one grand jury chosen after a defendant's indictment.  Certainly, the temporal proximity of this particular grand jury foreperson selection renders its inclusion in the court's statistical analyses relevant to the underlying issue, i.e., whether institutional discrimination existed in this process.  Accordingly, I find that the state appellate court's consideration of data from a single grand jury chosen immediately after Kennedy's indictment is not contrary to or an unreasonable application of Supreme Court law.

Kennedy argues alternatively that even if the Louisiana Fifth Circuit's 10-year review limitation was appropriate, he nevertheless made a prima facie showing of gender

---

[59]St. Rec. Supp. Vol. 1 of 1.

[60]Rec. Doc. No. 1, pp. 47-48.

13-31201.340

discrimination based upon this limited data. In support of this argument, Kennedy points to cases in which the Supreme Court has found that a prima facie case was established based upon less evidence of disparity. However, once again, the Supreme Court has not set a bright line disparity benchmark below which there is no equal protection violation and above which a constitutional violation exists. Thus, the state Fifth Circuit's determination that the gender disparity ranging from 13% to 18% was insufficient to prove a prima facie case of discrimination is not violative of Supreme Court law.

Kennedy also argues that because the state district court failed to provide reasons to support its finding concerning the prima facie case, there is no evidence that the court limited its review to a 10-year period and that the state appellate court, in reviewing the district court's opinion, erred in limiting its review to a 10-year period.[61] This argument is factually incorrect. The January 14, 2002 hearing transcript reflects that the district court quite clearly stated that its review was limited to a 10-year period.[62]

Kennedy further states that the Louisiana Fifth Circuit, in determining that the district court erred in finding that Kennedy had established a prima facie case, used the wrong state law standard of review. Kennedy argues that the trial court's decision should have been upheld absent an abuse of discretion, but because Kennedy was "an infamous

---

[61]Id. at p. 51.

[62]St. Rec. Vol. 9 of 42, pp. 2107, 2108, 2117.

53

father-figure accused of brutally violating his eight-year old stepdaughter," the state appellate court employed a more stringent standard of review.[63]

In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws or treaties of the United States. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). A federal court does "not sit as [a] 'super' state supreme court in a habeas corpus proceeding to review errors under state law." Wilkerson v. Whitley, 16 F.3d 64, 67 (5th Cir. 1994) (quotation omitted); see also Swarthout v. Cooke, 131 S. Ct. 859, 861 (2011) (federal habeas review does not lie for errors of state law). Thus, whether the state appellate court's standard of review was violative of state law is, on habeas review, irrelevant and insufficient to support federal habeas relief.

Finally, Kennedy argues that, contrary to the district court's decision, the State failed to rebut his prima facie showing and that discrimination in the selection of grand jury forepersons constitutes a structural defect requiring reversal of his conviction. Both of these arguments are moot. As discussed above, there was no constitutional error in the Louisiana Fifth Circuit's decision that Kennedy did not prove a prima facie case of discrimination. For all of the foregoing reasons, Kennedy's claim concerning alleged discrimination in grand jury foreperson selection is without merit.

---

[63]Rec. Doc. No. 19, pp. 11-12.

13-31201.342

VII.    TRIAL BY A DEATH-QUALIFIED JURY (CLAIM NO. 2)

Kennedy claims that his trial before a jury that was pre-qualified to consider the death penalty was unconstitutional because his initially imposed death sentence was subsequently deemed unconstitutional. Although my research has uncovered no case law clearly establishing the applicable standard of review as to this claim, I find that Kennedy's allegation concerns a mixed question of law and fact.

Kennedy might have a legitimate complaint in this regard if, at the time of his trial, the death sentence had already been deemed unconstitutional. However, the Supreme Court rendered its decision concerning impropriety of the death penalty for rape convictions in 2008, approximately five (5) years _after_ Kennedy's trial. The applicable legal standard is whether the State's action in seeking or imposing the death penalty was a violation of clearly established Supreme Court law. Obviously, when the rule against the death penalty for rape cases was _not_ established until five (5) years _after_ Kennedy's conviction, it _cannot_ be considered to have been _clearly established_ at the relevant time. The State could not foresee what the Supreme Court would decide in the future.

Moreover, the question of Kennedy's guilt was determined as an entirely separate matter from the question of his punishment. As the Louisiana Fifth Circuit Court of Appeal observed:   Kennedy "offered no authority for the proposition that his constitutional rights were violated because he was tried by a 'death qualified' jury."

13-31201.343

State ex rel. Kennedy v. Cain, No. 2010-KH-418 at p. 13.[64] My own research has located

no decision that supports petitioner's argument. On the contrary, the Supreme Court has

specifically rejected such a claim. See Lockhart v. McCree, 476 U.S. 162, 173 (1986)

(assuming "that 'death qualification' in fact produces juries somewhat more

'conviction-prone' than 'non-death-qualified' juries, . . . [w]e hold, nonetheless, that the

Constitution does not prohibit the States from 'death qualifying' juries in capital cases").

For the foregoing reasons, I find that Kennedy has failed to show that the state

courts' rejection of the instant claim was contrary to or an unreasonable application of

clearly established Supreme Court law.

## VIII.  UNTIMELY DISCLOSURE OF EXCULPATORY EVIDENCE (CLAIM NO. 3)

Kennedy argues that his constitutional rights were violated by the State's untimely

disclosure of exculpatory evidence.  Kennedy argues that the State waited until trial to

provide the defense with exculpatory Connecticut laboratory results regarding blood

recovered from a mattress pad.  Further, he argues that it was not until 1999, three (3)

years before his trial, that the State produced a March 7, 1998 videotaped interview in

which the victim stated that Kennedy did not rape her.

---

[64]St. Rec. Vol. 42 of 42.

13-31201.344

Kennedy also states: "Finally, the State continues to withhold Mrs. Kennedy's criminal record from the defense."[65] Kennedy provides no argument or evidence supporting this allegation.    Such a perfunctory statement is insufficient to satisfy Kennedy's burden of proof and insufficient to warrant review by this court.  See United States v. Ogbonna, 34 F. App'x 150, 2002 WL 493970, at *4 (5th Cir. 2002) (burden of proof not satisfied by conclusory statements); De Araujo v. Gonzales, 457 F.3d 146, 153 (1st Cir. 2006) (quotation omitted) ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

In addressing this issue on direct appeal, the Louisiana Supreme Court correctly set forth the applicable Supreme Court law, along with corresponding state law.

> In Brady v. Maryland, 373 U.S. 83 . . . (1963), the Supreme Court held that the suppression by the prosecution of evidence favorable to the accused after receiving a request for it violates a defendant's due process rights where the evidence is material either to guilt or punishment, without regard to the good or bad faith of the prosecution.  Id., 373 U.S. at 87 . . . . The Brady rule encompasses evidence which impeaches the testimony of a witness when the reliability or credibility of that witness may be determinative of guilt or innocence.  United States v. Bagley, 473 U.S. 667, 676 . . . (1985); Giglio v. United States, 405 U.S. 150, 154 . . . (1972); State v. Knapper, 579 So. 2d 956, 959 (La. 1991).  Still, Brady and its progeny do not establish a general rule of discoverability.  A prosecutor does not breach his constitutional duty to disclose favorable evidence "unless the omission is of sufficient significance to result in the denial of the defendant's right to a fair trial."  United States v. Agurs, 427 U.S. 97, 112 . . . (1976); State v. Willie, 410 So. 2d 1019, 1030 (La. 1982).

---

[65]Rec. Doc. No. 1, p. 56.

13-31201.345

While the Supreme Court has repeatedly emphasized the duty of the prosecution to disclose material exculpatory evidence, see e.g. Taylor v. Whitley, 514 U.S. 419 . . . (1995), it has never involved itself in the timing of such disclosures. In that respect, this Court has noted broadly that "the late disclosure as well as the non-disclosure of exculpatory evidence can so prejudice a defendant that he is deprived of his constitutional right to a fair trial." State v. Williams, 448 So. 2d 659, 665 (La. 1984). This standard appears elastic enough to sanction a deliberate delay of disclosure to protect witness safety as long as the defendant's opportunity to investigate the evidence and prepare to exploit it is not substantially impaired. See United States v. Higgs, 713 F.2d 39, 43-44 (3rd Cir. 1983) ("That inquiry in turn depends on what information has been requested and how that information will be used by [the defendants]. No denial of due process occurs if Brady material is disclosed to [defendants] in time for its effective use at trial.").

Not every violation of the discovery procedures requires reversal; before the defendant may complain of the violation, he must establish that prejudice resulted. State v. Hooks, 421 So. 2d 880, 886 (La. 1982); State v. Strickland, 398 So. 2d 1062, 1067 (La. 1981). When a defendant is lulled into a misapprehension of the strength of the state's case through the prosecution's failure to disclose timely or fully, and the defendant suffers prejudice when undisclosed evidence is used against him, basic unfairness results which constitutes reversible error. State v. Mitchell, 412 So. 2d 1042, 1044 (La. 1982); State v. Davis, 399 So. 2d 1168, 1171 (La. 1981). Regardless, discovery violations generally do not provide grounds for reversal of a conviction and sentence unless they have actually prejudiced the defendant; even a discovery violation involving the state's failure to disclose exculpatory evidence does not require reversal as a matter of the Due Process Clause unless the non-disclosure was so serious that there exists a reasonable probability that the suppressed evidence would have produced a different verdict. State v. Garrick, 03-0137 (La. 4/14/04), 870 So. 2d 990, 993.

The defendant must show here that the state's untimely disclosure . . . deprived him of an opportunity to place before the jury all evidence relevant to the credibility of the witness's testimony and thereby "'undermines confidence in the outcome of trial.'" State v. Walter, 96-

58

13-31201.346

1702 (La. 6/20/97), 695 So. 2d 1340 (quoting Kyles v. Whitley, 514 U.S. 419, 434 . . . (1995)).

Kennedy, 2005-KA-1981, Appendix, pp. 25-27.

Kennedy's claim that the State failed to disclose exculpatory evidence in violation of Brady constitutes a mixed question of law and fact. Banks v. Thaler, 583 F.3d 295, 309 (5th Cir. 2009); Cobb v. Thaler, 682 F.3d 364, 377 (5th Cir. 2012) (citing LaCaze v. Warden La. Corr. Inst. for Women, 645 F.3d 728, 736 (5th Cir. 2011)).

Regarding the Connecticut laboratory report, the Louisiana Supreme Court noted that the results of the report were "inconclusive and ultimately of no evidentiary value." Kennedy, 2005-KA-1981, Appendix, p. 27.[66] The court also observed that the defense had an independent expert test the same material, who was able to conclusively state that the victim was not "the source of the bloodstain." Id. at 27-28. The state high court observed that, in contrast to the Connecticut laboratory results, the videotape, in which the victim stated that Kennedy did not rape her, "was clearly exculpatory." Id. at 28. However, the court noted that Kennedy received the videotape "approximately three years before trial," thereby enabling him to make the videotape "the centerpiece of his case." Id.

---

[66]Specifically, Dr. Michael Adamowicz with the "Connecticut State Police Forensic Science Lab" tested samples of the mattress pad in 1998 and "found no DNA on the mattress." Kennedy, 957 So. 2d at 766.

13-31201.347

Based upon the above undisputed facts and law, the court concluded that Kennedy

suffered no constitutional violation, as he "has shown no prejudice in the delayed

disclosure that resulted in basic unfairness rising to the level of reversible error." Id.

at 29. The detailed analysis of the state courts set out above thoroughly and accurately

applies governing federal constitutional law to the facts and evidence in Kennedy's case.

I find that the Louisiana Supreme Court's finding in this regard does not represent an

unreasonable application of United States Supreme Court law to the facts of this case.

IX.   INEFFECTIVE ASSISTANCE OF COUNSEL (CLAIM NO. 4)

Kennedy alleges that his trial counsel was ineffective in ten (10) ways; specifically

that his counsel failed to (a) introduce exculpatory phone records, (b) introduce an

October 1999 videotape, (c) impeach the victim's mother, (d) object to the introduction

of a hearsay photograph, (e) adequately cross-examine Rodney Madere, (f) object to the

introduction of inadmissible videotape, (g) impeach Dr. Lee and subpoena Dr. Messina,

(h) request a "taint hearing" and (i) call favorable witnesses. In addition, he argues

(j) that the cumulative effect of ineffective counsel and untimely disclosure of Brady

evidence rendered his trial unfair.

As noted above, the state trial court addressed all of these claims, summarily

finding that Kennedy had failed to satisfy his burden of proof under Strickland v.

60

13-31201.348

Washington, 466 U.S. 668 (1984).[67] The state appellate court, addressing subclaims (a)

through (c), likewise found that Kennedy had failed to satisfy his burden of proof and

provided reasons to support its decision in this regard. State ex rel. Kennedy v. Cain, No.

2010-KH-418 (La. App. 5th Cir. 7/6/10) (unpublished opinion).[68]

A petitioner's claim that he received ineffective assistance of counsel constitutes

a mixed question of law and fact. Gregory v. Thaler, 601 F.3d 347, 351 (5th Cir. 2010).

The standard for judging performance of counsel was established by the United States

Supreme Court in Strickland, 466 U.S. at 668, in which the Court established a two-part

test for evaluating claims of ineffective assistance of counsel, which requires petitioner

to prove both deficient performance and resulting prejudice. Strickland, 466 U.S. at 697.

The Supreme Court held that "the defendant must [first] show that counsel's

representation fell below an objective standard of reasonableness." Id. at 687-88.

Second, "[t]he defendant must show that there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different."

Id. at 694; accord United States v. Kimler, 167 F.3d 889, 893 (5th Cir. 1999).

In deciding ineffective assistance of counsel claims, this court need not address

both prongs of the conjunctive Strickland standard, but may dispose of such a claim

---

[67]St. Rec. Vol. 42 of 42.

[68]St. Rec. Vol. 42 of 42. The Louisiana Supreme Court denied relief without assigning reasons.
State ex rel. Kennedy v. Cain, 60 So.3d 1246, No. 2010-KP-1765 (La. 2011).

13-31201.349

based solely on a petitioner's failure to meet either prong of the test. Id. A habeas corpus petitioner "need not show that 'counsel's deficient conduct more likely than not altered the outcome in the case.' It is not enough under Strickland, however, 'that the errors had some conceivable effect on the outcome of the proceeding.'" Motley v. Collins, 18 F.3d 1223, 1226 (5th Cir. 1994) (quoting Strickland, 466 U.S. at 693).

On federal habeas review, the "court must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." Bell v. Cone, 535 U.S. 685, 697 (2002) (citing Strickland, 466 U.S. at 689). This court must apply the "strong presumption" to counsel's strategy and defense tactics which fall "within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 690; accord Moore v. Johnson, 194 F.3d 586, 591 (5th Cir. 1999) (citing Strickland, 466 U.S. at 689-90); see also Hernandez v. Thaler, 463 F. App'x 349, 356 (5th Cir. 2012), petition for cert. filed, (U.S. May 29, 2012) (No. 11-10609) (citing Moore, 194 F.3d at 590-91) ("Moore is a pre-AEDPA opinion. AEDPA grants state court determinations more deference.") (emphasis added). In assessing counsel's performance, a federal habeas court must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time

13-31201.350

of trial. Strickland, 466 U.S. at 689; Neal v. Puckett, 286 F.3d 230, 236-37 (5th Cir. 2002); Clark v. Johnson, 227 F.3d 273, 282-83 (5th Cir. 2000).

The United States Supreme Court recently clarified that the question under Strickland "is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." Harrington v. Richter, 131 S. Ct. 770, 788 (2011).[69]

Federal courts have consistently recognized that tactical decisions when supported by the circumstances are objectively reasonable and do not amount to unconstitutionally deficient performance. Lamb v. Johnson, 179 F.3d 352, 358 (5th Cir. 1999) (citing Rector v. Johnson, 120 F.3d 551, 564 (5th Cir. 1997); Mann v. Scott, 41 F.3d 968, 983-84 (5th Cir. 1994)). Federal habeas courts presume that trial strategy is objectively reasonable unless clearly proven otherwise. Strickland, 466 U.S. at 689; Moore, 194 F.3d at 591. The burden is on petitioner to demonstrate that counsel's strategy was constitutionally deficient. Id.

---

[69]The Harrington court recognized the high level of deference owed to a state court's findings under Strickland in light of the AEDPA:

> The standards created by Strickland and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so. The Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Id. (quotations and citations omitted).

13-31201.351

Kennedy first argues that he was denied effective assistance of counsel by virtue of counsel's failure to introduce exculpatory telephone records[70] showing that he did not place telephone calls to A. Arpet Moving Co. and B & B Carpet Cleaning on the morning of the rape.[71]

The exculpatory nature of these records is highly questionable given that the records do not represent all of the phone calls made from Kennedy's home on the day in question. As evidenced by the return of the subject subpoena duces tecum, "Louisiana doesn't record 100% [of] local calls."[72] The fact that Kennedy's undisputed 911 call is not contained in the telephone records is additional evidence that all calls are not recorded.[73] The importance of the telephone records is further diminished by the fact that Kennedy admitted to calling his employer early on the morning of the rape. Specifically, Kennedy advised Sergeant Darren Monie that on the day of the rape he called his employer at around 5:15 a.m. and asked about how to remove blood from carpet.[74]

---

[70]A copy of the phone records are attached as Appendix A to Kennedy's motion for post-conviction relief. St. Rec. Vol. 27 of 42.

[71]As discussed earlier, the State relied on testimony from Alvin Arguello, a dispatcher with the moving company, and Rodney Madere, owner of the carpet cleaning company, that they had received phone calls from Kennedy early on the morning of March 2, 1998, to show that the rape occurred hours before Kennedy reported it via a 911 call.

[72]St. Rec. Supp. Vol. 1 of 1.

[73]The 911 call is reflected in the Call Detail Report for Jefferson Parish's 911 Call Management Reporting System, St. Rec. Vol. 27 of 42, but not in the subject records.

[74]St. Rec. Vol. 19 of 42, pp. 4643, 4646-4647.

13-31201.352

Under these circumstances, I cannot find that this evidence was so material or potentially helpful to the defense that counsel's failure to introduce it was constitutionally deficient performance.  As the Louisiana Fifth Circuit concluded, Kennedy has failed to show "that counsel was deficient in failing to introduce the telephone records, or that [he] was prejudiced thereby." State ex rel. Kennedy v. Cain, No. 2010-KH-418, p. 8 (La. App. 5 Cir. 2010) (unpublished opinion).[75]  I find that the court's conclusion in this regard does not represent an unreasonable application of Strickland to the facts of this case.

Kennedy also claims that trial counsel was deficient in failing to admit an October 1999 videotape "which demonstrated Mr. Kennedy's innocence, impeached L.H. [the victim] and [her mother's] trial testimony, and established that the State had coerced L.H. into testifying against Mr. Kennedy."[76]  Kennedy describes the videotape at issue as follows:

> In October of 1999, defense counsel and an investigator went to [the victim's mother's] home and, with her consent, conducted a videotaped interview. . . .  The videotape reveals that L.H. continued to maintain that Patrick Kennedy did not commit the rape, that prosecutors and [Office of Community Services] OCS workers were pressuring L.H. and [her mother]

---

[75]St. Rec., Vol. 42 of 42.

[76]Rec. Doc. No. 1, p. 71.

13-31201.353

to identify Patrick as the rapist, and revealed [the mother's] view that the prosecutors in the case had exhibited no care or concern for her daughter.[77]

The investigator who accompanied defense counsel to the mother's home in October 1999 was Robert Tucker.   Tucker offered the following testimony at trial concerning the videotape:.

> BY MS. DaPONTE [defense counsel]:
> Q. [I]n connection with your investigation, did you conduct any interviews with any members of Mr. Kennedy's family?
> A. Yes I did.
> Q. And did you specifically speak to his exwife [sic]?
> A. Yes I did.
>
>             ****
>
> Q. Okay.  And did you also speak with [the victim]?
> A. Yes I did.
>
>             ****
>
> Q. Do you recall meeting with [the victim] in October of 1999?
> A. . . . [Y]es.
> Q.  Okay.  And do you recall asking her any questions about what happened to her the year before in 1998?
> A. Yes I do.
> Q. Do you recall what you asked her?
> A.  I asked her what had happened, the details involving what had happened to her in '98.
> Q. Okay. . . . [W]hat did she tell you?
> A.  She told me that there were – she was attacked by a young man on a bicycle.
> Q.  Did you ask her specifically if her Stepfather, Patrick Kennedy, had raped her?
> A. Yes we did.
> Q. Alright.  And did she have an answer to that question?
> A. Yes she did.
> Q. What was her answer?

---

[77]Rec. Doc. No. 1, p. 11.

13-31201.354

A. No; that he had not.

Q. Prior to that interview, did you have conversations with [the victim's] Mother?

A. Yes.

Q. Did she express to you any fears or concerns that she was having at that time?

A. Yes she did.

Q. And what were those fears and concerns?

A. She said that she was afraid, because of the harassment and threatening behavior of the Police Department or the Sheriff's Department and the Social Workers in regard to her having [the victim] taken away from her prior to my meeting with you; that she was afraid that they would do that again.[78]

Through the testimony of Tucker, along with the testimony of the victim and Dr. Benton, both of whom conceded that the victim initially stated that she had been raped by a boy who had been riding a bicycle, trial counsel astutely brought into evidence the content and substance of the taped interviews that were arguably favorable to the defense. As the Louisiana Fifth Circuit concluded: "[T]he jury was presented with both scenarios, and they clearly believed the victim's later statements and her trial testimony that it was [Kennedy] who was the perpetrator. Hence, trial counsel was not deficient in failing to introduce the videotape, nor was relator prejudiced thereby." Kennedy, No. 2010-KH-418, pp. 9-10.[79] I find that the Louisiana Fifth Circuit's finding in this regard does not represent an unreasonable application of Strickland to the facts of this case.

---

[78]St. Rec. Vol. 24 of 42, pp. 5817-5820.

[79]St. Rec. Vol. 42 of 42.

13-31201.355

Kennedy also argues that his trial counsel "had multiple lines of defense" to overcome damaging evidence in the form of the victim's accusation against him and her mother's corroboration of that accusation, but failed adequately to employ them.[80]  He claims that his counsel had spoken with Cathy Holmes, a friend of the family, who informed him that officials had pressured the mother to persuade her daughter to "change her story and accuse Mr. Kennedy."[81]  He asserts that counsel also had records from the Office of Community Services ("OCS") reflecting that the agency was pressuring the mother to persuade her daughter to accuse Kennedy of the rape if she wanted to regain custody.[82]  Kennedy argues that counsel inexplicably did not utilize this information to impeach the mother, failed "to subpoena Ms. Holmes" and apparently left "the OCS records at home."[83]

The transcript reflects that, contrary to Kennedy's suggestion, Cathy Holmes testified at trial regarding the victim's mother's statements about the pressure she felt.[84] In addition, defense counsel elicited testimony from Robert Tucker on this same subject matter.  The transcript reflects that defense counsel vigorously cross-examined the

---

[80]Rec. Doc. No. 1, p. 72.

[81]Rec. Doc. No. 1, p. 72.

[82]Rec. Doc. No. 1, pp. 73-74.

[83]Rec. Doc. No. 1, p. 73.

[84]St. Rec. Vol. 24 of 42, pp. 5807-5816.

13-31201.356

victim's mother regarding any possible connection between her strong desire to regain custody of her daughter and the change in her daughter's story as to who raped her.[85] The OCS records show that the victim's mother initially believed her husband did not rape her daughter. Later, the victim's mother concluded that Kennedy was capable of rape. The records do not reflect that the victim's mother changed her opinion and allegedly persuaded the victim to change her version of events due to pressure exerted by the OCS. Instead, the victim's mother reported she now believed Kennedy committed the crime because of his behavior after his incarceration, e.g., instructing his mother to take items from the home and taking all the money from their joint savings account.[86]

Based upon the evidence which defense counsel elicited from Holmes and Tucker regarding the alleged pressure felt by the victim's mother, along with the lack of such evidence in the OCS records, I find that Kennedy has failed to satisfy his burden of proof under Strickland, and that the state courts did not unreasonably apply Supreme Court precedent as to this claim.

Kennedy also argues that Rodney Madere, owner of B & B Carpet Cleaning, testified that Kennedy called him around 7:30 a.m. on the day of the rape to schedule a carpet cleaning job to remove blood stains. The physical evidence supporting Madere's testimony was a photograph of the caller I.D. box from B & B Carpet Cleaning reflecting

---

[85]St. Rec., Vol. 22 of 42, pp. 5383-5391.

[86]Supp. St. Rec. Vol. 1 of 1.

13-31201.357

receipt of a call from Kennedy. Additionally, Madere kept an appointment log tracking

clients' cleaning appointments. Kennedy asserts that the evidence did not support

Madere's testimony and the photograph of the caller I.D. box was inadmissible hearsay.[87]

He claims that counsel's failure to object to the admission of the photograph, along with

counsel's failure to use the information reflected in the photograph and the appointment

log to impeach Madere, rendered counsel's performance ineffective.

Assuming that Kennedy's allegations are correct,[88] I find that he has failed to show

either deficient performance or prejudice resulting from counsel's alleged deficiencies

in this regard. First, I find that the "inaccurate" information contained in the caller I.D.

box and the appointment log would not have been effective in impeaching Madere. The

inaccuracies were clearly attributable to inadvertent errors, as Madere's testimony, which

the jury was in the best position to judge, explained. In addition, while defense counsel

did not utilize the inconsistencies between the date reflected on the caller I.D. box

photograph with the actual date of the rape during cross-examination of Madere, the

discrepancy was in fact brought to the jury's attention via counsel's cross-examination

of Lieutenant Thurman. Thurman interviewed Madere and examined the information set

---

[87]It is undisputed that, as noted by the Louisiana Supreme Court, the caller I.D. box reflected "a call from 'Kennedy P' at 7:37 on March 2." Kennedy, 957 So. 2d at 761. However, Kennedy points out that the caller I.D. box incorrectly registered that the call was placed on March 2, 1997, rather than March 2, 1998, the date the rape occurred. Rec. Doc. No. 1, p. 81. With respect to the appointment log, Kennedy asserts that it originally reflected that he made his appointment on March 1. However, this date was later crossed out and replaced with March 2, the date the rape occurred. Rec. Doc. No. 1, p. 87.

[88]Kennedy has attached no documentation to his petition to verify his assertions in this regard.

forth on the caller I.D. box. Detective Thurman admitted that the photograph of the caller I.D. box reflected that Madere received the phone call from Kennedy on March 1st, when the rape occurred on March 2nd.[89]

Finally, the photograph was not hearsay. Hearsay is an out-of-court "statement," which means an "oral" or "written" assertion, or nonverbal "conduct." La. Code Evid. art. 801(a); Fed. R. Evid. 801(a). A photograph is none of these things. Instead, a photograph is demonstrative or illustrative evidence, a tangible item, not a statement. S. Goode and O. Welborn, Courtroom Handbook on Federal Evidence at 282 (West 2012). A photograph is fully admissible non-hearsay, as long as it is properly authenticated and relevant. In this case, the State laid a proper foundation for admission of the photograph during Madere's testimony:

> Q. How is that you know that a call was made to your house in regards to cleaning carpet?
> A. Well, with him [Kennedy] calling in and setting the job with his name and address, you know what he wanted done. And then I even had it on the caller I.D.
>                              ****
> Q. Okay, what I'm going to do is I'm going to show you what I've marked as State's Exhibit No. 1 and see if you can identify this?
>                              ****
> Q. Mr. Madere, would you take a look at that photograph and see if you can identify it?
> A. Yes, I can.

---

[89] St. Rec. Doc. 19 of 42, pp. 4701-4702

71

Q. And how can you identify that photograph?
A. That's my caller I.D. and my phone for my business.[90]

I find that counsel did not act deficiently or prejudicially in failing to object to State's Exhibit 1, the photograph of the caller I.D., which Madere maintained in the regular course of his business. In this instance, an objection by Kennedy's counsel to introduction of the photograph would have been wholly without merit. See Clark v. Thaler, 673 F.3d 410, 429 (5th Cir. 2012), petition for cert. filed, (U.S. May 29, 2012) (No. 11-10589) (quotation omitted) ("failure to assert a meritless objection cannot be grounds for a finding of deficient performance"). In addition, the photograph was only one piece of evidence corroborating Madere's testimony. Lester Theriot, an employee of B&B Carpet Cleaning, testified "that Madere called him before 8:00 on the morning of March 2, 1998, and told him to report immediately to the defendant's home." Kennedy, 957 So. 2d at 761. Under these circumstances, counsel's performance concerning the caller I.D. photograph and Madere's testimony was not constitutionally ineffective.

Kennedy also argues that his counsel was ineffective for failing to object to the admission of the December 1999 videotape of L.H.'s interview with Amalee Gordon in which L.H. states that Patrick Kennedy raped her. Kennedy provides several arguments in support of this claim.

---

[90]St. Rec. Vol. 18 of 42, pp. 4473-4474.

13-31201.360

First, Kennedy cites the following excerpt from the Louisiana Supreme Court's direct appeal opinion: "Thus, we do not consider whether lack of an objection constituted ineffective assistance of counsel and find that it does not provide grounds for us to consider defendant's unobjected to assignment of error." Id. at 775 n.19.[91] Based upon this excerpt, Kennedy implies that the court did not consider the issue because trial counsel failed to lodge an objection. However, when read in context, it is clear that counsel's alleged ineffectiveness was not considered because Kennedy's appellate counsel "specifically stated to the Court that it was not making an ineffective assistance argument at this stage of the proceedings." Id.

Kennedy also submits a second excerpt in support of his claim that counsel was ineffective for failing to object to the admission of the December 1999 videotape: "In addition, to the extent that the defendant now claims that he should have been allowed the opportunity to test the witness's competency prior to the admission at trial of the December 16, 1999 videotape, the defendant clearly waived that right as he did not request to at that time and instead freely stipulated to the admissibility of the tape. La.C.Cr.P. art. 841." Kennedy, No. 2005-KA-1981, Appendix, p. 24 (emphasis added).[92] Contrary to Kennedy's suggestion, however, the court in this excerpt is not stating that, due to counsel's stipulation, he forfeited his right to claim that he should have been

---

[91]Rec. Doc. No. 1, p. 89.

[92]Rec. Doc. No. 1, p. 89.

73

13-31201.361

provided the opportunity to test the victim's competence before the videotape's admission at trial. Instead, the court is stating that Kennedy forfeited this right <u>because he did not request that the victim's competency be tested prior to the videotape's admission at trial</u>, but instead stipulated to the videotape's admissibility.

More significantly, however, in July 2003, about a month <u>before</u> trial, Kennedy's counsel actually requested that the victim's competency be tested before admission of the videotape at trial. The basis of counsel's request was L.H.'s alleged incompetency during her December 1999 interview with Amalee Gordon.

> THE COURT:
> Okay. Defense's Motion to Assess Witness' [sic] Competency to Testify. What are you asking the Court to do?
> MS. DaPONTE [defense counsel]:
> I'm asking the Court to conduct a hearing pre-trial, outside the presence of any Jury to determine whether the witness today is competent to testify to events which occurred five years ago when the witness was eight. The only recorded information that we have about the victim's testimony regarding the incident which gives rise to the litigation is a videotape which was made with Ms. Omley [sic] Gordon (phonetically) of the Office of Social Services or Family Services, wherever she [Amalee Gordon] is; in which the victim indicates significant memory lapses for the incident. The Court, I believe, in assessing whether a witness is competent to testify can look at not only whether she appears to be truthful, whether she understands the difference between a falsehood and the truth, whether she has the proper understanding to be a competent witness. Also I believe the Court can look at the witness' [sic] capacity to recall the events for which she is being asked to testify. And I believe that the Court is the only - - According to the Code of Criminal Procedure - the Court is the only

13-31201.362

instrument that can make that determination. I would ask the Court to do that pretrial.[93]

Thus, defense counsel did not waive the right to test L.H.'s competency prior to admission of the videotape. Counsel questioned L.H.'s competency based upon L.H.'s poor recollection exemplified in her December 1999 interview. Counsel's pretrial lack of success in this regard apparently was the reason counsel did not object to the admission of the videotaped interview at trial. Counsel knew such an objection would be futile given the trial court's pretrial finding that L.H. was competent when she gave the interview.

Finally, Kennedy argues that counsel was ineffective in failing to object to the December 1999 videotape because it precluded him from raising the following claims: (1) The state statute, La. Rev. Stat. § 15:440.5, pursuant to which the videotape was admitted, is unconstitutional.[94] (2) Assuming that the state statute is not unconstitutional,

---

[93]St. Rec. Vol. 10 of 42, pp. 2465-2466. The trial court denied defense counsel's motion. St. Rec. Vol. 10 of 42, p. 2470.

[94]Section 15:440.5 provides, in pertinent part:
A.   The videotape of an oral statement of the protected person made before the proceeding begins may be admissible into evidence if:
(1) No attorney for either party was present when the statement was made;
(2) The recording is both visual and oral and is recorded on film or videotape or by other electronic means;
(3) The recording is accurate, has not been altered, and reflects what the witness or victim said;
(4) The statement was not made in response to questioning calculated to lead the protected person to make a particular statement;
(5) Every voice on the recording is identified;
(6) The person conducting or supervising the interview of the protected person in the recording is present at the proceeding and available to testify or be cross-examined by

13-31201.363

the videotape was nevertheless admitted in violation of La. Rev. Stat. § 15:440.5 and in

violation of his right of confrontation because the victim was not available to testify.

In addressing this claim, the Louisiana Supreme Court specifically recognized that

defense counsel did not object to the admission of the tape. Kennedy, 957 So. 2d at 774.

The court nevertheless addressed the merits of the issue, stating: "[A]ssuming [that] the

facial unconstitutionality of this statute can be considered in the absence of an objection

at trial, we reject defendant's argument that this statute is unconstitutional on its face."

Id. at 775 (footnote omitted).

As to the merits, the state supreme court began its analysis with a review of

Crawford v. Washington, 541 U.S. 36, 63 (2004), stating: "[T]he Court held that

testimonial hearsay statements may be admitted as evidence at a criminal trial only when

the declarant is unavailable to testify and the defendant has had a prior opportunity to

cross-examine the declarant." Kennedy, 957 So. 2d at 776.   Therefore, the court

reasoned that under Crawford, "a testimonial videotaped statement is not inadmissible

under the Sixth Amendment if 'the declarant is present at trial to defend or explain it.'"

Kennedy, 957 So. 2d at 777 (quoting Crawford, 541 U.S. at 59 n. 9). In Kennedy's case,

the declarant in this videotape was present at the trial.  Thus, the Louisiana Supreme

---

either party;

(7) The defendant or the attorney for the defendant is afforded an opportunity to view the recording before it is offered into evidence; and

(8) The protected person is available to testify.

La. Rev. Stat. § 15:440.5(A) (emphasis added).

76

13-31201.364

Court concluded that La. Rev. Stat. § 15:440.5 (A) (8) does not violate the Sixth Amendment "as it specifically requires as a condition of admissibility that the protected person is available to testify." Id. (quotation omitted).

Kennedy clearly was not prejudiced by trial counsel's failure to raise this objection to the admission of the videotape. Despite counsel's alleged deficiency, the Louisiana Supreme Court nevertheless addressed the merits of Kennedy's substantive claim, finding that the state statute providing for the tape's admission was constitutional.

In addition, the Louisiana Supreme Court specifically stated: "Once again, we note that the defendant stipulated to the admissibility of the tape before it was played and expressly stated that he had 'no objection to the tape.'" Kennedy, 957 So. 2d at 777. The court, nevertheless, addressed the merits, stating: "[E]ven had defendant objected, we would still find that the victim was 'available to testify' for purposes of La. R.S. 15:440.5(8) and the Confrontation Clause." Id.

In its analysis, the court reviewed and rejected Kennedy's argument as follows:

> The defendant argues that although the victim was physically present to testify, she was unable to respond to questioning in a meaningful way and simply adopted her videotaped statement, which was obtained without the presence of defense counsel or any opportunity to effectively cross-examine the witness either pre-trial or at trial. Defendant contends that the victim's poor memory rendered her unavailable for cross-examination despite her physical presence on the stand.
> . . . . [T]he [Supreme] Court has made clear that "[t]he Confrontation Clause guarantees only an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent the defense may wish." . . . .

13-31201.365

In this case, the victim was able to answer the vast majority of the questions asked of her. See, supra pp. 767-71.[95] In court, she identified defendant as the person who raped her, and testified that she remembered making the videotape, that everything happened as she reported on the videotape, that she earlier had told police and others that a boy had raped her but that was a lie, and she testified about circumstances surrounding the rape. The fact that she could not remember meeting with specific people during the investigation and that she did not remember making the first videotape with Dr. McDermott does not render her "unavailable" for purposes of the statute or the constitution. She was clearly able to "defend or explain" the videotaped statement at trial.

Kennedy, 957 So. 2d at 777-78 (quoting United States v. Owens, 484 U.S. 554, 561 (1988)) (internal quotation and citations omitted).

Both the trial transcript and the state supreme court's in-depth review of this issue on the merits establish that Kennedy was not prejudiced by trial counsel's failure to object to the admission of the videotape. Accordingly, I find that Kennedy has failed to satisfy his burden of proof under Strickland, and that the state courts did not unreasonably apply Supreme Court precedent.

As to Dr. Lee's testimony, it supported the State's position that the victim was not raped outside in the yard when he testified about the lack of grass or soil stains on the victim's shorts. Dr. Lee offered this testimony despite the fact that the Connecticut Lab Report included no laboratory testing of the shorts. According to Kennedy, his counsel was ineffective in failing to challenge Dr. Lee on grounds that Lee's testimony was an

_____

[95]The portion of its opinion cited by the court is its quotation of the victim's trial testimony, which is set forth verbatim above at pp. 10 through 13 in this court's report and recommendation.

78

13-31201.366

expansion of the lab report. I find that Kennedy was not prejudiced by any alleged deficiency in this regard.[96]

First, the trial transcript reflects that much of Dr. Lee's opinion testimony was not based upon lab tests, but rather on his close personal examination of the shorts and his experience and investigational expertise. As Dr. Lee testified, "In addition, also I look at it [the shorts] inch by inch to see any grass or grass stain, because if some transfer, let's say this short is on the grass, generally we expect to see some greenish grass stain, or a portion, a small portion of little tiny grass or soil on there. I did not observe any."[97]

Second, even if Dr. Lee had not offered testimony regarding the lack of grass or soil stains on the victim's shorts, there was still ample evidence contradicting Kennedy's story that the rape had taken place outside in the grass. As stated in the above factual recitation, Deputy Michael Burgess, who arrived minutes after Kennedy's 911 call, testified that "the crime scene in the yard was inconsistent with a rape occurring there: there was a dog sleeping undisturbed nearby and a small patch of coagulated blood was found in otherwise undisturbed long grass." Kennedy, 957 So. 2d at 762. Additionally, Sergeant Kelly Jones stated that "she noticed a location in the grass which appeared to

---

[96]Kennedy also challenges counsel's effectiveness based upon counsel's failure to subpoena Dr. Messina who, according to Kennedy, authored exculpatory reports. Rec. Doc. No. 1, p. 97. Kennedy, however, makes no mention of these allegedly exculpatory reports, or even Dr. Messina, in his four pages of supporting argument. I find Kennedy's vague, passing reference to Dr. Messina wholly insufficient to explain or support his claim that counsel should have subpoenaed Dr. Messina.

[97]St. Rec. Vol. 23 of 42, p. 5581 (emphasis added).

13-31201.367

contain coagulated blood but the grass was not disturbed and she could not locate any blood leading away from this location." Id. at 763. Accordingly, I find that Kennedy has failed to satisfy the two-part Strickland test as to this argument.

Kennedy further argues that his trial counsel was ineffective in waiting until July 14, 2003, about one month before trial, to file a motion seeking a pre-trial hearing to evaluate the victim's competency, which he calls a "taint hearing."[98] Kennedy asserts that counsel should have filed such a motion prior to the April 2000 Prieur hearing.[99]

As the record excerpt quoted below reflects, the trial court relied principally on L.H.'s competency at the April 2000 Prieur hearing as the basis for denying counsel's July 2003 motion for a competency hearing.

> The Court:
> Alright. In reviewing the transcript given by L.H. on April 7, year 2000, and in reviewing the applicable law, I'm not inclined to grant the Defendant's Motion. The Defendant in this case asks me to test the competency of L.H. She is thirteen years of age as we speak, if my calculations are correct. She was eight years of age when the rape allegedly occurred, for which Defendant is charged. Your motion asks that the events – argues rather that the events which she is being asked to recall occurred at an age in which her competency to testify surely would have

---

[98]Kennedy characterizes the type of motion that his counsel should have filed as a motion for a "taint" hearing. However, "[t]here is no basis in Louisiana Law for a 'taint' hearing." State v. Merrick, 755 So. 2d 889, 889 (La. 2000). Thus, counsel could not be expected to request the trial court to grant a hearing that is not available under state law.

[99]See generally State v. Prieur, 277 So. 2d 126 (La. 1973) (hearing conducted to determine admissibility of evidence of defendant's other acts of misconduct when such acts are allegedly offered not to show defendant's bad character, but to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or connection to conduct integral to the act which is the subject of the trial).

13-31201.368

been at issue, and that her reported memory of those events is vague and spotty, casting doubt on her credibility as a witness. And I think that's a quote almost verbatim from your motion.

It is the Court's appreciation that understanding, not age, is the test of whether a person is competent to be sworn as a witness. And that the key determination to be made in determining the competency of a witness is whether – in this case [L.H.] was able to discern the difference between truth and falsehood. In other words, competency is not the same as testing a witness' [sic] memory or lack thereof [and] in my judgment is clearly an issue for the jury to decide.

If you're asking me to test whether or not [L.H.] was competent at age eight, I certainly decline to make that determination. Because I don't have and couldn't have the benefit of knowing how she would have responded to questioning five years ago.

I have a transcript.[100]   And the transcript made for interesting reading. And I don't mean that in the perjuritive [sic] sense. The young lady was able to state her full name, her date of birth, names of family members, as well as the names of the street and the neighborhood that she lived in previous to the time of the alleged rape for which your client has been charged. And I note and made a list of the following questions put to her by Mr. Armato [defense counsel]. Question: "L.H., do you always tell the truth?" Answer: "No." Question: "Mr. Bates asked you whether you knew the difference between what the truth is and what a lie is; do you?" Answer: "Yes." Question: "Why don't you tell us what the truth is and what a lie is." Answer: "A lie is when somebody believes something and they don't tell what they did to you." Question: "When somebody does something and when they don't tell what they actually did to you?" Answer: "When somebody do something and they don't tell what they actually did." Question: "Allright [sic]. They tell something different than what they actually did?" Answer: "Yes." Question: "Okay. What is the truth when somebody does something?" "They tell what they did."

****

I think that the Defense established clearly in my mind that she knew the difference between a truth and a falsehood. And what sort of

---

[100]The court is referring to the transcript of L.H.'s testimony at the April 2000 Prieur hearing.

81

13-31201.369

underscored that point in my mind was that she readily admitted that she didn't always tell the truth; of which I'm sure the Defense found interesting. Perhaps not as interesting for the State.

She had a sound understanding of these concepts. Unless you can show me today some circumstances that have manifested themselves between that testimony in April of 2000 and today that would cause me to concern myself about her competency to testify—unless you can do that today, your Motion is denied.

Kennedy, No. 2005-KA-1981, Appendix, pp. 21-22. Thus, in the trial judge's opinion, he had already determined, based upon the evidence presented in the April 2000 Prieur hearing, that L.H. was competent. Kennedy does not state what evidence could have been presented in a further competency hearing to persuade the court otherwise. I find no ineffective performance in connection with counsel's timing of this motion. See United States v. Graham, 429 F. App'x 783, 785 (10th Cir. 2011), cert. denied, 132 S. Ct. 1939 (2012) (due in part to court's prior determination that petitioner was competent, motion for competency hearing would have been futile; counsel was not ineffective in failing to file such a motion).

Kennedy also complains that his trial counsel was ineffective in her cross-examination of the victim. Kennedy claims that counsel, on cross-examination, failed adequately to attack L.H.'s credibility, despite the fact that counsel was armed with numerous reports and statements undermining her credibility.

The trial transcript of counsel's cross-examination of L.H. reflects that counsel vigorously challenged the victim's credibility. Counsel elicited testimony from L.H. in

82

13-31201.370

which the victim twice admitted that she had changed her story regarding who raped her.[101] Further, while counsel may not have used the reports and statements contradicting L.H.'s version of events during cross-examination, counsel nevertheless introduced the statements and reports into evidence, giving counsel another basis during her closing remarks to argue to the jury that L.H.'s credibility was questionable.[102]

As noted above, trial counsel also called Robert Tucker to the witness stand and elicited testimony that L.H. had told him that a boy on a bicycle had raped her and specifically denied that Patrick Kennedy had raped her. Counsel also introduced the videotape of L.H.'s interview with Barbara McDermott in which L.H., despite aggressive questioning insinuating that her version of events did not make sense, stuck with her story that a boy on a bicycle raped her.[103] Additionally, the defense hired an expert, Carolyn Van Winkle, who testified that "[t]he DNA from the mattress pad, the two different stains, both of the stains were from a female, however, neither stain could have come from the victim in this case."[104] Ms. Van Winkle's testimony obviously called into question L.H.'s account that the rape took place on her bed, rather than outside.

---

[101] St. Rec. Vol. 22 of 42, pp. 5364-5365.

[102] St. Rec. Vol. 24 of 42, pp. 5848-5851.

[103] St. Rec. Vol. 23 of 42, pp. 5755-5759.

[104] St. Rec., Vol. 23 of 42, p. 5713.

13-31201.371

Clearly, defense counsel made the jury aware of numerous facts that placed the victim's credibility at issue. Based on this evidence, counsel strenuously argued that the victim's testimony could not be credited. The fact that the jury nevertheless found Kennedy guilty of the rape cannot be attributed to any lack of effort on the part of defense counsel to impugn the credibility of the victim's testimony. See Baker v. United States, No. 3:10-CV-762, 2011 WL 3841690, at *13 (E.D. Va. 2011) (when the record shows that "counsel effectively advocated on petitioner's behalf . . . , counsel's actions were effective notwithstanding their lack of success"). Accordingly, I find that Kennedy has failed to satisfy Strickland's two-prong burden of proof.

Kennedy also complains that counsel was ineffective in failing to call as witnesses hospital personnel who could have testified that when L.H. requested to see her "daddy," she was referring to Kennedy and not to her biological father. However, in her videotape interview with Barbara McDermott, L.H. stated that, on the day of the incident, "she woke up, watched television, and ate breakfast, which was prepared by the defendant, whom she called 'Daddy.'" Kennedy, 957 So. 2d at pp. 764-765. Thus, the jury was already aware that L.H. referred to Kennedy as "daddy," and counsel's failure to call a witness to provide merely cumulative evidence cannot be deemed constitutionally ineffective assistance. Lavernia v. Lynaugh, 845 F.2d 493, 498 (5th Cir. 1988); Pritchett v. Quarterman, No. 3:04-CV-1198-N, 2006 WL 3342609, at *2 (N.D. Tex. 2006).

13-31201.372

Kennedy also argues that his counsel was ineffective in not calling L.H.'s younger brother, Davell, to the witness stand. Kennedy alleges that "Davell could have testified that he saw L.H. lying sprawled in the grass soon after the rape. And unlike L.H., he did not change his story over time; thus the defense would have had a strong and consistent eyewitness to rebut L.H.'s inconsistent testimony."[105] Kennedy's argument in this regard is disingenuous. Kennedy attacks the credibility of L.H. given that she was only eight years old when the rape occurred, but characterizes as "strong" the testimony that her younger brother allegedly would have offered.

Contrary to Davell's alleged version of events, there was strong evidence that L.H. was not sprawled in the grass soon after the rape. Under these circumstances, counsel's decision not to call the younger brother as a witness can only be characterized as the kind of strategic or tactical trial decision entitled to deferential treatment by this court. See Moore v. Johnson, 194 F.3d 586, 591 (5th Cir. 1999) (highly deferential scrutiny afforded to counsel's performance in the context of strategic or tactical trial decisions). I find that counsel was not deficient in choosing not to call the victim's younger brother as a witness, and Kennedy was not prejudiced by counsel's tactical decision in this regard.

---

[105]Rec. Doc. No. 1, p. 107.

13-31201.373

Finally, Kennedy argues that he was denied a fair trial as a result of the cumulative effect of his counsel's ineffective assistance and the prosecution's failure timely to disclose Brady evidence. This argument is wholly without merit. When, as in this case, the individual claims are meritless, that result cannot be changed simply by asserting the claims collectively. "[W]here individual allegations of error are not of constitutional stature or are not errors, there is 'nothing to cumulate.'" Turner v. Quarterman, 481 F.3d 292, 301 (5th Cir. 2007) (quoting Yohey v. Collins, 985 F.2d 222, 229 (5th Cir. 1993)) (citing Miller v. Johnson, 200 F.3d 274, 286 n.6 (5th Cir. 2000); United States v. Hall, 455 F.3d 508, 520 (5th Cir. 2006)).

X.    JURY PASSION: MISTRIAL MOTIONS (CLAIM NOS. 6 and 7)

Kennedy contends that the victim's emotional displays on the witness stand inflamed the passion of the jury, such that his motions for mistrial should have been granted, and the trial court should have instructed the jury to confine its attention to the evidence during the victim's testimony. While my research has uncovered no case law concerning the applicable standard of review, I find that this claim presents a mixed question of law and fact.

Emotional display or testimony by a crime victim or the victim's family members may serve as the basis for federal habeas relief only if it was so unduly prejudicial as to violate the Due Process Clause by rendering the trial fundamentally unfair. See Varga v. Quarterman, 321 F. App'x 390, 397-98 (5th Cir. 2009) (murder victim's widow's

86

testimony about child abuse she endured at her stepfather's hands did <u>not</u> so intensify jury sympathy for victim's widow that it rendered the trial fundamentally unfair); <u>Castillo v. Johnson</u>, 141 F.3d 218, 223-24 (5th Cir. 1998) (testimony by murder victim's wife during guilt-innocence phase of trial concerning impact of victim's murder without cautionary instructions did <u>not</u> render trial so fundamentally unfair that federal habeas relief might be warranted).

For Kennedy to establish that his trial was unfair in violation of due process, he would have to show a "failure to observe that fundamental fairness essential to the very concept of justice. In order to declare a denial of it we must find that the absence of that fairness fatally infected the trial; the acts complained of must be of such quality as necessarily prevents a fair trial." <u>Lisenba v. California</u>, 314 U.S. 219, 236 (1941); <u>Peters v. Whitley</u>, 942 F.2d 937, 940 (5th Cir. 1991) (Habeas review is proper only to determine whether a state trial judge's error is so extreme as to render the trial fundamentally unfair or violate an explicit constitutional right.).

Relatedly, a trial court's denial of a motion for a mistrial triggers federal habeas corpus relief only if it was "'error . . . so extreme that it constitutes a denial of fundamental fairness under the Due Process Clause.'" <u>Hernandez v. Dretke</u>, 125 F. App'x 528, 529 (5th Cir. 2005) (quoting <u>Bridge v. Lynaugh</u>, 838 F.2d 770, 772 (5th Cir. 1988)). To obtain relief, the petitioner must show that the state trial court's error, if any, had a "substantial and injurious effect or influence in determining the jury's verdict."

87

Brecht v. Abrahamson, 507 U.S. 619, 623 (1993).  The petitioner must show that "there
is more than a mere reasonable possibility that [the error] contributed to the verdict.  It
must have had a substantial effect or influence in determining the verdict."  Woods v.
Johnson, 75 F.3d 1017, 1026 (5th Cir. 1996) (emphasis omitted).

Kennedy has not demonstrated error on the part of the state trial court in denying
his motion for mistrial on grounds that the victim cried on the stand sufficient to warrant
federal habeas relief.  The trial transcript reflects that when the victim took the witness
stand, neither prosecutor was in the courtroom.  During a bench conference, the trial
court admonished the prosecutors, stating:  "The witness is sitting on the stand and she's
in tears."[106]  Thereafter, during the same conference, defense counsel requested a mistrial
because "[t]his witness has been crying in front of the jury."[107]  The court denied the
motion, stating:  "You're not getting a mistrial because she's been sitting there tearing
[sic] just for a few minutes."[108]

Shortly after the prosecution began to question the victim, she apparently lost her
composure, prompting the court to call a recess.[109]  During the recess, the defense once
again moved for a mistrial, and the court again denied the request.

---

[106]St. Rec. Vol. 22 of 42, p. 5333.

[107]Id. at p. 5334.

[108]Id. at p. 5334 (emphasis added).

[109]Id. at p. 5337.

13-31201.376

MS. DaPONTE [defense counsel]:

I have a motion for a mistrial. And I just want the record to reflect the victim is sobbing and both the prosecution, prior to the jury having left, they wer[e] up here around the victim. I think that that's improper for the jury to see and move for a mistrial on that basis.

THE COURT:

Okay, your request is denied.[110]

A videotape was then played for the jury, following which defense counsel, during

a bench conference, once again sought a mistrial.

MS. DaPONTE:

Judge, I have another motion for mistrial. The record needs to reflect that during the entire twenty-three or twenty-four minute tape, the victim was on the witness stand crying. I am certainly not impugning, I'm not suggesting anything other than it was prejudicial and I would request a mistrial on that basis.[111]

The court again denied defense counsel's motion for a mistrial, stating:

The Court observed the witness resting her head on the shelf or desk area immediately in front of her chair. The Court did observe at one point that she seemed to have tears in her eyes and possibly on her left cheek. The Court did not observe what I would characterize as an unbridled outburst or display of emotion. The Court did not hear her weep and the Court did not see any of the jurors react to her in a way to show that they, their viewing of her, caused them to be emotionally upset. And in conclusion, let me say I don't feel that the defendant has been prejudiced and has not gotten a fair trial. Your motion is denied for those reasons.[112]

---

[110]Id. at p. 5338.

[111]Id. at pp. 5346-5347.

[112]Id. at pp. 5347-5348.

13-31201.377

The above findings of fact are entitled to deference and presumed to be correct. See Smith v. Bradshaw, No. 1:04-CV-694, 2007 WL 2840379, at *28 (N.D. Ohio Sept. 27, 2007), aff'd, 591 F.3d 517 (6th Cir. 2010) (court must defer to trial court which observed witness's and jury's demeanor and concluded that incident did not inflame jury against Smith) (citing Riley v. Taylor, 277 F.3d 261, 309 (3d Cir. 2001) ("habeas court must defer to state trial court on its assessments of jury demeanor and attitude)").

Kennedy contends that the victim's emotional displays so inflamed the passions of the jury that he was prejudiced when the trial court refused to give a preventive instruction before the victim's testimony concluded. When inadmissible evidence is heard or emotional displays are observed by the jury, "a cautionary instruction is presumed to have cured prejudicial impact." Dubria v. Smith, 224 F.3d 995, 1002 (9th Cir. 2000). The trial court provided such a cautionary instruction.

Initially, the transcript reflects that in a bench conference immediately before the victim testified, the trial court proposed "instruct[ing] this jury on the record to disregard anything they've seen on the witness stand in terms of, if they saw any emotional displays or outbursts, okay, and confine their attention to the evidence presented and nothing more. I'm going to do that."[113] The prosecution objected on the ground that such

---

[113]Id. at pp. 5351-5352.

90

13-31201.378

an instruction "sounds like she is being scolded,"[114] and the trial court opted not to give

the proposed instruction at that time.

At the conclusion of the trial testimony, however, the court clearly instructed

jurors that it was their duty to base their verdict "solely upon the evidence, without

prejudice or sympathy."[115]  The court then reiterated:  "You are not to be influenced by

sympathy, passion, prejudice, or public opinion.  You are expected to reach a verdict

based on the evidence or lack of evidence."[116]  The fact that Kennedy would have

preferred the court to give the instruction earlier, rather than shortly before the jurors

commenced their deliberations, does not establish that that he was denied a fair trial.

There is no per se rule as to when a cautionary instruction must be given.  See United

States v. Papia, 560 F.2d 827, 840 (7th Cir. 1977) (timing of limiting or cautionary

instructions lies within the sound discretion of the trial judge). The trial court actually

provided the cautionary instruction that Kennedy argues was lacking, and it is immaterial

that the instruction was given at the end of the trial rather than at the time of the victim's

testimony.  Kennedy makes no showing that he was prejudiced by the timing of the

instruction.  See United States v. McCoy, 41 F.3d 1508, 1994 WL 652765, at *3-4 (6th

Cir. Nov. 18, 1994) (defendants were not prejudiced; it was proper for trial court to give

---

[114]Id. at p. 5352.

[115]St. Rec. Vol. 24 of 42, p. 5889.

[116]Id. at p. 5901.

91

cautionary instruction at end of trial).  Thus, this argument is insufficient to support

habeas relief.

Finally, Kennedy contends that, because there was no dispute that the victim was

raped and that her injuries were severe, the trial court's admission of photographs of the

victim's injuries served no purpose other than to inflame the passions of jurors.  Kennedy

points to the fact that, at a pre-trial hearing, the court limited the State to introducing

photographs no larger than "five by seven."[117]  However, at trial, the State was allowed

to introduce one photograph that was larger than the agreed-upon size of five inches by

seven inches.

> THE COURT:
> The Court notes [that the photograph] doesn't appear to be an 8 [by]
> 10, but nonetheless, even if it is, the Court finds that that's not
> inflammatory, it is critical . . . in my opinion, for a demonstration by this
> witness [Dr. Scott Benton], to the jury, considering the nature and extent
> of the injuries.
> MR. PACIERA [prosecutor]:
> That's exhibit number 181, which is the only one that is larger than
> a 5 [by] 7.
> THE COURT:
> Okay.[118]

In addressing these claims on direct appeal, the Louisiana Supreme Court denied

relief based solely upon state law.  With regard to Kennedy's complaint that he was

entitled to a mistrial based upon the victim's emotional outbursts and the court's failure

---

[117]St. Rec. Vol. 11 of 42, p. 2526.

[118]St. Rec. Vol. 22 of 42, p. 5465

13-31201.380

at that time specifically to advise jurors not to consider such outbursts, the court reviewed state procedural rules, along with state case law regarding a defendant's heavy burden in showing that he or she is entitled to a mistrial. Based upon the cited state rules and decisions, the court determined that Kennedy had failed to satisfy his heavy burden of proof. Kennedy, No. 2005-KA-1981, Appendix, pp. 40-41. As for the trial court's admission of photographs depicting the victim's injuries, the court, after reviewing state evidentiary rules and case law, concluded that "defendant shows no abuse of discretion on the part of the trial judge in admitting these photographs." Id. at pp. 45-47.

It is not "the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). As discussed above, federal habeas corpus review is limited to questions of federal constitutional dimension, and federal courts do not review alleged errors in the application of state law. See Swarthout v. Cooke, 131 S. Ct. 859, 861 (2011) (federal habeas review does not lie for errors of or in applying state law); Narvaiz v. Johnson, 134 F.3d 688, 695 (5th Cir. 1998) (quoting McGuire, 502 U.S. at 67-68; Lewis v. Jeffers, 497 U.S. 764, 780 (1990)) (citing West v. Johnson, 92 F.3d 1385, 1404 (5th Cir. 1996)); accord Turner v. Johnson, 46 F. Supp. 2d 655, 674 (S.D. Tex. 1999); see also Molo v. Johnson, 207 F.3d 773, 776 n.9 (5th Cir. 2000) ("Federal habeas review does not extend to state court conclusions of state law."); Hogue v. Johnson, 131 F.3d 466, 506 (5th Cir. 1997) (disagreement as to state law is not cognizable on federal habeas review).

93

Again, the essence of this court's inquiry is whether admission of the photographs rendered the proceedings fundamentally unfair. See Woods v. Johnson, 75 F.3d 1017, 1038-39 (5th Cir. 1996) (admission of photographs not unconstitutional unless it renders trial fundamentally unfair); accord Smallwood v. Gibson, 191 F.3d 1257, 1275 (10th Cir. 1999); Jackson v. Shanks, 143 F.3d 1313, 1322 (10th Cir. 1998).

The trial court concluded that the photographs were relevant and that their prejudicial impact did not outweigh their probative value in clarifying Dr. Scott Benton's testimony concerning the extent of the victim's injuries. See Hoxsie v. Kerby, 108 F.3d 1239, 1243 (10th Cir. 1997) (no due process violation when photographs were relevant for purpose of clarifying and illustrating testimony). Although there was no dispute that the victim was raped and that her injuries were severe, the photographs and the victim's emotional display on the stand merely confirmed these established facts without crossing any constitutional line. I find that the introduction of the photographs did not so prejudicially infect Kennedy's trial as to deny his right to due process.

## XI. PROSECUTORIAL MISCONDUCT (CLAIM NO. 8)

Kennedy argues that the "prosecution secured a guilty verdict through misconduct, in violation of the Due Process Clause and [his] Sixth Amendment right to a fair trial."[119] Specifically, Kennedy objects to the following remarks during the prosecution's closing

---

[119]Rec. Doc. No. 1, p. 117.

13-31201.382

argument: "Only you can protect her. . . . This Defendant took the childhood from an eight-year old, and took her places she should never be. And she will live with that for the rest of her life."[120]

Kennedy also objects that the prosecution referred to him as a "monster," made reference to his large size as compared to the victim's small size, then stated: "It takes a real man to do this, ladies and gentlemen."[121] Kennedy also argues that the prosecution "treaded upon [his] presumption of innocence and his decision not to testify" by maintaining "that the reason the defense had failed to present a tape recording of L.H. was because it was unhelpful."[122] The prosecutor stated:

> They talked about the Investigator, Bob Tucker, that testified today, saying that in October [the victim] told him that it was somebody on a bicycle and not Patrick. But he also told you that the Defense Attorney was there with him. And that you heard earlier in the trial he had a tape recorder with him, and that the child knew that they were there, because they represented Patrick Kennedy. How much pressure was on her then. Who is putting the pressure on her then.
> I suggest you didn't hear a tape record[ing]. And they don't have to put on any evidence whatsoever, and you can't hold that against him. But I suggest you didn't hear that tape record[ing], because you would have heard the pressure that was being put on that child at that time.[123]

---

[120]St. Rec. Vol. 24 of 42, p. 5883. Rec. Doc. No. 1, p. 117.

[121]Id. at pp. 5841 and 5883. Rec. Doc. No. 1, p. 118.

[122]Rec. Doc. No. 1, p. 118. In his memorandum, Kennedy quotes only a portion of the prosecutor's remarks. Based upon this excerpt, it is unclear what tape recording is the subject matter of the prosecutor's comments.

[123]St. Rec. Vol. 24 of 42, pp. 5880-5881 (emphasis added).

13-31201.383

Additionally, Kennedy takes issue with the prosecution's eliciting testimony from Dr. Scott Benton to the effect that the victim's injuries were "the worst ever."[124]

A claim of prosecutorial misconduct presents a mixed question of law and fact. Brazley v. Cain, 35 F. App'x 390, 2002 WL 760471, at *4 n.4 (5th Cir. 2002) (citing United States v. Emueqbunam, 268 F.3d 377, 403-04 (6th Cir. 2001); Jones v. Gibson, 206 F.3d 946, 958 (10th Cir. 2000); United States v. Noriega, 117 F.3d 1206, 1218 (11th Cir. 1997); United States v. Spillone, 879 F.2d 514, 520 (9th Cir. 1989)).

A prosecutor's alleged misconduct does not present a claim of constitutional magnitude in a federal habeas action unless it is so prejudicial that the state court trial was rendered fundamentally unfair in violation of due process. Jones v. Butler, 864 F.2d 348, 356 (5th Cir. 1988). Due process requires reversal when the prosecutor's comments "so infect the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. 168, 181 (1986); Rogers v. Lynaugh, 848 F.2d 606, 608 (5th Cir. 1988); Bell v. Lynaugh, 828 F.2d 1085, 1095 (5th Cir. 1987). The prosecutor's action must be evaluated in the context of the entire trial. Greer v. Miller, 483 U.S. 756, 765-66 (1987) (citing Darden, 477 U.S. at 179); Kirkpatrick v. Blackburn, 777 F.2d 272, 281 (5th Cir. 1985). "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant question is

---

[124]Rec. Doc. No. 1, p. 120.

13-31201.384

whether the prosecutors' comments so infected the trial with unfairness as to make the
resulting conviction a denial of due process." Darden, 477 U.S. at 181 (citations and
quotations omitted).

In the Fifth Circuit, courts must apply a two-step analysis in reviewing claims of
prosecutorial misconduct. United States v. Wise, 221 F.3d 140, 152 (5th Cir. 2000);
United States v. Lankford, 196 F.3d 563, 574 (5th Cir. 1999). First, the court must
determine whether the prosecutor made an improper remark. "If an improper remark was
made, the second step is to evaluate whether the remark affected the substantial rights of
the defendant." Wise, 221 F.3d at 152.

To do so, a petitioner "must demonstrate that the misconduct [was] persistent and
pronounced or that the evidence of guilt was so insubstantial that the conviction would
not have occurred but for the improper remarks." Jones, 864 F.2d at 356; Hogue v. Scott,
874 F. Supp. 1486, 1533 (N.D. Tex. 1994). Under this test, a petitioner must
demonstrate that the comment rendered his trial "fundamentally unfair," by showing "a
reasonable probability that the verdict might have been different had the trial been
properly conducted." Rogers, 848 F.2d at 609 (footnote and citations omitted).

In response to Kennedy's complaints regarding the prosecution's closing remarks,
the Louisiana Supreme Court reviewed the closing arguments in their entirety. Kennedy,
2005-KA-1981, Appendix, p. 41. Applying Louisiana law, a standard that mirrors
federal law, the court stated that it "will not reverse a conviction unless 'thoroughly

97

convinced' that the argument influenced the jury and contributed to the verdict." Id. at

p. 43 (quotation and citations omitted).  The court then reasoned:

> In the instant case, the bulk of the state's arguments were fair
> statements of the evidence admitted and the lack of evidence to corroborate
> the defense's theory of the case.  The final statement by the state during
> closing (quoted above), however, bordered on improper.  But as noted
> above, improper closing argument does not constitute reversible error
> unless the appellate court is thoroughly convinced that the remarks
> influenced the jury and contributed to the verdict.  The reviewing court
> must also give credit "to the good sense and fair-mindedness of jurors who
> have heard the evidence." State v. Jarman, [445 So. 2d 1184,] 1188 [(La.
> 1984)].  Reading the prosecutor's argument as a whole, and considering the
> entirety of the record, nothing the defense argues indicates that these
> remarks so influenced the jury that they contributed to the verdict. Given
> the traditional breadth accorded the scope of closing arguments by this
> Court, none of these comments would either individually (or collectively
> for that matter) merit reversing the defendant's conviction and sentence. . . .
> Given that the defendant fails to show any reasonable likelihood that the
> argument influenced the verdict, this assignment does not warrant relief.

Id. at pp. 43-44.

As to Dr. Benton's testimony regarding the severity of the victim's injuries, the

state high court similarly found that the testimony did not contribute to the jury's verdict.

The supreme court stated: "The witness never opined whether the victim would be more

likely to accuse her attacker truthfully because of the severity of the injuries.  This

witness simply testified that it was clear that the victim had been raped and that her

injuries were the most severe he had seen during his practice to have resulted from sexual

assault." Id. at p. 45.

98

13-31201.386

I find that the Louisiana Supreme Court's conclusions concerning the statements of the prosecution and the witness do not represent an unreasonable application of federal law to the facts of this case. I cannot conclude that the prosecutor's comments and the comment of the witness were so persistent and pronounced, particularly when compared to the scope and nature of the evidence, that Kennedy's rights were substantially affected or that the conviction would not have occurred except for the improper remarks.

The opinion of the Louisiana Supreme Court does not refer to the following two allegedly objectionable comments: (1) Given the difference in size between Kennedy and the victim, it took "a real man to do this." (2) The defense did not want the jury to hear the tape recording because it reflected the pressure the victim was under when she provided the statement. As with his other claims of prosecutorial misconduct, I find Kennedy's argument about these comments without merit. Having observed the defendant and the victim at trial, the jury was well aware of the considerable size difference between the two. It was clear from the tangible evidence that the defendant could easily have overpowered the victim, such that the prosecutor's comment in this regard did not affect the substantial rights of the defendant when viewed against the backdrop of the substantial evidence of his guilt.

As to the prosecutor's comment that the tape recording was not introduced, substantial evidence was presented by both sides at trial tending to show that the victim had been pressured at one time or another to give different versions of who raped her.

99

Kennedy admits, and the transcript clearly reflects, that the prosecutor specifically advised jurors that the defense was under no obligation to introduce the tape recording or any other evidence. In addition, the trial court clearly instructed the jury that counsel's closing arguments are not evidence, are merely counsel's interpretation of the evidence and should not be considered in adjudicating defendant's guilt or innocence.[125] When the argument of the prosecution is viewed as a whole and in light of the substantial evidentiary record and the context of the overall trial, it cannot be concluded that the conviction would not have occurred except for the prosecutor's comments or that the trial as a whole was fundamentally unfair. The state court's determination of this issue was not an unreasonable application of Supreme Court precedent. Kennedy is not entitled to federal habeas relief on this claim.

## XII. EXPERT TESTIMONY OF DR. LEE (CLAIM 9)

Kennedy argues that he was denied a fair trial because the trial court allowed Dr. Lee to testify that there were no depressions in the grass where the defense claimed that the rape occurred. Dr. Lee testified in pertinent part as follows:

> A. I did not see any damage of the grass, broken grass, or impressed grass pattern on this photo.
> ****
> Q. Now Doctor, I believe you testified that you didn't find any of the blades of the blades of grass broken?
> A. No, I did not observe any.

---

[125]St. Rec. Vol. 24 of 42.

Q. And there was –

A. I wasn't there, so I only can look at the picture.

Q. Well, I'm looking at the photograph. Were you able to determine if there were any depressions in the ground?

A. I did not notice any.

Q. Nothing to indicate a struggle?

A. I did not see any large smear or broken grass, disturbance of the soil. Usually, those are the indicator, say a struggle.[126]

Kennedy argues that the above testimony constitutes "quintessential junk science," which the trial court erroneously allowed to be presented as "valid scientific evidence," thereby denying him a fair trial.[127]

On habeas review, whether the trial court erred in admitting the above testimony is a mixed question of law and fact. Lowery v. Collins, 988 F.2d 1364, 1371-72 (5th Cir. 1993) (trial court's allegedly erroneous admission of evidence represents mixed question of law and fact). "[E]ven the erroneous admission of prejudicial testimony does not justify habeas relief unless it is material in the sense of a crucial, critical, highly significant factor." Skillern v. Estelle, 720 F.2d 839, 852 (5th Cir. 1983) (quotation omitted); accord Bailey v. Procunier, 744 F.2d 1166, 1169 (5th Cir. 1984). I find that Kennedy has failed to satisfy this heavy burden.

First, Dr. Lee did not hold himself out as an expert on broken grass or soil disturbance. He clearly stated that his testimony in this regard was based on nothing

---

[126]St. Rec. 23 of 42, pp. 5593, 5594-5595.

[127]Rec. Doc. No. 1, p. 122.

101

13-31201.389

more than his review of a photograph where the rape was alleged to have occurred.  He

readily admitted that he had not personally visited the alleged crime scene.  Second, even

if the trial court erred in allowing the above testimony into evidence, I find that Kennedy

suffered no prejudice.  As noted above, even without Dr. Lee's testimony concerning his

observations of the photographs of the soil and grass, there was ample evidence

contradicting Kennedy's story that the rape took place outside in the grass.  Both Deputy

Burglass and Sergeant Jones testified that they observed the area in person shortly after

the rape was reported and neither observed any disturbance of the grass.

Accordingly, I find that the admission of Dr. Lee's testimony regarding the

condition of the grass did not constitute a violation of Kennedy's right to due process.

The state courts' determination of this issue was not an unreasonable application of

federal constitutional law, and the instant claim is without merit.[128]

## XIII.  POTENTIAL JURORS WITH PRIOR PARDONED FELONY CONVICTIONS (CLAIM NO. 10)

Kennedy alleges that persons with prior felony convictions, even when they had

been pardoned for their convictions, were unconstitutionally excluded from service on

his jury.  His argument has two components:  (1) The Louisiana statute excluding

---

[128]Kennedy also points to the prosecution's closing argument, arguing that the State, based upon Dr. Lee's testimony, "hammered home the lack of grass breakage." Rec. Doc. No. 1, p. 121. However, as noted above, there was other evidence provided by the two police offers to support this argument, and the trial court clearly instructed jurors that the attorneys' closing remarks were not evidence and that they could only consider evidence in arriving at their verdict.

13-31201.390

convicted felons from jury service "violates the Fourteenth Amendment to the United States Constitution" and "constitutes an ongoing badge of racism."[129]  (2) The trial court "excluded jurors who had received first offender pardons.  These jurors were in all legal respects the same as jurors without first offender pardons, but were discriminated [against] under the legislative scheme."[130]

The Louisiana statute at issue is Louisiana Code of Criminal Procedure article 401(A)(5), which at the time of Kennedy's trial provided:  "In order to qualify to serve as a juror, a person must: . . . not be under indictment for a felony nor have been convicted of a felony for which he has not been pardoned." La. Code Crim. P. art. 401(A)(5) (emphasis added).

The Louisiana Constitution provides in pertinent part that "[f]ull rights of citizenship shall be restored upon termination of state and federal supervision following conviction for any offense," La. Const. art. I, § 20, and that

> a first offender convicted of a non-violent crime, or convicted of aggravated battery, second degree battery, aggravated assault, mingling harmful substances, aggravated criminal damage to property, purse snatching, extortion, or illegal use of weapons or dangerous instrumentalities never previously convicted of a felony shall be pardoned automatically upon completion of his sentence, without a recommendation of the Board of Pardons and without action by the governor.

Id. art. IV, § 5 (emphasis added).

---

[129]Record Doc. No. 1 at p. 122.

[130]Id. at p. 123.

103

However, the Louisiana Supreme Court, in Kennedy's own case, held that

> the restoration of the full rights of citizenship under <u>Article I, § 20 restores only the basic rights</u> of citizenship, such as the right to vote, work or hold public office, but does not restore privileges as a first offender pardon under La. Const. art. IV, § 5(E)(1) does. <u>Likewise, an automatic pardon for a first felony offender under Article IV, § 5(E)(1)</u>, while restoring some privileges, does not restore the status of innocence to the convict who has merely served out his sentence[,] as does an executive pardon granted by the governor. . . . <u>Absent a pardon from the governor,</u> a person convicted of a felony in Louisiana is not qualified to serve as a juror.

<u>State v. Kennedy</u>, 957 So. 2d 757, App. at p. 41 (citing <u>Diaz v. Chasen</u>, 642 F.2d 764, 766 (5th Cir. 1981); <u>State v. Baxter</u>, 357 So. 2d 271, 273 (La. 1978); <u>State v. Adams</u>, 355 So. 2d 917, 922 (La. 1978)) (emphasis added). Since this decision and Kennedy's trial, Louisiana Code of Criminal Procedure article 401(A)(5) has been amended to state specifically that the only type of pardon that restores the right to jury service is a pardon "by the governor." La. Acts 2010, No. 438 § 1.

Kennedy's challenge to the constitutionality of this state statute presents a question of law. <u>Ortiz v. Quarterman</u>, 504 F.3d 492, 496 (5th Cir. 2007). Thus, in this court Kennedy may obtain federal habeas relief on his claim that article 401(A)(5) is unconstitutional only if he establishes that the state court's decisions were contrary to or an unreasonable application of clearly established federal constitutional precedent. On the other hand, an issue concerning the manner in which counsel exercise or a trial judge rules on cause or peremptory challenges during jury selection presents a question of fact. <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 339-41 (2003); <u>Rivers v. Thales</u>, 389 F. App'x 360,

13-31201.392

362 (5th Cir. 2010); <u>Williams v. Cain</u>, 359 F. App'x 462, 464 (5th Cir. 2009). Therefore, a presumption of correctness attaches to the state courts' findings that Kennedy may overcome only by providing clear and convincing evidence.

During the lengthy voir dire in Kennedy's case, much of which was devoted to the potential jurors' attitudes concerning the death penalty, the state trial judge asked all venire members whether any were facing felony charges or had been convicted of a felony for which they had not been pardoned.[131] Five (5) venire members, Michael Barnes, Mr. Kummerer,[132] Leroy Roussel, Amanda McIntyre and Keith Williams, answered affirmatively.

Michael Barnes stated that he was then facing several charges of violence against his ex-wife, possibly including "rape." Barnes was not challenged on that ground.[133] Kummerer testified that he had previously been convicted of contributing to the delinquency of a minor and had served his time, but was not sure if he had been pardoned. Kummerer was challenged for cause by the prosecutor, but the trial court denied the challenge.[134] Roussel stated that he had been charged with indecent exposure, but his attorney "pleaded it out" and he never served any jail time. Roussel was not

---

[131]St. Rec. Vol. 11 of 42, p. 2636; St. Rec. Vol. 13 of 42, p. 3092.

[132]Mr. Kummerer's first name is not stated.

[133]St. Rec. Vol. 11 of 42, p. 2638-2639.

[134]St. Rec. Vol. 11 of 42, pp. 2639-2641.

105

13-31201.393

challenged.[135]  Amanda McIntyre testified that she had been convicted of possession of cocaine, but had been pardoned.  McIntyre was not challenged.[136]  Keith Williams stated that he had been convicted of simple burglary, but had been pardoned.  Williams was not challenged."[137]  Neither McIntyre nor Williams stated or were asked whether their pardons were the statutorily available pardons for first offenders or were individual pardons issued by the governor.

Like all other jurors, these five venire members were asked about their views concerning the death penalty, as opposed to life imprisonment, if the defendant were found guilty.  Barnes stated that he could not send anyone to jail and could not sentence anyone to death.  He was then struck for cause without objection based on these views.[138]  Kummerer stated that he favored the death penalty and that, if the defendant was convicted, he "would push real hard towards the death penalty."  Kummerer was struck for cause without objection after that answer.[139]  Roussel initially stated that he leaned in favor of the death penalty, but concluded he could consider both life imprisonment and death.  Roussel was challenged for cause based on that answer by defense counsel, but

---

[135]St. Rec. Vol. 11 of 42, pp. 2647-2648.

[136]St. Rec. Vol. 13 of 42, p. 3092-3094.

[137]St. Rec. Vol. 13 of 42, p. 3103-3105.

[138]St. Rec. Vol. 13 of 42, pp. 3028-3029; 3042.

[139]St. Rec. Vol. 13 of 42, pp. 3021-3022; 3041.

13-31201.394

the trial court denied the challenge.[140] McIntyre stated that she could consider both life imprisonment and death. Neither party moved to strike McIntyre.[141] Williams stated that he could never impose a death sentence and would always vote for life imprisonment. Williams was struck for cause without objection after that answer.[142]

A total of 78 venire members were "death qualified" to serve on Kennedy's jury.[143] These 78 were divided into 14-member groups. One such group at a time was then separately subjected to further voir dire and the exercise of additional challenges, until 14 jurors were selected.[144] When Roussel's group was called before the court, Roussel asked to be excused for "health reasons."[145] By agreement of both sides, the trial court excused Roussel on that basis.[146] After questioning the remaining members of Roussel's group, a 14-member jury had been chosen.[147] The remaining venire members in the

_____

[140]St. Rec. Vol. 15 of 42, pp. 3520-3530.

[141]St. Rec. Vol. 15 of 42, pp. 3723-3724; St. Rec. Vol. 16, p. 3803.

[142]St. Rec. Vol. 13 of 42, p. 3229; St. Rec. Vol. 14 of 42, p. 3271.

[143]St. Rec. Vol. 16 of 42, p. 3830.

[144]St. Rec. Vol. 16 of 42, p. 3852.

[145]Roussel stated that, when he returned home from court, his heart was beating fast, his face was red, his blood pressure was "extremely high" and he "had to take an EKG." St. Rec. Vol. 18 of 42, p. 4368.

[146]St. Rec. Vol. 18 of 42, pp. 4368-4369.

[147]St. Rec. Vol. 18 of 42, p. 4395.

13-31201.395

remaining 14-member groups, including McIntyre, were then excused without further questioning because they were not needed.

As to Kennedy's first argument, it is clear as a matter of law that Kennedy's claim that Louisiana Code of Criminal Procedure article 401(A)(5) is unconstitutional lacks merit.  Although my research has located no decisions specifically addressing the constitutionality of the Louisiana provision under the 14th Amendment – and Kennedy has cited none – the exclusion of felons from jury service has uniformly been upheld as constitutional in the federal context.  United States v. Arce, 997 F.2d 1123, 1127 (5th Cir. 1993); United States v. Greene, 995 F.2d 793, 795-96 (8th Cir. 1993); United States v. Anthony, 138 F. App'x 591, 594 (4th Cir. 2005); United States v. McElhiney, No. 98-40083-01, 05-3225-RDR, 2006 WL 516879, at *3 (D. Kan. Mar. 2, 2006); United States v. Best, 214 F. Supp. 897, 905 (N.D. Ind. 2002).  The cited decisions addressed the constitutionality of 28 U.S.C. § 1865(b)(5).  Louisiana Code of Criminal Procedure article 401(A)(5), the state law at issue in the instant matter, is substantially similar to Section 1865(b)(5), which prohibits from jury service persons who have been charged with or convicted, in state or federal court, of a crime punishable by imprisonment for more than one year and whose civil rights have not been restored.  In those decisions upholding the constitutionality of the corresponding federal statute, the courts have consistently rejected arguments similar to those advanced by Kennedy in this case.

13-31201.396

The second component of Kennedy's argument, that the state court excluded potential jurors who had been pardoned, is <u>not</u> supported factually by the record. The record is clear that <u>none</u> of the five (5) veniremen who identified themselves as previously convicted felons or as facing charges that might include a felony were excluded <u>on that ground</u>. Instead, four were excused because of their death and/or life imprisonment views or for health reasons, and one was excused, based <u>not</u> on any challenge, but because she and others were not needed after the 14-person jury was fully selected. Thus, while it is clear that these five persons were not selected to serve on the jury, it is also clear that they were not affirmatively excluded based upon their felony charges or the manner of their pardons, if any. Kennedy's argument in this regard is factually erroneous, and he has not presented any evidence sufficient to warrant federal habeas relief concerning the manner in which these veniremen were excused from serving on his jury.

## XIV. <u>CUMULATIVE ERROR</u>

Kennedy argues that when his claims are considered cumulatively, rather than individually, he is entitled to relief. Kennedy's argument is without merit. As noted above, where, as here, the individual claims are meritless, that result cannot be changed simply by asserting them collectively. <u>See Turner</u>, 481 F.3d at 301 (meritless claims or claims that are not prejudicial cannot be cumulated regardless of the total number raised because "there is nothing to cumulate") (quotation omitted); <u>Mullen v. Blackburn</u>, 808

13-31201.397

F.2d 1143, 1147 (5th Cir. 1987) (with respect to the cumulation of meritless claims, "[t]wenty times zero equals zero.").

## XV.  EVIDENTIARY HEARING

Kennedy argues that he is entitled to an evidentiary hearing in federal court because he was denied such a hearing in state court.[148]  He raised this same claim, along with others, in his motion for an evidentiary hearing previously filed and decided in this court.[149]  Kennedy's motion was denied by Magistrate Judge Louis Moore, Jr., to whom this matter was originally allotted.[150]  For essentially the same reasons set out in detail in Magistrate Judge Moore's order, I also find that a federal evidentiary hearing is unwarranted.

> (2) . . . the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –
> (A) the claim relies on –
>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

---

[148]Rec. Doc. No. 1, p. 125.

[149]Rec. Doc. No. 20.

[150]Rec. Doc. No. 21.  Kennedy, in response to Magistrate Judge Moore's order, filed objections with the presiding district judge, who dismissed Kennedy's objections without prejudice as premature, providing that any objections could be raised after a report and recommendation has been issued.  Rec. Doc. No. 23.

13-31201.398

28 U.S.C. § 2254(e)(2) (emphasis added).  Kennedy has made no such showing in this case.

## RECOMMENDATION

For all of the foregoing reasons, it is **RECOMMENDED** that the petition of Patrick Kennedy for issuance of a writ of habeas corpus under 28 U.S.C. § 2254 be **DENIED** and **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object.  Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc) (citing 28 U.S.C. § 636(b)(1)).[151]

New Orleans, Louisiana, this ___19th___ day of September, 2012.

JOSEPH C. WILKINSON, JR.
UNITED STATES MAGISTRATE JUDGE

---

[151]Douglass referred to the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend the period to fourteen days.

111

13-31201.399

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

---

**PATRICK KENNEDY, #210126**
**Petitioner**

**CIVIL ACTION**
**NO. 11-922**

v.

**SECTION "C" (6)**

**BURL CAIN, WARDEN**
**Respondent**

---

## NOTICE OF CROSS-APPEAL

Now comes Petitioner Patrick Kennedy, through counsel, pursuant to the Rules Governing Section 2254 Cases, Rule 11, Federal Rule of Appellate Procedure 22, and Federal Rule of Appellate Procedure 4, and respectfully gives notice that Petitioner hereby appeals to the United States Court of Appeals for the Fifth Circuit from the final judgment entered in this action on the 16th day of October, 2013, as to the denial of an evidentiary hearing, Claim I as to race discrimination, and Claim IV of his Petition. This Notice is timely under Fed. R. App. P. 4(a)(3).

Respectfully submitted,

/s Cecelia Trenticosta

Cecelia Trenticosta, La. Bar #32736
The Capital Appeals Project
636 Baronne Street
New Orleans, LA 70113
(504) 529-5955

*Counsel for Patrick Kennedy*



EXHIBIT
8

PENGAD 800-631-6989

13-31201.643

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and forgoing was filed electronically with the Clerk of Court using CM/ECF on this 25th day of November, 2013.   Notice of this filing as generated by the electronic filing system constitutes service of the filed document on counsel for the Respondent.

/s Cecelia Trenticosta

Cecelia Trenticosta

## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF LOUISIANA

PATRICK KENNEDY                                    CIVIL ACTION

VERSUS                                            NO. 11-0922

BURL CAIN                                         SECTION "C"(2)

### CERTIFICATE OF APPEALABILITY

Having separately issued a final order in connection with the captioned habeas corpus

proceeding, in which the detention complained of arises out of process issued by a state court, the

Court, after considering the record and the requirements of 28 U.S.C. § 2253 and Fed. R. App. P.

22(b), hereby orders that,

_____        a certificate of appealability shall be issued having found that petitioner has made a
                substantial showing of the denial of a constitutional right related to the following
                issue(s):

                _____
                _____
                _____

__xx____        a certificate of appealability shall not be issued for the following reason(s):

                the petitioner has not made a substantial showing of the denial of a constitutional
                right pertaining to the claims on cross-appeal._____
                _____
                _____

New Orleans, Louisiana, this 18th  day of February , 2014.

_____

**UNITED STATES DISTRICT JUDGE**

EXHIBIT

9

PENGAD 800-631-6989

STATE OF LOUISIANA

VERSUS

PATRICK KENNEDY

NO. 02-K-214

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA


ON WRIT APPLICATION FROM
THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 98-1425, DIVISION "O"
HONORABLE ROSS P. LADART, JUDGE


**JUNE 26, 2002**


# THOMAS F. DALEY
## JUDGE


Panel composed of Judges Sol Gothard,
James L. Cannella, and Thomas F. Daley


PAUL D. CONNICK, JR.,
DISTRICT ATTORNEY
TERRY M. BOUDREAUX,
THOMAS J. BUTLER,
GREGORY KENNEDY,
DONALD A. ROWAN, JR.,
ASSISTANT DISTRICT ATTORNEYS
24th Judicial District
Parish of Jefferson
Courthouse Annex
Gretna, Louisiana 70053
ATTORNEYS FOR RESPONDENT



EXHIBIT

10

PENGAD 800-631-6989

MARK ARMATO
3525 N. Causeway Boulevard
Suite 201
Metairie, Louisiana  70002

       And

CLIVE A. STAFFORD SMITH
636 Baronne Street
New Orleans, Louisiana  70113
ATTORNEYS FOR RELATOR

## WRIT OF REVIEW GRANTED; RELIEF DENIED

Patrick Kennedy, defendant/relator, seeks this court's supervisory review of the trial court's denial of his Motion to Quash Indictment. The trial court found that while Kennedy made out a *prima facie* case of purposeful discrimination against women in the selection of grand jury forepersons over a 10 year period in Jefferson Parish, the State rebutted the case by showing racial and gender neutral selection criteria. We granted this writ application to review this important issue. After considering defendant's arguments, the State's opposition, the transcript of the hearing, and the introduced statistical and expert testimony, we affirm the trial court's denial of the Motion to Quash, but on different grounds. We find that under current applicable law, the defendant did not show a *prima facie* case of purposeful discrimination against women in the grand jury foreperson selection process.

Relator, an African-American male, was indicted on May 7, 1998 for capital aggravated rape of a female under the age of 12 allegedly occurring on March 2,

3

1998, in violation of LSA-R.S. 14:42. Defendant filed a Motion to Quash the indictment on the basis of race and gender discrimination in violation of defendant's rights to due process, equal protection, and the right to be indicted by a grand jury that represented a fair cross section of society. He specifically asserted that the foreperson of the grand jury that indicted him was a white male; the procedure for selecting grand jury forepersons was susceptible to abuse; there was intentional, discriminatory, and systematic exclusion of African-Americans from the position of foreperson on the grand jury that indicted defendant; the parish has a history and pattern of intentional, discriminatory, and systematic exclusion of African-Americans from the position of grand jury foreperson; the trial judges chose to appoint a white male as foreperson; and, there is both race and gender discrimination in the selection of the grand jury foreperson. Defendant claimed that Louisiana's selection process for grand jury foreperson violated defendant's constitutional rights to due process, equal protection, and the right to be indicted by a grand jury made up of a fair cross-section of the community.

A hearing was held on January 14, 2002. At the hearing, the relevant time period to be examined was set by the court as the roughly 10-year period preceding the defendant's indictment, starting May 24, 1988 and ending September 10, 1998, the year in which the defendant was indicted.[1] The defendant presented data (Tables D-1, 2 and 3, not included in defendant's Writ Application, but supplied by the State in its Opposition thereto) representing the race and gender of each grand jury foreperson selected during that time period (and a greater 19 year time period, from

---

[1] At the hearing, the trial court alluded to a previous hearing, the date of which is not mentioned, wherein he requested data from this 10 year period to review. The defendant-relator presented data from this time period, which was analyzed by his expert witness. Additional data totaling 19 previous years, starting with figures from 1979, was also presented and analyzed, though the trial court only considered the 10 year period as the relevant time period.

1979 until 1988) and the race and gender of the judge who selected the grand jury foreperson. The State stipulated to the authenticity of the data, though not to the interpretation of that data by the defendant's expert, Dr. Joel Devine. At closing argument, the defense stated that the composition of the grand jury itself was not at issue, because it was randomly selected. Defense counsel also conceded that the evidence did not show discrimination against African-Americans as grand jury forepersons during the 10-year time period, but did show discrimination against women as grand jury forepersons.

During the 10-year time period considered by the trial court, there were 19 grand juries empaneled and 19 grand jury forepersons selected by the judges of the 24th Judicial District Court of Jefferson Parish. Ten forepersons were white males; six were white females; one was a black female; and two were black males. Thus, African-Americans made up 15.78% of the grand jury forepersons during this time period; and women were grand jury forepersons 36.8% of the time.

This data was compared to several statistical population samples, the 1990 and 2000 census figures from Jefferson Parish, average voter registration from Jefferson Parish for 1990-2000, and the number of women called randomly to serve on grand juries during the above-mentioned 10-year period.[2] For African-Americans, the 1990 census data shows that 17.63% of the population of Jefferson Parish were African-Americans. Thus, comparing the population percentage of African-Americans to the percentage of African-Americans chosen as grand jury forepersons, there is an

---

[2]The use of gross population (census) figures and voter registration figures has been approved by the Louisiana Supreme Court as an appropriate basis for comparison with actual grand jury foreperson statistics. State v. Langley, 95-1489 (La. 4/3/02), __ So.2d __, 2002 La. Lexis 965 (Langley III).

Defendant has conceded that the grand jury selection process was random and not discriminatory.

According to exhibit D-3, voter registration data for race were not available for 1988 and 1989. Data were not available for 1988 regarding gender.

absolute disparity of 1.85% (17.63% minus 15.78%). Considering the 2000 census data, 22.9% were African-American. Thus, the disparity in 2000 becomes 7.12% (22.9% minus 15.78%). Considering voter registration lists, 15% were African-American. Thus, the disparity is -0.78%, indicating that a slightly higher portion of African-Americans were chosen to serve as forepersons in comparison to the voting population of Jefferson Parish.

Regarding women, it is noted that 36.8% of the forepersons were women for the 10-year period. The 1990 census figures show 51.95% females in the gross population, indicating an absolute disparity of 15.15%. The 2000 census figures show 52% as female. For 2000, the disparity is 15.2%. Considering the voter registration for 1990 to 2000, females represent 54.21%, an absolute disparity of 17.41%. The number of women randomly called to serve on grand juries from May 1988 until September 1998 was 50.2%, for an absolute disparity of 13.4%. Therefore, for women, the disparities range from 13.4% to 17.41%. We note that women comprised a much larger segment of the overall population segments than did African-Americans.

Dr. Devine was qualified as an expert in quantitative sociology. He did some calculations using the binomial distribution method to determine the *probability* of the composition of the forepersons over the grand juries in the period covered by the data. At the conclusion of Dr. Devine's testimony the court found that the defendant had shown a *prima facie* case of discrimination. The court gave no reasons for its ruling.

Following that ruling, the State offered the testimony of Judge Marion Edwards in rebuttal. Judge Edwards, a former Assistant District Attorney, testified that he served over 25 years in that position before being elected to the 24th JDC in 1996. As

6

Assistant District Attorney, he had been involved in the grand jury foreperson selection process for about 19 years.[3] His role in this process consisted of soliciting volunteers for the foreperson position. He made positive efforts to interest and include minorities and women in this position, though he noted that more white males volunteered than any other group. Ultimately, however, the selection of foreperson was up to the particular judge, who interviewed each volunteer. Edwards had no involvement in these interviews. His involvement was limited to compiling a group of volunteers for foreperson to be interviewed by the judge.[4] He testified that the judges who selected the grand jury foreperson looked for a someone who was qualified to serve on the grand jury, was literate, had organizational skills, and was interested in and was capable of serving as foreperson. After the conclusion of the State's evidence offered in rebuttal, the court found that:

> ...The Court is persuaded after hearing all of the evidence, that the State of Louisiana has shown that there, to the extent of the statistics in the methodology for selecting Grand Jury Forepersons, that these criteria are permissible, racially and gender neutral."

## ANALYSIS

Recently, the Louisiana Supreme Court addressed the applicable law to be applied when reviewing an equal protection challenge to grand jury selections in

---

[3] He was not involved with the grand jury that indicted the defendant, because he had already been elected to the bench at that time. And as a district court judge, he never selected a grand jury foreperson.

[4] We note that under prevailing jurisprudence, Judge Edwards's testimony, as a matter of law, was insufficient to rebut a *prima facie* case if made by defendant. Jurisprudence has shown that the State should present the testimony of the actual person(s) who made the selection of the grand jury foreperson. Because Judge Edwards did not make the actual selection of foreperson, he was not a competent witness to testify regarding what criteria the selecting person used in picking the foreperson. See Castaneda v. Partida, 430 U.S. at 491; Guice v. Fortenberry, 722 F.2d 276 (5th Cir. 1984); United States v. Perez-Hernandez, 672 So.2d 1380 (11th Cir. 1982).

State v. Langley, supra, 95-1485 (La. 4/3/02), ___ So.2d ___, 2002 La. Lexis 965

(Langley III):

> ...the Supreme Court [U.S.] set out a three-part test in Castaneda v. Partida, supra. To demonstrate an equal protection violation in the context of grand jury selection, a defendant must establish a prima facie case of purposeful discrimination by showing: (1) that those discriminated against belong to a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied; (2) that the degree of under-representation must be proved "by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time;" and (3) that the selection procedure is "susceptible of abuse or is not racially neutral" so as to support the presumption of discrimination raised by the statistical showing. Castaneda v. Partida, 430 U.S. at 494-95, 97 S. Ct. at 1280; see also State v. Cosey, 97-2020, p. 10, 779 So. 2d at 682. This court has previously acknowledged that blacks and women are identifiable groups capable of being singled out for disparate treatment. State v. Cosey, 97-2020, p. 10, 779 So. 2d at 682, citing J.E.B. v. Alabama ex. rel. T.B., 511 U.S. 127, 114 S. Ct. 1419, 128 L. Ed. 2d 89 (1994). This court has also recognized that, at the time the defendant was indicted, Louisiana's procedure for selecting grand jury forepersons was unquestionably subject to abuse according to subjective criteria that may include race and gender. Cosey, 97-2020, pp. 10-11, 779 So. 2d at 682-83, citing Campbell v. Louisiana, supra; Johnson v. Puckett, supra.

The remedy for intentional discrimination in the selection and composition of grand juries, whether resulting in the complete exclusion of an identifiable group or substantial under representation of that group, is to vacate the conviction and quash the indictment returned by the unconstitutionally constituted grand jury.[5]

Defendant herein was indicted prior to the 1999 amendment allowing for random selection of the foreperson, a time when Louisiana's procedure for selecting grand jury forepersons was subject to abuse according to subjective criteria that may include race and sex.[6] Women are an identifiable group who are capable of being singled out for disparate treatment.[7] Therefore, defendant has met two of the three

--------

[5] Langley III, 2002 La. Lexis 965, pp. 39-40.

[6] Langley III, supra.

[7] State v. Cosey, 779 So.2d at 682-683.

8

criteria for making a *prima facie* case of discrimination in the selection of the foreperson.

The State argues in its opposition that defendant failed to meet its burden of proving a *prima facie* case. We note that the court gave no basis or reasons for its finding; thus, we have no way of determining what criteria the court used or what evidence it found significant. Without oral or written reasons, the court of appeal is without the benefit of the trial court's thought processes. We must review the trial court's result, the denial of the Motion to Quash, in light of the evidence presented to determine if the result was correct.

The determination of under representation is necessarily dependent upon a determination of what constitutes the relevant time period and a determination of the relevant comparative population. The State relies on pre-Langley III cases showing a range of 10 years to 12 years.[8] In Langley III the relevant time period examined was identified as a 22-year period.

In Langley III the absolute disparity from the percentage of grand jury members to the percentage of African-American forepersons ranged from 15.5% to 15.9%. With respect to women, the absolute disparity was 25.4%. The court found there was no manifest error in the trial court's conclusion that defendant established a *prima facie* case of purposeful discrimination under Castaneda.[9]

In the present case, the absolute disparity for African-Americans selected as forepersons for the 10-year period ranges from 7.12% to -0.78%, a figure that is far

---

[8]State v. Young, 569 So.2d 570 (La. App. 1 Cir. 1990)(using a 10 year period); State v. Thomas, 609 So.2d 1078, 1081 (La. App. 2 Cir. 1992)(holding a 12 year period "sufficiently reasonable and significant"); State v. Davis, 626 So.2d 800, 804 (La. App. 2 Cir. 1993)(12 year period significant); State v. Guillory, 97-179, p. 21 (La. App. 3 Cir. 3/11/98), 715 So.2d 400, 413 (10 year period).

[9]Langley III, 2002 La. Lexis 965, pp. 42-43.

below the 15.5% to 15.9% absolute disparity in Langley III. The figure is also far below the absolute disparities noted by the Langley III court in other cases that ranged from 14.7% to 40.1%.[10] Regarding women serving as forepersons, the absolute disparity for the 10-year period ranges from 13.4% to 17.21%, absolute figures that fall partially within the Langley III range as significant.

Intentional discrimination is an element of an equal protection challenge to the selection of grand juries.[11] Our analysis requires not only the consideration of significant absolute disparities but also other criteria such as the number of years involved, the size of the sampling, and the number of the class in the general population, in order to obtain the most accurate and complete picture of the disparity in the context of the totality of the circumstances. Bryant v. Wainwright[12] held that a disparity of 10.4% did not support a prima facie showing.[13] The court reviewed various ranges as follows:

> Most courts, however, have adopted a single method for evaluating a defendant's statistical evidence. A determination is made first of the percentage of the relevant general population composed of the particular group or class allegedly singled out for discriminatory treatment. A similar finding must then be made of the percentage of the same group or class represented in grand jury venires or the office of grand jury foreperson. Finally, the two figures are compared, and if the result reveals a significantly large disparity, then there arises a presumption of discrimination. For example, in Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970), the evidence established that in 1968 sixty percent of Taliaferro County, Georgia, was black, although the same class represented only thirty-seven percent of the grand jury. The Court had no difficulty in concluding that a disparity of twenty-three percentage points in any given year was too large to be explained by any reason other than discrimination. Turner v. Fouche,

---

[10] Langley III, 2002 La. Lexis 965, pp. 42-43.

[11] U.S. v. Royal, supra, citing Duren v. Missouri, 439 So.2d 357, 369, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979).

[12] 686 F.2d 1373, 1375-1376 (11th Cir. 1982), reh'g denied, 691 F.2d 512 (11th Cir. Fla. 1982), cert. denied, 461 U.S. 932, 103 S.Ct. 2096, 77 L.Ed.2d 305 (1983)

[13] 686 F.2d at 1377.

396 U.S. at 359, 90 S. Ct. at 539. Likewise, in <u>Whitus v. Georgia</u>, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967), there was a significant disparity of over thirty points in the percentage of blacks in the general population of Mitchell County, Georgia, and the percentage of blacks on the county's grand and petit jury venires. In contrast, in <u>Swain v. Alabama</u>, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), a difference of only ten percentage points was not sufficient to establish a prima facie case of discrimination. These cases serve only as general guidelines, since, as we noted earlier, <u>there is no magic number which can control a court's resolution. We cannot hold that any disparity over fifteen percentage points is always too great, and any disparity under twelve percentage points is always permissible. In cases where the statistical difference is arguably substantial, a court must look beyond the figures to other criteria such as the number of years involved, the size of the sampling, and the number of the class in the general population. A disparity of fifteen percentage points is much greater in a case where the class or group represents only twenty percent of the general population, than where the class or group represents seventy percent of the population. Similarly, a disparity of fifteen percentage points is much more significant if it has continued for ten years, than if it has occurred in only one isolated year.</u> The magnitude of a disparity may also depend on whether the statistics are based on one grand jury venire of thirty people, or on dozens of grand jury venires representing thousands of people. See <u>Rose v. Mitchell</u>, [443 U.S. 545, 571 99 S.Ct. 2993, 3007, 61 L.Ed.2d 739 (1979)].[14]

Thus, the significant disparities noted in <u>Bryant</u> range from 23% to 30%. See also <u>Ramseur v. Beyer</u>[15] (14.1% is of borderline significance); <u>United States v. Hawkins</u>[16] (1.75% to 5.45% not significant).

<u>Langley III</u> noted the following significant range from 14.7% to 40.1%:

Compare <u>Castaneda v. Partida</u>, 430 U.S. at 495-96, 97 S.Ct. at 1280-1281 . . . (absolute disparity of 40.1%); <u>Turner v. Fouche</u>, supra (absolute disparity of 23%); <u>Whitus v. Georgia</u>, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967) (absolute disparity of 18%); <u>Jones v. Georgia</u>, 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25 (1967) (absolute disparity of 14.7%).[17]

---

[14]686 F.2d at 1377 (footnote omitted)(emphasis added).

[15]983 F.2d 1215, 1232 (3rd 1992), cert denied, 508 U.S. 947, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993).

[16]661 F.2d 436, 442 (5th Cir. 1981), cert. denied, 456 U.S. 991, 102 S.Ct. 2274, 73 L.Ed.2d 1287 (1982).

[17]2002 La. Lexis 965, pp. 42-43.

We note that in <u>Whitus</u>, the total African-American population segment was 27.1%, with only 9.1% represented in the venire, and in <u>Jones</u>, it was 19.7%, with only 5% on the jury list. These cases can be distinguished from the facts in the instant case because these absolute disparities were drawn from much smaller overall comparative population segments than the 51.95% to 54.21% statistical bases for women in Jefferson Parish.

The analysis of the figures looking at "comparative" disparities, together with absolute disparities, has been cited with approved for analyzing large, as opposed to small, segments of the population for under representation.[18] Comparative disparity is calculated by dividing the absolute disparity by the population figure for a population group. It measures the diminished likelihood that members of an under represented group, when compared to the population as a whole, will be called for jury service. <u>Ramseur</u> at 1231. Because we think that figures from both methods inform the degree of under representation, we will examine and consider the results of both in order to obtain the most accurate picture possible.[19] See also <u>Ramseur v. Beyer</u>, supra, which used both absolute and comparative disparity methods when considering an equal protection challenge regarding the empaneling of grand juries.

Regarding women, it is noted that 36.8% of the forepersons were women for the 10 year period. The 1990 census figures show 51.95% women, for an absolute disparity of 15.15%, and a comparative disparity of 29.16%. The 2000 census figures

---

[18]<u>U.S. v. Weaver</u>, 267 F.3d 231 (3rd Cir. 9/21/01). We have found no Louisiana State court case that discusses the use of comparative disparity analysis as a complement to the use of absolute disparity analysis. <u>Weaver</u> considered a fair cross section claim, which differs from an equal protection claim.

[19]We note that some federal circuits have criticized the use of comparative disparity analysis, especially when considering small segments of the population, because then it tends to exaggerate the effect of any deviation. Some circuits have also criticized the use of absolute disparity analysis, while others use both methods in complement with one another. <u>U.S. v. Royal</u>, 174 F.3d 1 (1st Cir. 1999), and cases cited therein.

show 52% female, for an absolute disparity of 15.2%, and a comparative disparity of 29.23%. Considering the voter registration from 1990 to 2000, females represent 54.21%, an absolute disparity of 17.41% and a comparative disparity of 32.12%. Considering the number of women called randomly to serve in grand juries from 1998 until 1998, 50.2%, the absolute disparity is 13.4% and the comparative disparity is 26.7%.

The comparative disparity figures show that females served as grand jury forepersons 68-70% of the time in relation to their overall representation in the population groups, or conversely, that they were under represented 29-32% of the time. Ramseur considered a comparative disparity, or under representation, of 40% as "borderline." We note that the comparative disparities in Langley III were almost 70% for African-Americans (absolute disparity of 15.9% divided by 22.9%, the population base for African-Americans) and 48.5% for women (25.4% absolute disparity divided by 52.4% population base).[20]

Consistently, throughout the cases in this area, the courts have exhibited a reluctance to emphasize any one factor that controls the court's resolution of the issue. There is no magic, controlling number. Rather, we have been instructed to look at all the factors that bear on the issue, such as the number of years involved, the duration of the disparity, the size of the population segment, and the number of grand juries considered. In other words, it is the totality of the circumstances that must be considered in determining whether the defendant has succeeded in making a *prima facie* showing of significant under representation.

In this case, considering all these factors, we find that the defendant has failed to meet his burden. There was no discrimination shown in the selection of African-

---

[20]Langley III, 2002 La. Lexis 965, p. 42.

American grand jury forepersons. To the contrary, there was a showing that the percentage of African-Americans selected as grand jury forepersons, as it related to African-Americans registered to vote, was slightly higher rather than lower over the 10 year period preceding the selection of the grand jury that indicted the defendant in this case. While the defendant makes the point that the absolute disparity was greater when the preceding 19 years are considered rather than just the preceding 10 years, the fact that the disparity did not continue, made obvious by the significant improvement in the system evidenced by the more recent numbers, provides ample justification for placing more emphasis on the preceding 10 years rather going back 19 years.

Similarly, as concerns the statistical disparity between the female population in the parish and the number of female forepersons chosen for grand jury duty, we find a system that has significantly improved over time. Thus, considering the 10 years preceding the selection of the defendant's grand jury, we find that of the total number of female grand jurors randomly called to serve[21], 50.2% were female, and of that number, women were chosen as grand jury forepersons 36.8 % of the time, leaving an absolute disparity of 13.4%. These figures come from a total of only 19 grand juries selected over this 10 year period.

In *Langley III*, the Court found an unrebutted *prima facie* showing of purposeful discrimination in the selection of grand jury forepersons where females were under represented by an absolute disparity of 25.4% and African-Americans by a 15.5% - 15.9%. In our case, African-Americans were slightly over represented and females were under represented by 13.4% compared to the number of female grand

---

[21]We note that the defendant has conceded that the grand jury selection process was random and not discriminatory.

jurors randomly selected. When the degree of the under representation of women is considered along with all the other factors such as the improvement in the selection process in the preceding 10 years rather than 19 years, the large size of the population segment and correlative small comparative disparity, and the fact that only 19 grand juries are considered, we cannot conclude that the defendant made a *prima facie* showing of purposeful discrimination in the selection of grand jury forepersons.

Accordingly, we affirm the trial court's ruling, finding that the trial court did not err in denying defendant's Motion to Quash the indictment.

**WRIT OF REVIEW GRANTED; RELIEF DENIED**

## CERTIFICATE OF SERVICE

I hereby certify that on April 16, 2014, I electronically field the foregoing

with the Clerk of Court using the CM/ECF system, which will send a notice of

electronic filing to all counsel of record.  I further certify that a hard copy of the

foregoing Record Excerpts has been served upon opposing counsel, G. Ben Cohen

and Cecelia Trenticosta, Capital Appeals Project, 636 Baronne Street, New

Orleans, Louisiana 70113, by placing same in the United States mail in a properly

addressed, postage prepaid envelope on this 16th day of April 2014.

/s/ Juliet L. Clark
Juliet L. Clark (#23451)
Assistant District Attorney
200 Derbigny Street
Gretna, Louisiana 70053
(504) 361-2534